# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 10-13445 (KJC) |
| THE BANNING LEWIS RANCH | ) | |
| COMPANY, LLC, et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hearing Date: December 21, 2010 at 11:30 a.m. |
| | ) | Objections Due: December 14, 2010 at 4:00 p.m. |

## DEBTORS' MOTION TO APPROVE ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 365 AND 507: (1) APPROVING SECURED POSTPETITION FINANCING; (2) AUTHORIZING USE OF CASH COLLATERAL; (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (4) GRANTING ADEQUATE PROTECTION, AND (5) MODIFYING AUTOMATIC STAY

The Banning Lewis Ranch Company, LLC ("BLRC") and Banning Lewis Ranch Development I & II, LLC ("Devco"; BLRC and Devco, each a "Debtor," and collectively, the "Debtors"), by and through their undersigned counsel, hereby file this motion, pursuant to sections 105, 361, 362, 363, 364, and 365 of title 11 of the United States Codes (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, substantially in the form attached hereto (the "Final Order").

1. By this Motion, the Debtors seek to obtain post-petition financing from BDL Investors, LLC (the "BDL Lender") and Greenfield BLR Finance Partners, L.P. (the "Greenfield Lender," and collectively with BDL Lender, the "DIP Lenders"). The Debtors request that the Final Order include, without limitation, the following relief:

---

[1] The Debtors in these proceedings, along with the last four digits of each Debtor's federal tax identification number, are The Banning Lewis Ranch Company, LLC (4090) and Banning Lewis Ranch Development I & II, LLC (3461). The Debtors' corporate headquarters and the service address for each Debtor is 4100 MacArthur Boulevard, Suite 100, Newport Beach, CA 92660.

1

(A)     Authorizing the Debtors to obtain new money loans under a secured postpetition credit facility (collectively, the "DIP Facility"), pursuant to the terms of the Debtor in Possession Credit Agreement substantially in the form attached hereto as Exhibit "A" (the "DIP Credit Agreement"),[2] with the DIP Lenders. The Debtors seek a loan in the amount of up to $3,500,000 upon entry of the Final Order (the "Loan Commitment"), to finance working capital, capital expenditures, administrative expenses, and for other general corporate purposes of the Debtors.

(B)     Authorizing the Debtors to use the proceeds of the DIP Facility up to the Loan Commitment in accordance with the budget for the Debtors (the "DIP Budget") attached hereto as Exhibit "B", as such budget may be revised or amended with the consent of the DIP Lenders;

(C)     Authorizing the Debtors to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required thereby;

(D)     Granting security interest, liens (including priming liens pursuant to section 364(d) of the Bankruptcy Code), to the DIP Lenders to secure all obligations of the Debtors under and with respect to the DIP Facility. The collateral for the DIP Facility is as more particularly described as follows:

> To provide security for the repayment of the Loans and the payment of the other obligations of each of the Borrowers grants to the Lender:
>
> (1) a first priority, perfected Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, upon (a) all Banning's Collateral that is not subject to valid perfected and non-avoidable liens in existence at the time of the

---

[2] All capitalized terms that are not expressly defined herein shall have the meanings ascribed to such terms in the respective DIP Credit Agreement, and any associated loan or collateral documents memorializing the DIP Facility with terms that substantially conform to the DIP Credit Agreement (the "DIP Facility Documents").

commencement of the Bankruptcy Case(s); (b) all Devco's Collateral that is not subject to valid perfected and non-avoidable liens in existence at the time of the commencement of the Bankruptcy Case(s); and (c) any rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof;

(2) a perfected Lien, pursuant to Section 364(c)(3) and 364(d)(1) of the Bankruptcy Code upon (a) all of Banning's Collateral that is (i) junior in priority and payment only to the Key Bank Term Loan Lien and Key Bank Term Loan up to the value of the Key Bank Term Loan Collateral as of the Petition Date, and (ii) senior in priority and payment as to any other Liens (other than the Key Bank Term Loan Lien) on Banning's Collateral; and (b) all Devco's Collateral that is (i) junior in priority and payment only to the KeyBank Revolving Loan Lien and Key Bank Revolving Loan up to the value of the Key Bank Revolving Loan Collateral as of the Petition Date, and (ii) senior in priority and payment as to any other Liens (other than the Key Bank Revolving Loan Liens) on Devco's Collateral; and

(3) an allowed administrative expense claim in the Case that shall be granted Superpriority Claim status pursuant to Section 364(c)(1) of the Bankruptcy Code.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this motion pursuant to sections 157 and 1334 of title 28 of the United States Code. Venue of this proceeding and this Motion is proper in this District pursuant to 8 U.S.C. §§ 1408 and 1409.

3. This is a core proceeding pursuant to section 157(b)(2) of the Judicial Code.

4. The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND

5. On October 28, 2010 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the

3

filing of these bankruptcy cases, is set forth in detail in the declaration of Barry Marcus (the "Marcus Declaration"), fully incorporated by reference.

6. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing in the management and possession of their properties as debtors-in-possession.

7. No trustee, examiner, or committee has been appointed in these chapter 11 cases.

## DESCRIPTION OF THE DEBTORS' BUSINESS

8. In June 2004, Banning Lewis Ranch Management Company, LLC ("Management")[3], Makar BLR Investors, LLC ("Makar"), Greenfield BLR Partners, LP ("Greenfield"), and Farallon BLR Investors, LLC ("Farallon")[4] entered into the Operating Agreement that established Debtor, BLRC.

9. BLRC was founded to develop approximately 20,000 acres of land in eastern Colorado Springs, Colorado. The land was ultimately to be developed as a community of some 76,000 residential units and approximately 79 million square feet of commercial space (the "Property").

10. In early 2005, Devco was created to own and operate the first portion of the Property to be developed. On or about March 31, 2005, BLRC contributed approximately 2,700 completed acres of the Property to Devco and became Devco's 99.9% equity owner.[5]

---

[3] Management is the successor in interest to Makar Properties, LLC, the original signatory to the Operating Agreement.

[4] Management is an enterprise controlled by Hadi Makarechian. Greenfield and Farallon are companies that invest the assets of major educational endowments and similar investors.

[5] The remaining, 0.1% interest was transferred to another Delaware limited liability company, MFG I and II, LLC ("MFG"), which is also owned by members of Banning.

4

11.     BLRC's primary business purpose is to own and manage its interest in Devco and to hold, for investment, the portion of the Property that BLRC owns. Devco's primary business purpose is to own and develop the portion of the Property that it owns, and to market and sell developed lots to merchant builders who then construct and sell houses on those lots. The Debtors do not have any employees; rather, the Debtors contract with a management company to secure, manage and market the Property.

12.     The national downturn in the economy and, in particular, the decline in residential real estate, has severely impacted BLRC and Devco. Revenues from lot sales are far below projections at the same time that the value of their holdings as collateral for loans has precipitously declined.

13.     To the extent the Debtors sell developed lots to builders, or sell other portions of the Property, the Debtors receive income from proceeds of those sales. The Debtors have existing builder contracts for future lot sales, but not sufficient projected cash flow to sustain these cases absent a credit facility.

## BACKGROUND REGARDING THE RESTRUCTURING

14.     The sub-prime crisis of 2008 has created conditions in which there is very little market appetite for the homes which were to be built on the Property site.

15.     Devco has borrowed under a revolving loan (the "Revolving Loan") obtained from a group of lenders, for whom KeyBank is the agent. The amount currently owed under the Revolving Loan totals approximately $65.5 million. The Revolving Loan is secured by substantially all of the assets of Devco. In addition to the Revolving Loan, Devco is burdened by over $105 million of mezzanine loans, with accrued interest, from members Greenfield and Farallon, secured by the members' ownership interests in BLRC. Although disputed, Banning

Lewis Ranch Management Company, LLC has also asserted a mechanic's lien of approximately $16 million against Devco for development fees.

16. A second group of lenders, for whom KeyBank is also agent, extended a $23.5 million term loan (the "Term Loan") to BLRC. The Term Loan is secured by substantially all of BLRC's assets. Additionally, BLRC guaranteed Devco's Revolving Loan. Also, BLRC owes Greenfield and Farallon over approximately $105 million under certain mezzanine loans, with accrued interest. BLRC owes Greenfield and Farallon at least $36 million (including accrued interest) under certain "Special Member Loans". Finally, Banning Lewis Ranch Management Company, LLC has asserted a disputed mechanic's lien of approximately $35 million against BLRC for development fees.

## NEED FOR THE DIP FACILITY AND USE OF CASH COLLATERAL

17. The Debtors believe they have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use cash collateral in order to reorganize the Debtors' financial structure and/or to sell the Debtors' assets. The Debtors obtained authority to use cash collateral, however that authority (and available cash) expires on December 21, 2010. The Debtors' access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Facility and the use of cash collateral is vital to maximizing the value of the Debtors' estates. Without access to the DIP Facility and the continued use of cash collateral, the Debtors lack sufficient funds to pay administrative expenses or take actions to maintain safety, security and maintenance concerns at the Property. Without access to a DIP Facility, the Debtors will have no ability to market and sell the Property. As a result, without the DIP Facility, the estates would suffer immediate and irreparable harm and would have no option but to convert these cases to ones under Chapter 7.

18. The Debtors have minimal cash and do not anticipate receipt of significant cash for the foreseeable future. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estate under section 364(c)(2) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility. The only source of secured credit available to the Debtors, other than the use of cash collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of cash collateral in order to satisfy their postpetition liquidity needs.

19. The DIP Lenders have indicated a willingness to provide the Debtors with certain financing to preserve the Property pending a prompt sale pursuant to 11 U.S.C. §363, but solely on the terms and conditions set forth in the DIP Facility Documents. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Facility Documents represents the best financing presently available to the Debtors.

20. The Debtors have negotiated the DIP Credit Agreement and the DIP Facility Documents in good faith. The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with the fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

## SUMMARY OF DIP FACILITY

21. The following is a summary of the key terms of the DIP Facility Documents and the Final Order.[6] The proposed form of the Final Order will provide for a waiver of surcharge rights under section 506(c) of the Bankruptcy Code. The key provisions of each DIP Credit Agreement are further summarized below:

| | |
|---|---|
| **Borrower:** | Banning Lewis Ranch Company, LLC ("BLRC") and Banning Lewis Ranch Development I & II, LLC ("Devco") (each a "Debtor" and collectively, the "Obligors"). |
| **DIP Lenders:** | BDL Investors, LLC and Greenfield BLR Finance Partners, L.P. ("DIP Lenders"). |
| **DIP Facility:** | Up to $3.5 million revolving credit facility, with advances issued under the DIP Facility in accordance with and subject to the terms of the Budget. |
| **Use of Proceeds:** | All advances will be made solely for the purpose of financing expenditures contemplated by the Budget, within certain agreed upon variances. |
| **Date Available:** | Immediately upon approval of the Bankruptcy Court |
| **Maturity Date:** | DIP Facility shall be repayable in full on the Maturity Date which shall be the earlier of the Termination Date or May 31, 2011. |
| **Interest:** | 10.0% per annum, compounded monthly. |
| **Loan Administration Fee:** | $6,000 per month. |
| **Termination Fee:** | $100,000.00, to be waived in the event of a successful restructuring involving Greenfield and Farallon. |

---

[6] To the extent there is any discrepancy between the summary herein and the DIP Facility Documents or the Final Order, the terms of the DIP Facility Documents or the Final Order, respectively, shall govern.

8

| **Collateral:** | To provide security for the repayment of the Loans and the payment of the other obligations of each of the Borrowers grants to the Lender: |
|---|---|

(1) a first priority, perfected Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, upon (a) all Banning's Collateral that is not subject to valid perfected and non-avoidable liens in existence at the time of the commencement of the Bankruptcy Case(s); (b) all Devco's Collateral that is not subject to valid perfected and non-avoidable liens in existence at the time of the commencement of the Bankruptcy Case(s); and (c) any rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof;

(2) a perfected Lien, pursuant to Section 364(c)(3) and 364(d)(1) of the Bankruptcy Code upon (a) all of Banning's Collateral that is (i) junior in priority and payment only to the Key Bank Term Loan Lien and Key Bank Term Loan up to the value of the Key Bank Term Loan Collateral as of the Petition Date, and (ii) senior in priority and payment as to any other Liens (other than the Key Bank Term Loan Lien) on Banning's Collateral; and (b) all Devco's Collateral that is (i) junior in priority and payment only to the KeyBank Revolving Loan Lien and Key Bank Revolving Loan up to the value of the Key Bank Revolving Loan Collateral as of the Petition Date, and (ii) senior in priority and payment as to any other Liens (other than the Key Bank Revolving Loan Liens) on Devco's Collateral; and

(3) an allowed administrative expense claim in the Case that shall be granted Superpriority Claim status pursuant to Section 364(c)(1) of the Bankruptcy Code.

| **No Surcharge:** | No costs or expenses of administration shall be imposed against the DIP Lenders' pre-petition or post-petition collateral under Section 506(c) of the Bankruptcy Code. No proceeds of the DIP Loan shall be used directly or indirectly to prosecute the investigation of or proceedings to contest the liens, if any, in favor of the DIP Lenders which secure any prepetition obligations owed to the DIP Lenders. |
|---|---|

**Carve-Out:**    To the extent the Obligors do not have unencumbered cash to pay the items set forth in (a)(i) or (ii) below, the liens on the Collateral will be subject to (a) the payment of (i) professional fees and disbursements allowed by order of the Bankruptcy Court incurred by any of the Obligors, and (ii) professional fees and expenses allowed by order of the Bankruptcy Court incurred by the Official Committees of Unsecured Creditors in the Obligors' bankruptcy cases (collectively, the "Creditors' Committees"), and any reasonable disbursement (other than attorneys' or other professional fees) of any member of the Creditors' Committees (collectively, the "Carve-Out"), and (b) the payment of unpaid fees pursuant to 28 U.S.C. § 1930 and any fees payable to the Clerk of the Bankruptcy Court. So long as no Event of Default under the DIP Loan documents shall have occurred and be continuing, the Obligors will be permitted to pay reasonable compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code, as the same may be payable and subject to the Budget, and the amounts so paid prior to an Event of Default shall not reduce the Carve-Out. The Carve-Out is subject to a maximum equal to all outstanding costs plus $150,000.

**Budget:**    As a condition precedent to the DIP Loan, the Obligors shall prepare monthly receipt and disbursement budgets acceptable to the DIP Lenders through May 31, 2011 (as amended and approved from time to time, the "Budget"). Availability under the DIP Loan will be limited by the approved operating Budget. The Budget will be adjusted from time to time to take into account any asset sales and operational changes, which changes must be approved by the DIP Lenders.

**Asset Sales:**    The proceeds from the sale of any of the Collateral that remain after payment of any liens on such assets that are superior in priority to the DIP Lenders' liens thereon shall be paid to the DIP Lenders for application to the DIP Loan.

**Deadlines:**    The Debtors shall:

i) file a motion seeking to retain EisnerAmper LLP and Edward Phillips as Chief Restructuring Officer no later than November 27, 2010;

(ii) file a Motion seeking to engage a sale broker no later than December 3, 2010 and, by January 15, 2011, cause the broker to finalize a confidential information memorandum and commence a marketing process;

(iii) file a Motion to Approve Sale Procedures, in a form acceptable to the DIP Lenders, no later than January 15, 2011 or promptly after the selection of a Stalking Horse Purchaser, whichever is sooner;

(iv) obtain an Order setting the Bar Date no later than January 26, 2011;

(v) conduct an auction of the Assets no later than May 31, 2010;

(vi) obtain an Order, in a form acceptable to the DIP Lenders, approving the Sale of Substantially all of the Debtors' Assets no later than May 31, 2011;

(vii) obtain an order confirming (and substantially consummate) a Plan no later than May 31, 2011;

**Events of Default**: Events of Default customary for transactions of this type, including, without limitation, each of the following (after the Agent has sent notice thereof to the Company and the same shall not be cured within five (5) Business Days after such notice is sent):

(a) The failure to meet any of the Deadlines set forth above

(b) The failure of the Obligors to obtain a final order from the Bankruptcy Court within 30 days after entry of the interim order approving the DIP Loan;

(c) Non-payment of principal, interest, or mandatory prepayments from sales proceeds when due;

(d) Material breach of any covenant;

(e) Appointment of a trustee for any of the Obligors without the written support of the DIP Lenders;

(f) the entry of an order granting relief from automatic stay on any collateral on which the DIP Lenders hold a first priority lien;

(g) the institution by the Obligors of any proceeding or investigation, or support the same by another person, to challenge status and/or validity of liens granted in favor of the DIP Lenders, or either of them;

(h) the entry of an order rejecting any contract to which a DIP Lender is a party, without the respective DIP Lenders' consent;

(i) the dismissal of any of the Obligors' chapter 11 bankruptcy cases.

(j) the failure to secure a stay against any third party whose action could materially harm the DIP Lenders.

**Priority**: The DIP Facility shall have the status of an expense of administration under 11 U.S.C. § § 503(b)(1), 362(d), and 363(e), which shall have the priority of § 507(b), senior to all other expenses of administration under § 507(a)(1) except for the Carve-Out.

**Loan Documents**: The Obligors and DIP Lenders shall enter into appropriate documentation setting forth the specific terms of the DIP Facility (which shall include the foregoing terms and such other terms as the parties may agree upon), and security agreements and such other financing documents as are necessary to implement the rights and obligations of the parties under DIP Facility, satisfactory in form and substance to each such party.

**Termination of Commitments**: All commitments of the DIP Lenders under the DIP Credit Agreement shall terminate at the earliest of the Maturity Date or Termination Date.

**Termination Date**: The earliest to occur of (i) May 31, 2011, (ii) a default under any covenant, term, or other provision of the DIP Loan shall occur and five (5) Business Days shall have lapsed since the sending of notice thereof by Agent to Company, without cure, (iii) the date a plan of reorganization or liquidation is consummated, (iv)

conversion of any bankruptcy case to a case under Chapter 7 of the Bankruptcy Code; (v) dismissal of any bankruptcy case; (vi) the date the Bankruptcy Court issues an order denying the 363 Motion and (vii) the date on which the Debtors have consummated a Section 363 Sale.

## RELIEF REQUESTED

22. The Debtors require financing and authority to use cash collateral to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs. The Debtors are unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other financing under section 364(c) or section 364 (d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Facility Documents. A loan facility in the amount and in the manner provided by the DIP Facility Documents is not available to the Debtors, generally, without granting to the DIP Lender, pursuant to section 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, the benefits set forth in the DIP Facility Documents. After considering all alternatives, the Debtors have concluded in the exercise of their prudent business judgment that the loan facility provided under the DIP Facility Documents represents the best working capital financing available to them. Hence, the Debtors request approval of the DIP Facility and authority to use cash collateral to maintain their going concern operations and maximize the value of their estates.

## BASIS FOR RELIEF REQUESTED

A. Debtor-in-Possession Financing

23. Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing stipulation where

13

debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

24. Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
    (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
    (2) secured by a lien on property of the estates that is not otherwise subject to a lien; or
    (3) secured by a junior lien on property of the estates that is subject to a lien.

11 U.S.C. § 364(c).

25. The Debtors satisfy the requirements of section 364(c) of the Bankruptcy Code because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates. In satisfying the standards of section 364(c) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. See, e.g., Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); Ames Dept. Stores, 115 B.R. at 40 (finding that debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions). Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the

'time is of the essence' nature of this type of financing." In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In In re Sky Valley, Inc., 100 B.R. 107, 112-13 (Bankr. N.D.Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the debtors' approach of only four lenders was sufficient under such circumstances. See also, In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) (satisfied where two banks refused to provide unsecured credit to debtor); see also In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (element satisfied where "specialist in commercial lending practices…explained that most banks lend money only in return for secured position. The debtor cannot obtain financing secured by a lien on unencumbered property…because there is not property in the estate which is not already subject to a lien.").

26. In order for the Debtors to achieve the necessary liquidity to maintain the Property, and importantly, to market and sell the Property, the Debtors must have access to the DIP Facility. The Debtors have not been able to obtain postpetition financing on an unsecured basis, pursuant to sections 364(a) or 364(b) of the Bankruptcy Code. Similarly, the Debtors have sought, but have been unable to obtain, postpetition financing under section 364(c) of the Bankruptcy Code in amounts sufficient to provide the Debtors with the necessary liquidity, other than secured by liens under section 364 of the Bankruptcy Code such as those set forth in the DIP Facility.

27. Section 364(d)(1) of the Bankruptcy Code allows Debtors to obtain a priming lien if the debtor is unable to obtain credit otherwise and there is adequate protection for the holders

of primed liens. The proposed Credit Agreement does not prime KeyBank's lien arising out of the Term Loan to BLRC or the KeyBank lien which arises from its Revolving Loan to Devco. However, if any other liens exist, they will be primed. Debtors believe that no other valid liens exist and further that, if such liens did exist, they are adequately protected. In addition, the Debtors cannot obtain financing without such priming. Therefore, the requirements of section 364(d)(1) are satisfied.

28. The Debtors are unable to obtain financing from other capital sources. No other lender or capital source will provide the Debtors with postpetition financing on terms equal to or more favorable to the estates than the proposed DIP facility under the circumstances.

29. The Debtors further submit that the terms and conditions of the DIP Facility are the best possible under the circumstances of these cases, and were negotiated in good faith and at arm's length with all parties represented by experienced counsel. Accordingly, the DIP Lenders should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, or terminated by subsequent order of this or any other Court, the DIP Lenders will be fully protected with respect to any amounts previously disbursed.

B.  Use of Cash Collateral

30. The Debtors' use of property of the estate is governed by section 363 of the Bankruptcy Code. Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section...1108...of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estates, in the ordinary course of business, without notice or hearing, and may use property of the estates in the ordinary course of business without notice or hearing.

11 U.S.C. § 363(c)(1). The Bankruptcy Code establishes a special requirement, however, regarding the debtor-in-possession's use of "cash collateral," defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estates and an entity other than the estates have an interest...." 11 U.S.C. § 363(a). Section 363(c)(2) of the Bankruptcy Code permits the debtor in possession to use, sell or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances exist: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section. 11 U.S.C. § 363 (c)(2). Here, the DIP Lenders consent to the Debtors' use of cash collateral on the terms set forth in the DIP Budget and this Motion.

**PROVISIONS O BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2(a)(i)**

31. The proposed Credit Agreement, at Section 2.10 grants the Lenders a security interest in the Borrowers' rights under section 506(c) of the Bankruptcy Code. Section 5.10 prohibits the Borrowers from seeking, consenting to, or suffering to exist without Lenders' consent, section 506(c) claims. Moreover, Sections 6.1(p) and (z) state that it shall be en event of default if the Borrowers seek, obtain, or cause to be enter a section 506(c) claim. While these are not technically waivers of section 506(c) claims, these provisions together provide equivalent relief and thus the Debtors highlight them pursuant to Local Rule 4001-2(a)(i).

32. In addition, and as noted above, Section 2.10 of the Credit Agreement provides for a priming lien to a limited extent. The lien thus granted is:

> a perfected Lien, pursuant to Section 364(c)(3) and 364(d)(1) of the Bankruptcy Code upon (a) all of Banning's Collateral that is (i) junior in priority and payment only to the Key Bank Term Loan Lien and Key Bank Term Loan up to the value of the Key Bank Term Loan Collateral as of the Petition Date, and (ii) senior in priority and payment as to any other Liens (other than the Key Bank Term Loan Lien) on Banning's Collateral; and (b) all Devco's Collateral that is (i) junior in

priority and payment only to the KeyBank Revolving Loan Lien and Key Bank Revolving Loan up to the value of the Key Bank Revolving Loan Collateral as of the Petition Date, and (ii) senior in priority and payment as to any other Liens (other than the Key Bank Revolving Loan Liens) on Devco's Collateral.

33. Debtors believe that the inclusion of these provisions are justified, for the reasons stated previously in this Motion.

## NOTICE

34. The Debtors have given notice of this Motion to: (i) the U.S. Trustee, (ii) counsel to KeyBank; (iii) all other parties with liens of record on assets of the Debtors as of the Petition Date; and (iv) the Debtors' 20 largest unsecured creditors as identified in their chapter 11 petitions; and (v) all other parties requesting notice pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

35. No previous application for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors request that the court (i) approve the DIP Facility and the use of cash collateral on a final basis and (ii) grant such further relief as is just and proper.

Dated: Wilmington, Delaware
December 6, 2010

CROSS & SIMON, LLC

By: _____
Christopher P. Simon (No. 3697)
Kevin S. Mann (No. 4576)
Joseph Grey (No. 2358)
913 North Market Street, 11th Floor
P.O. Box 1380
Wilmington, Delaware 19899-1380
Tel: (302) 777-4200
Fax: (302) 777-4224
csimon@crosslaw.com
kmann@crosslaw.com

Counsel to Debtors and Debtors-in-Possession