## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 10-13445 (KJC) |
| THE BANNING LEWIS RANCH | ) | |
| COMPANY, LLC, *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Hearing Date: May 18, 2011 at 11:00 a.m.** |
| | ) | **Objections Due: May 11, 2011 at 4:00 p.m.** |

**MOTION OF BANNING LEWIS RANCH DEVELOPMENT I & II, LLC FOR AN
ORDER: (A) APPROVING PROCEDURES FOR THE SALE OF THE DEBTOR'S
ASSETS, (B) SCHEDULING AUCTION AND HEARING TO CONSIDER APPROVAL
OF SALE, (C) APPROVING NOTICE OF RESPECTIVE DATES, TIMES AND PLACES
FOR AUCTION AND HEARING ON APPROVAL OF (I) SALE AND (II) ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, (D) APPROVING THE FORM AND MANNER OF NOTICE OF SALE
PROCESS AND OF APPROVAL HEARING, AND (E) GRANTING RELATED RELIEF**

Banning Lewis Ranch Development Company I & II, LLC ("Devco" or the "Debtor")[2],

debtor and debtor-in-possession in the above-captioned cases, hereby files this motion, pursuant

to sections 105(a), 1123 and 1129 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*,

the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules

of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules") for entry of an order (a) approving procedures to govern the

process for the sale (the "Sale Procedures"), as set forth below, (b) scheduling an auction (the

---

[1] The Debtors in these proceedings, along with the last four digits of each Debtor's federal tax
identification number, are The Banning Lewis Ranch Company, LLC (4090) and Banning Lewis
Ranch Development I & II, LLC (3461). The Debtors' corporate headquarters and the service
address for each Debtor is 101 West Avenue, Jenkintown, Pennsylvania 19046.

[2] By separate motion filed contemporaneously herewith, debtor The Banning Lewis Ranch
Company, LLC seeks the approval of procedures to govern the sale of its assets.

"Auction") and hearing to consider approval of the sale of the Debtors' assets in Devco (the "Sale Hearing") which will be implemented pursuant to an Order approving the sale of the Debtor's assets (the "Devco Sale Transaction"), (c) approving the notice of respective dates, times, and places for (i) the Auction, (ii) the Sale Hearing, (iii) the assumption and assignment of certain executory contracts and unexpired leases; (d) approving forms and manner of notice; and (e) granting related relief (the "Sale Procedures Motion"). In support of this Sale Procedures Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

Devco, in the exercise of its informed and considered business judgment, has determined that the best way to maximize value for the benefit of its estate and creditors is to sell its assets. In December of 2010, the Debtor and The Banning Lewis Ranch Company, LLC ("Banning" and together with Devco, the "Debtors") retained Eastdil Secured, L.L.C. ("Eastdil") to assist in the marketing of approximately 20,000 acres of land in eastern Colorado Springs, Colorado (the "Property"). On or about January 14, 2011, Eastdil disseminated its marketing materials to over 1,400 investors representing over 900 companies. Since that time, Eastdil has been in contact with at least 100 potential purchasers, at least 40 of whom have signed confidentiality agreements, and some of whom have expressed an interest in bidding on the Property. Eastdil has encouraged new potential investors to review the Property and helped approved potential investors review the due diligence materials. The interested parties are largely institutional and consist primarily of private equity funds, opportunity funds, land bankers and regional homebuilders and community developers. Eastdil continues to actively discuss the Property and encourage investors to participate in a sale.

2

Devco believes entry into the Devco Sales Transaction is highly advantageous, as it is expected to provide a fair valuation of the Devco assets, and provide the capital necessary for the Debtors to confirm and implement a plan. Further, the Debtor expects to use a sale to obtain releases from certain lenders, satisfy the outstanding DIP Loan, and allow payments to general unsecured creditors. On the contrary, a liquidation under Chapter 7, or effective foreclosure by secured lenders, would yield nothing for any party other than the secured lenders. By separate motion filed contemporaneously herewith, Banning seeks the approval of procedures to govern the sale of the assets of Banning.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 1123 and 1129 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and Rules 2002-1 6004-1 and 9006-1 of the Local Rules.

## BACKGROUND

4.      On October 28, 2010 (the "Petition Date"), each of the Debtors filed a petition for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the declaration of Barry Marcus (the "Marcus Declaration") [Docket No. 6], which the Debtors hereby fully incorporate by reference.

5.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing in the management and possession of their properties as debtors-in-possession. No trustee, examiner, or committee has been appointed in these chapter 11 cases.

6.    In June 2004, Banning was founded to develop the Property. The land was ultimately to be developed as a community of some 76,000 residential units and approximately 79 million square feet of commercial space.

7.    In early 2005, Devco was created to own and develop the first portion of the Property to be developed. On or about March 31, 2005, Banning contributed approximately 2,700 completed acres of the Property to Devco and became Devco's 99.9% equity owner.

8.    Banning's primary business purpose was to own and manage its interest in Devco and to hold, for investment purposes, the portion of the Property that is still owned by Banning.

9.    Devco's primary business purpose was to own and develop the portion of the Property that it owns and to market and sell developed lots to merchant builders who then construct and sell houses on those lots. The Debtors do not have any employees; rather, the Debtors contract with a management company to secure, manage and market the Property.

10.    The national downturn in the economy and, in particular, the decline in real estate development, has severely impacted the Debtors. Revenues from lot sales are far below projections and the value of the Property as collateral for loans has declined.

11.    Prior to the Petition Date, the Debtors obtained loans from two groups of lenders. KeyBank National Association ("KeyBank") currently acts as agent to one group, while Associated Bank, N.A. ("Associated Bank") currently acts as agent to the other. The Debtors have granted the lending groups a security interest in substantially all assets, including the Property and the Debtors' cash.

12.     Devco has borrowed under a revolving loan (the "Revolving Loan") obtained from a group of lenders for whom KeyBank is the agent. The amount currently owed under the Revolving Loan totals approximately $65.5 million. The Revolving Loan is secured by substantially all of the assets of Devco. In addition to the Revolving Loan, Devco is burdened by $105.3 million of mezzanine loans from members Greenfield BLR Partners, LP and Farallon BLR Investors, LLC, secured by the members' ownership interests in Banning.

13.     A second group of lenders, for whom Associated Bank currently acts as agent, extended a $23.5 million term loan (the "Term Loan") to Banning. The Term Loan is secured by substantially all of Banning's property. Additionally, Banning guaranteed the Revolving Loan to Devco. Also, Banning owes members Greenfield BLR Partners, LP and Farallon BLR Investors, LLC another approximately $105.3 million under certain mezzanine loans. Banning owes members Greenfield BLR Partners, LP and Farallon BLR Investors, LLC at least $42.6 million under certain "Special Member Loans".

14.     As of the Petition Date, the Debtors had approximately $860,000 in cash on hand.

15.     Banning believes that the Sale represents the best option available to it in light of the current markets and the Property's need for funding.

## NECESSITY OF SALE

16.     In February 2009, in response to the financial difficulties of Banning and Devco, Greenfield and Farallon began to make "Special Member Loans" pursuant to a Third Amendment to the Debtors' Operating Agreement (the "Third Amendment"). Greenfield and Farallon were funding a real estate project in trouble in the midst of a residential real estate depression. In the Third Amendment, Greenfield and Farallon agreed to extend Special Member Loans to Banning in February 2009 in the total amount of approximately $25.8 million. Any

future funding was to be provided only if requested by one of the two investor entities. The Third Amendment states that apart from its express provisions, neither Greenfield nor Farallon is required to "make any Capital Contributions or Members Loans (or otherwise provide or advance money)" to Management. Greenfield and Farallon have informed the Debtors that they will not provide additional Special Member Loans.

17.     On or about September 21, 2010, KeyBank stated that it was no longer interested in further extending the maturity of its debt or in restructuring the Property. Indeed, KeyBank suggested to the Debtors, Management, Greenfield, and Farallon that the Debtors' assets were no longer worth the $88 million that the lenders had provided.

18.     On October 8, 2010, Greenfield and Farallon informed Management that, in light of the financial condition of the Debtors, they felt it would be an imprudent use of their investors' assets to extend further loans to the Debtors and refused to continue to fund the Debtors through loans or further equity contributions.

19.     The absence of funding posed an imminent threat to the Debtors. Because the Debtors' existing debt to secured and unsecured creditors already far exceeded the value of their assets, no other financier, outside the protections of bankruptcy, would provide them with financing. A majority of the Members of the Debtors approved resolutions dated October 27, 2010, authorizing Debtors to file bankruptcy petitions in this Court and to hire Edward A. Phillips of EisnerAmper, LLP, as Chief Restructuring Officer ("CRO") to guide the Debtors through the bankruptcy process.

20.     As of the Petition Date, the Debtors had cash and cash equivalents of only about $860,000. Additionally, due to the protections provided bankruptcy "debtor in possession" lenders under Section 364 of the Code, financing for operating expenses became available, and

the Debtors were able to obtain up to $3,500,000 of post-petition financing (the "Post-Petition Financing"). The Post-petition Financing is currently set to expire on May 31, 2011. However, the Debtor believes that the DIP Lenders may be willing to consent to an extension of the maturity date to enable the Debtors to consummate the Sale on the time-table set forth herein. The Debtors estimate that their cash and cash equivalents and the remaining financing available under the Post-Petition Financing will be sufficient to meet their cash needs through the completion of the Sale. Absent the Post-Petition Financing, however, the Debtors cannot fund their post-petition operations and obligations. Moreover, on April 20, 2011, KeyBank objected to any further extension of the deadline under the Post-Petition Financing for the filing of a motion to approve sale procedures. As a result, time is of the essence in completing the Sale and concluding the Chapter 11 cases.

21.     To assure meeting these deadlines, it is necessary to commence the sale process immediately.

## POST-PETITION MARKETING EFFORTS

22.     The Debtor, in the exercise of its informed and considered business judgment, has determined that the best way to maximize value for the benefit of its estate and creditors is to sell the Property. To assist the Debtor with the sale and marketing of the Property, the Debtors employed Eastdil. The Debtors enlisted the services of Eastdil to assist in the sale of their Property based on Eastdil's experience and knowledge of the industry. Eastdil has detailed knowledge of the Debtors' business, the market for the Debtors' assets, commercial real estate issues and other issues that lead the Debtors to believe that the retention of Eastdil is in the best interest of their estates and creditors. The retention of Eastdil was approved by the Court on December 23, 2010.

23. As set forth above, on or about January 14, 2011, Eastdil disseminated its marketing materials to over 1,400 investors representing over 900 companies. Since that time, Eastdil has been in contact with at least 100 potential purchasers, at least 40 of whom have signed confidentiality agreements and some of whom have expressed an interest in bidding on the Property. Those that have signed confidentiality agreements have been provided with the Confidential Offering Memorandum and Due Diligence Information Package which contains detailed information on the Property. This information has also been uploaded to Eastdil's due diligence website, which is consistently updated with recent sale activity in the area. Eastdil has also conducted tours of the Property with potential bidders.

24. Devco has determined that, in light of the interest expressed in and feedback received regarding Devco's assets, it is in Devco's best interest to set procedures to govern the sale of the assets of Devco through the submission of bids and auction. Devco believes that, ultimately, entry into a sales transaction will be highly advantageous, as it is expected to provide a fair valuation of Devco's assets, and provide the capital necessary for the Debtor to confirm and implement a plan. Further, the Debtors hope a sale will enable Devco to confirm a plan and allow payments to general unsecured creditors of Devco. On the contrary, a liquidation under Chapter 7, or effective foreclosure by secured lenders, would yield nothing for any party other than the secured lenders.

## THE PROPOSED SALE

25. Devco proposes to sell substantially all of its assets following an auction to a qualified bidder with the highest or otherwise best bid, free and clear of liens, claims, encumbrances and other interests, pursuant to an Order approving the Sale pursuant to section

1129 of the Bankruptcy Code, with such liens, claims, encumbrances and other interests to attach to the proceeds of such Sale.

## RELIEF REQUESTED

26.     Devco has determined that it is in the best interests of its estate to solicit and enter into one or more sale transactions with a willing and qualified bidder or bidders, of all or substantially all of the assets of the Debtor. Entry into a sale transaction is anticipated to be highly advantageous, as it is expected to provide a fair valuation of the Debtor's Property and to provide the capital necessary for the Debtors to confirm and implement a plan.

27.     Pursuant to the Sale Procedures Motion, the Debtors seek the entry of an order: (a) approving the Sale Procedures, and (b) scheduling and/or setting: (i) the deadline for submitting bids pursuant to the Sale Procedures to be Thursday, June 23, 2011 at 12:00 noon prevailing Eastern time, (ii) the Auction pursuant to the Sale Procedures to commence at approximately 10:00 a.m. prevailing Eastern time on Tuesday, June 28, 2011 at 10:00 a.m. prevailing Eastern Time, (iii) the deadline for filing and serving objections to the Motion to Approve the Sale (the "Sale Motion")[3] to be Wednesday, June 22, 2011 at 4:00 p.m. prevailing Eastern time, and (iv) the Sale Hearing (as defined in the Sale Procedures) on Wednesday, June 29, 2011 at 3:00 p.m. or such other time that the Court shall be available.

## PROPOSED SALE PROCEDURES

28.     The Debtor seeks the greatest value for the Debtor's assets. The proposed Sale Procedures were developed consistent with the Debtor's need to expedite the sale process and with the objective of promoting further active bidding that will result in the highest and best offer the marketplace can sustain for the Debtor's assets. The proposed Sale Procedures reflect the

---

[3] The Sale Motion will be filed upon Court approval of this Sale Procedures Motion.

Debtor's goal of conducting the Auction in a controlled, fair and open fashion that promotes interest in the Property by any financially-capable, motivated bidders who are likely to close a Sale.

29.     The proposed Sale Procedures, including the bidding procedures, are attached hereto as Exhibit "A".  The following is a summary of the pertinent terms of the Sale Procedures.[4]

30.     Promptly following the filing of this Sale Procedures Motion, the Debtor will send, by overnight delivery, a copy of this Sale Procedures Motion to all parties identified by the Debtor and its professionals as likely to have an interest in participating in a sale of the Debtor's assets, so that such parties will have more than adequate time to perform any necessary due diligence and participate in the Sale.  All parties that have requested notice pursuant to Rule 2002 in this case will also be sent a copy of this Sale Procedures Motion by United States first class mail.

31.     **Actions Leading Up to the Submission of Bids:**  Until five (5) days prior to the Auction, the Debtor will qualify potential bidders ("Bidders") according to their financial qualifications to consummate a Sale.  All potential Bidders will be required to complete and execute a confidentiality agreement satisfactory to the Debtor prior to conducting any due diligence.  Bidders having initially satisfied the Debtor as to their financial qualifications to consummate a Sale and having executed a confidentiality agreement with the Debtor generally will be allowed to perform reasonable due diligence, including being granted reasonable access to the books, records and executives of the Debtor.  Any party wishing to take part in this process

---

[4] The Sale Procedures should be reviewed in their entirety and bidders and parties in interest should not rely on this summary.  Capitalized terms not defined herein have the meanings ascribed to such terms in the Sale Procedures.

would begin by contacting Eastdil Secured, L.L.C., using the contact information set forth in the Sale Procedures.

32.     Upon the submission by a Bidder of a written, non-binding expression of interest to the Debtor describing the terms of the Sale that the Bidder would be proposing (including assets to be purchased, price and other material terms and conditions), the Debtor or its advisors will be prepared to commence discussions and, if appropriate, negotiations regarding the terms of such Bidder's proposal. Prospective Bidders are encouraged to begin discussions and, if appropriate, negotiations with the Debtor well in advance of the deadline for the submission of bids set forth below.

33.     **Deadline for Submission of Bids:**  Any Bidder that wishes to take part in the Sale Process must submit a written bid (a "Bid") so as to be received by Devco's undersigned counsel, on or before Thursday, June 23, 2011 at 12:00 noon (prevailing Eastern Time) (the "Bid Deadline").

34.     **Form of Bid:**  A Bid must contain, at a minimum, the form of consideration (cash, notes, etc.) to be provided to satisfy the purchase price, any conditions to the Bidder's obligation to purchase such assets, evidence of the Bidder's ability to consummate the Sale and confirmation by such Bidder that the Sale reflected in its Bid is not contingent upon financing, additional due diligence, environmental review or other material contingency.

35.     Each Bid must be for all of the Devco assets.

36.     Each Bid for the Devco assets must provide for the assumption of the Assumed Liabilities or contain consideration in cash equal to the amount of any Assumed Liabilities not assumed.

37.     All Bids must be accompanied by a draft Purchase Agreement (hard copy and electronic version in Microsoft Word) reflecting the applicable Bid and the other terms and conditions of the Sale proposed by the Bidder.  Each Bid must include, from the Bidders, an earnest money deposit of $1,000,000, which shall be held in escrow and shall not become property of the Debtor's estate pending the hearing to approve the Sale (the "Approval Hearing").  Such deposit shall be nonrefundable if the Bidder is designated as the Winning Bidder, the Order approving the Sale to such Bidder has been entered by this Court (and such Order has not been modified, reversed, vacated or stayed) and such Bidder fails to close the Sale for any reason other than the Debtor's breach.  The Debtor may refuse to consider any Bid that does not strictly comply with the terms set forth above.

38.     The Debtor and all other entities shall keep each such Bid confidential in accordance with the applicable confidentiality agreement, with access restricted to the Debtor, its professionals, and the Office of the United States Trustee.  However, Bids may be revealed to any other entity at the option of the Debtor, and shall be disclosed to any other Qualified Bidders (as defined below) no later than one business day prior to the commencement of the Auction. The Debtor may request additional information from a Bidder (whether previously qualified or not) in order to evaluate the Bidder's ability to consummate the Sale and to fulfill its obligations in connection therewith, and such Bidder shall be obligated to provide such information as a precondition to participating further in the Sale process and the Auction.

39.     **Selection of Qualified Bidders:**  By 2:00 p.m. prevailing Eastern time three (3) business days prior to the Auction, the Debtor shall notify each party that submitted a Bid either that its Bid (i) satisfies the requirements of the Sale Procedures, and therefore that it may be a "Qualified Bidder" authorized to participate in the Auction, or (ii) does not satisfy the

requirements of the Sale Procedures such that it would not be beneficial to the Debtor's estates to further consider the Bid, and thus such party will not be a Qualified Bidder and will not be allowed to take part in the Auction. However, if a party approaches the Debtor prior to the commencement of the Auction without having submitted a Bid, but is able to establish its financial wherewithal to consummate a Sale and is willing to make an offer on substantially the same terms as those set forth in a previously proposed Sale which the Debtor has deemed a Qualified Bid, the Debtor may deem such party to have provided a Bid such that it may take part in the Auction.

40. **Auction and Selection of Winning Bid:** The Debtor will convene a meeting of all Qualified Bidders that have been notified that they are entitled to participate in accordance with the Sale Procedures at 10:00 a.m., prevailing Eastern time, on Tuesday, June 28, 2011, or such later date as the Debtor may set, at the offices of Cross & Simon LLC, 913 N. Market St., 11th Floor, Wilmington, Delaware 19801.

41. If no Qualified Bid for the Devco assets is received by the Bid Deadline, the Debtors will report the same to the Bankruptcy Court and cancel the Auction.

42. The Auction will begin with the Debtor's presentation of the then existing highest and best Bid, as determined by the Debtor (the "Baseline Bid"). All other Qualified Bidders shall then be entitled to propose a superior Sale Transaction, by providing higher and better bids than the initial best Bid. An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. Any Overbid must be made in increments of at least $250,000 over the previous highest or otherwise best Bid. The Debtor reserves the right to (i) declare the precise terms and conditions of a single proposed Sale Transaction to be the then existing highest and best Bid; (ii) declare that all further Bids made at the Auction be on the basis

13

of a specified form or structure of a Sale Transaction reflected in an initial best Bid or in any other form or structure that the Debtors specify; and (iii) declare the bidding at the Auction closed.

43. **Determination of Winning Bid:** During the Auction, the Debtor shall determine in good faith, based upon all factors it deems relevant, which Bid constitutes the highest and best offer for the Debtor's assets. In determining the Bidder whose Bid constitutes the highest and best offer (the "Winning Bidder"), the Debtor will consider various factors including, but not limited to: (i) the Debtor's and the Bidder's ability to satisfy the conditions to closing the Sale Transaction, (ii) the inherent valuation of the Debtor that such Bid represents, (iii) the time required to consummate the Sale contemplated by the Bid, (iv) other terms of the Bid, in light of the impact on the Debtor and the likelihood of and timing of closing, and (v) the ability of the Bidder and the Debtor to consummate the Sale and confirm a plan within a timeframe consistent with the Debtor's budget and projections.

44. **Notice of the Winning Bidder:** Immediately after the conclusion of the Auction, the Debtor will transmit a notice of the Winning Bidder by facsimile, electronic mail transmission, or overnight delivery, to the following entities only: (i) the Office of the United States Trustee; (ii) the DIP Lenders, (iii) the pre-petition Revolving Loan Lenders, (iv) any party that requests in writing that it be sent such a notice; (v) any other entities the Debtors desire to receive notice, and (vii) the other Bidders.

45. **Hearing to Approve the Results of the Sale Process:** The Debtor requests that the Court convene the Approval Hearing to approve the Sale Transaction with the Winning Bidder on June 29, 2011 at 3:00 p.m. The Debtor respectfully requests that the deadline to object to the results of the Sale Process be set for June 22, 2011 at 4:00 p.m. (prevailing Eastern Time)

46.     **Failure to Obtain Court Approval of the Transaction:** If for any reason the Court does not approve a Sale with the Winning Bidder, the offeror of the second highest and best bid at the Auction, as determined by the Debtor, will automatically be deemed to have submitted the highest and best Bid, and to the extent the Debtors consent, the Debtor and such offeror will be authorized and directed to effect the Sale with such offeror.

47.     **Return of Deposits:** Within two (2) business days after the adjournment of the Auction, the deposits, if any, of all participating Bidders who are not the Winning Bidder or the second highest and best Bidder shall be returned.

48.     **Reservation of Rights; Deadline Extensions:** The Debtor reserves its rights to: (i) impose, at or prior to the Auction, additional terms and conditions on any Sale; (ii) extend the deadlines set forth in the Sale Procedures, adjourn the Auction, and/or adjourn the Approval Hearing in open court without further notice; and (iii) withdraw consideration of the Sale at any time prior to or during the Auction and make subsequent attempts to market the same.

49.     The Debtor believes that these Sale Procedures are necessary to establish an efficient bidding environment for the Sale, which will enable the Debtor and other parties in interest to review potential Qualified Bidders and proposed bids promptly, convene a productive Auction, and determine which bid is the best for the Debtor's estates.

## PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

50.     As noted above, pursuant to the Sale Motion, the Debtor may seek to assume certain executory contracts and unexpired leases to be identified, other than those executory contracts and unexpired leases excluded by the Winning Bidder pursuant to its agreement with the Debtors (the "Assumed Executory Contracts").

51.     The Debtor will serve the Sale Motion and the *Notice to Counterparties to Executory Contracts and Unexpired Leases That May be Assumed and Assigned* (the "Cure Notice") in substantially the form of Exhibit "B" hereto upon each counterparty to the Assumed Executory Contracts.  The Cure Notice shall state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.   The Cure Notice also shall identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  If a contract or lease is assumed and assigned pursuant to this Court's order approving same, then unless, the Assumed Executory Contract counterparty properly and timely files and serves an objection to the Cure Amount contained in the Cure Notice, the Assumed Executory Contract counterparty shall receive at the time of the closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any, with payment to be made pursuant to the terms of the agreement, as executed and delivered at closing by the Debtor.  If an objection is filed by a counterparty to an Assumed Executory Contract, the Debtor proposes that such objection must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount, if any, specified by the Debtor in the Cure Notice.

52.     If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract, the Debtor proposes that the counterparty must file the objection by no later than (i) 4:00 p.m. prevailing Eastern time on June 22, 2011, or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Approval

Hearing); *provided, however,* that any counterparty may raise at the Approval Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Winning Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract.

53.     The Debtor proposes that the Court make its determination concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Approval Hearing.  Cure Amounts disputed by any counterparty shall be resolved by the Court at the Approval Hearing.

54.     Except to the extent otherwise provided in the agreement with the Winning Bidder, subject to the payment of any Cure Amounts, the assignee of the Assumed Executory Contracts shall not be subject to any liability to the assigned contract counterparty or lessor that accrued or arose before the closing date of the sale and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

## BASIS FOR RELIEF

### A.     This Court Has The Authority to Approve the Sale Procedures

55.     Courts have indicated that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.  See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

56.     Here, the proposed Sale Procedures are reasonable, appropriate, and within the Debtor's sound business judgment under the circumstances, because they will serve to maximize the value that the Debtor will recover on account of the Sale and they will enable the Debtors to fund and confirm a plan.

**B.      The Sale Procedures Are Appropriate**

57.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Products, Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

58.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See, e.g., Integrated Resources, 147 B.R. at 659 (such procedures "encourage bidding and maximize the value of the debtor's assets"); In re Financial News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate").

59.     The Debtor believes that the Sale Procedures establish the parameters under which the value of the Debtor's assets may be established and maximized at the Auction, the ensuing Confirmation Hearing and under a plan. The proposed Sale Procedures will enhance competitive bidding; therefore, such procedures will increase the likelihood that the Debtor will

receive the greatest possible consideration for such assets by ensuring a competitive and fair bidding process.

60.     The Sale Procedures are fair and reasonable procedures that are intended to encourage competitive bidding. The Debtor believes that all of the Sale Procedures proposed herein will increase the likelihood that the Debtor will receive the greatest possible consideration for its assets because they will ensure a competitive and fair bidding process. They also allow the Debtor to undertake the Sale in as expeditious a manner as possible, which the Debtor believes is essential to maximizing the value of the estates.

61.     The Debtor submits that the proposed Sale Procedures are reasonable under the facts and circumstances of these cases. The Debtor believes that the approval of the Sale Procedures provides the Debtor with the best possibility of maximizing the value of the Debtor's assets for the benefit of creditors, and, accordingly requests that the Court approve the Sale Procedures.

### C.     The Initial and Subsequent Overbids are Appropriate

62.     One important component of the Sale Procedures is the "overbid" provision, pursuant to which any initial offer for the Purchased Assets must be in an amount of at least $250,000 more than the baseline bid. A minimum initial overbid is necessary, among other things, to ensure that there is an increase in the net proceeds received by the estates in the event of a prevailing overbid. Case law also supports minimum overbids that are up to 10% of the initial purchase price as fair and reasonable. As the court stated in In re Wintex, Inc., 158 B.R. 540 (D. Mass. 1992), a debtor may avoid the increased costs and complexity associated with considering additional bids unless the additional bids are high enough to justify their pursuit. The 10% increase requirement is one example of a reasonable litmus test. Id. at 543. See, e.g., In re Financial News Network, 126 B.R. 152, 154 (S.D.N.Y. 1991) (requiring minimum overbids

to exceed purchaser's offer of $105 million by at least $10 million (9.5%)); In re Colony Hill Associates, 111 F.3d 269 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer of $7.5 million by at least $650,000 (8.6%)); In re Tempo Technology Corp., 202 B.R. 363, 369 (D. Del. 1996) (requiring minimum overbids of $1.4 million in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities). Here, the proposed overbid is lower than what courts have typically found to be reasonable and appropriate.

**D.    Notice of the Sale Process and the Approval Hearing**

63.    Under Bankruptcy Rules 2002(a)(2) and (c), the Debtor is required to notify, *inter alia*, all of its creditors of a proposed sale of its assets outside of the ordinary course of business, including a disclosure of the time and place of a public sale, the terms and conditions of a private sale, and the deadlines for filing any objections. The Debtor submits that the Notice of Sale Process and Approval Hearing attached as Exhibit "C" contains the types of information required under Bankruptcy Rule 2002(c) and would provide adequate notice of the Sale Procedures, Sale Process, Auction Date and Sale Hearing and thus requests that this Court approve the form, manner and the content of the Notice of Sale Process and Approval Hearing.

64.    The Debtor also submits that the form of Cure Notice, substantially in the form attached hereto as Exhibit "B", would provide adequate notice of the potential assumption and assignment of executory contracts and unexpired leases and cure amounts to contract counterparties and lessors, and should therefore be approved.

**NO PRIOR REQUEST**

65.    No prior request for the relief sought in this Sale Procedures Motion has been made to this or any other court.

## NOTICE OF THIS MOTION

66.     Notice of this Motion has been given to (i) the United States Trustee, (ii) counsel to the Debtors' Revolving Loan and Term Loan agents, (iii) counsel to the Debtors' Post-Petition Financing lenders (iv) counsel to any official committee of unsecured creditors, (v) all parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002, (vi) any party that has expressed an interest in a Transaction, and (vii) all parties known to assert a security interest in property of the Debtor.  In light of the nature of the relief requested, the Debtor submits that, except as set forth above, no further notice need be given.

WHEREFORE, Devco respectfully requests that the Court (i) enter an order, substantially in the form annexed hereto, approving the Sale Procedures, approving the form and manner of the sale process and Approval Hearing and (ii) grant such other and further relief as is just and proper.

Dated:  April 26, 2011
Wilmington, Delaware                              CROSS & SIMON, LLC

                                    By: _____
                                        Christopher P. Simon (No. 3697)
                                        Kevin S. Mann (No. 4576)
                                        Joseph Grey (No. 2358)
                                        913 N. Market St.
                                        11th Floor
                                        P.O. Box 1380
                                        Wilmington, DE 19899-1380
                                        Ph: (302) 777-4200
                                        Fax: (302) 777-4224
                                        kmann@crosslaw.com

                                        *Counsel for Debtors and Debtors-in-Possession*