# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 10-13445 (KJC) |
| THE BANNING LEWIS RANCH | ) | |
| COMPANY, LLC, *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**JOINT DISCLOSURE STATEMENT ACCOMPANYING PLAN OF
LIQUIDATION FOR THE BANNING LEWIS RANCH COMPANY,
LLC AND BANNING LEWIS RANCH DEVELOPMENT I & II, LLC
UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Christopher P. Simon (No. 3697)
Kevin S. Mann (No. 4576)
Joseph Grey (No. 2358)
David G. Holmes (No. 4718)
CROSS & SIMON, LLC
913 N. Market Street
11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
Ph: (302) 777-4200
Fax: (302) 777-4224
kmann@crosslaw.com

*Counsel to Debtors and Debtors-in-
Possession*

Dated: May 16, 2011

---

[1] The Debtors in these proceedings, along with the last four digits of each Debtor's federal tax identification number, are The Banning Lewis Ranch Company, LLC (4090) and Banning Lewis Ranch Development I & II, LLC (3461). The Debtors' corporate headquarters and the service address for each Debtor is 101 West Avenue, Jenkintown, Pennsylvania 19046.

# TABLE OF CONTENTS

Page

I.   INTRODUCTION.............................................................................................1

II.  OVERVIEW OF THE PLAN.............................................................................3
     A.  Holders of Claims and Equity Interests Entitled To Vote.......................9
     B.  Voting Procedures...........................................................................11
     C.  Confirmation Hearing.......................................................................11
     D.  Disclaimer.....................................................................................12

III. OVERVIEW OF CHAPTER 11........................................................................13

IV.  DESCRIPTION OF THE DEBTORS' OPERATIONS, ASSETS, LIABILITIES AND
     RESTRUCTURING EFFORTS.........................................................................14
     A.  History of the Debtors......................................................................15
     B.  The Debtors' Real Property................................................................16
     C.  Other Assets...................................................................................16
     D.  The Debtors' Liabilities.....................................................................16
         1.  Secured Debt..............................................................................17
         2.  Member Loans............................................................................17
         3.  Claims Filed Against the Debtors...................................................18
     E.  The Debtors Obtain Post-Petition Financing..........................................18

V.   THE DEBTORS' CHAPTER 11 CASES.............................................................20
     A.  Significant "First Day" Motions in the Chapter 11 Cases.......................20
     B.  Disclosure Statement and Plan Confirmation Hearings..........................23
     C.  Background Regarding The Sale Transactions.......................................23
         1.  Marketing Efforts.........................................................................23
         2.  The Motion and Sale Procedures....................................................24
         3.  The Stalking Horse Purchaser of the Banning Assets..........................25
         4.  Assumption and Rejection of Executory Contracts.............................27
         5.  Parties in Interest and Professionals..............................................28

VI.  SUMMARY OF THE PLAN OF LIQUIDATION....................................................28
     A.
     Introduction.....................................................................................28
     B.  Classification and Treatment of Administrative Claims, Claims and Equity
         Interests Under the Plan...................................................................28
         1.  Unclassified Claims.....................................................................29
         2.  Classified Claims Against and Equity Interests in Debtors.....................32

VII. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN....................36
     A.  Overview of Plan Implementation.......................................................36
     B.  Sale Agreements............................................................................37
     C.  Distributions Under the Plan..............................................................37

|     |     | 1.  | General.................................................................37 |
|     |     | 2.  | Objections to Claims.......................................40 |
|     |     | 3.  | Disputed Claims; Reserve and Estimations...............40 |
|     |     | 4.  | Setoffs ................................................................41 |
|     |     | 5.  | Preservation of Causes of Action........................42 |
|     |     | 6.  | Value of Post Effective Date Debtors.....................42 |
|     | D.  | General Information Concerning the Plan..................42 |
|     |     | 1.  | No Liability For Solicitation or Participation............42 |
|     |     | 2.  | Limitation of Liability........................................42 |
|     | E.  | Effect of Confirmation of the Plan..........................44 |
|     |     | 1.  | Vesting of Assets..............................................44 |
|     | F.  | Retention of Jurisdiction.........................................44 |
|     | G.  | Miscellaneous Provisions........................................46 |
|     |     | 1.  | Exemption From Transfer Taxes.........................46 |
|     |     | 2.  | Payment of Statutory Fees.................................46 |
|     |     | 3.  | Modification or Withdrawal of the Plan.................46 |
|     |     | 4.  | Governing Law.................................................47 |
|     |     | 5.  | Filing or Execution of Additional Documents..........47 |
|     |     | 6.  | Withholding and Reporting Requirements..............47 |
|     |     | 7.  | Waiver of Rule 62 (a) of the Federal Rules of Civil Procedure.............47 |
|     |     | 8.  | Headings.........................................................47 |
|     |     | 9.  | Exhibits and Schedules.....................................47 |
|     |     | 10. | Notices...........................................................48 |
|     |     | 11. | Conflict...........................................................48 |
|     |     | 12. | Successors and Assigns....................................48 |
|     |     | 13. | Saturday, Sunday or Legal Holiday......................48 |
|     |     | 14. | Post-Effective Date Effect of Evidences of Claims or Equity Interests...48 |
|     |     | 15. | Severability of Plan Provisions............................49 |
|     |     | 16. | Balloting.........................................................49 |
|     |     | 17. | No Admissions or Waiver of Objections.................49 |
|     |     | 18. | Survival of Settlements.....................................49 |
| VIII. | PROJECTIONS AND VALUATION ANALYSIS.......................50 |
| IX. | CONFIRMATION PROCEDURE.............................................50 |
|     | A.  | Solicitation of Votes.............................................50 |
|     | B.  | The Confirmation Hearing......................................51 |
|     | C.  | Confirmation......................................................51 |
|     |     | 1.  | Feasibility.......................................................54 |
|     |     | 2.  | Best Interests Test/Liquidation Analysis................54 |
| X.  | EFFECTIVENESS OF THE PLAN............................................56 |
|     | A.  | Conditions to Confirmation.....................................56 |
|     | B.  | Conditions To Effective Date...................................56 |
|     | C.  | Waiver of Conditions............................................57 |
|     | D.  | Effect of Failure of Conditions.................................57 |

      E.     Vacatur of Confirmation Order..................................................................57

XI.   POST-EFFECTIVE DATE DEBTORS.............................................................57
      A.    Capitalization and Structure of Post-Effective Date Debtors................57
      B.    Management of the Post-Effective Date Debtors....................................58

XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.59
      A.    Liquidation Under Chapter 7.................................................................59
      B.    Alternative Plans of Liquidation............................................................60
      C.    Post-Confirmation Conversion/Dismissal..............................................60
      D.    Final Decree..........................................................................................60

XIII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.................61

XIV. CONCLUSION.................................................................................................61

RECOMMENDATION..................................................................................................61

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.**

## I.    INTRODUCTION

The Debtors hereby submit this joint disclosure statement (the "Disclosure Statement")[2] pursuant to Section 1125 of the Bankruptcy Code, for use in the solicitation of votes on their joint plan of liquidation (as it may be amended, modified or supplemented, the "Plan"), filed with the United States Bankruptcy Court for the District of Delaware on or about May 16, 2011.

On _____, 2011, after notice and a hearing, the Court entered an order approving this Disclosure Statement (the "Disclosure Statement Order") as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment as to whether to accept or reject the Plan. Approval of the Disclosure Statement does not constitute a determination by the Court as to the fairness or merits of the Plan.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating votes. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim or Equity Interest entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made other than pursuant to Section 1125 of the Bankruptcy Code.

On October 28, 2010 (the "Petition Date"), The Banning Lewis Ranch Company, LLC ("Banning") and Banning Lewis Ranch Development I & II, LLC ("Devco" and, together with Banning, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). **The Debtors' cases have not been substantively consolidated.** The Debtors remain

---

2    Capitalized terms not defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan or Bankruptcy Code.

in possession of their properties and assets and continue to manage their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Each of the Debtors intends to sell its respective assets pursuant to the Plan. On April 26, 2011, the Debtors filed with the Court motions to approve procedures for conducting sales of each of the Debtors' assets.[3] Pursuant to the Bid Procedures Motions, the Debtors are seeking entry of orders establishing procedures to govern the participation in an auction with respect to the sale of the substantially all of the assets of each of the Debtors (the "Bid Procedures Order"). At the auction, the Debtors will select the highest and best Sale Transaction(s) which will be implemented pursuant to a joint plan of liquidation. The Plan will be modified following the auction to specifically describe the selected Sale Transaction(s) and provide for their implementation.

The Plan is attached to the Disclosure Statement as Exhibit "A". This Disclosure Statement describes certain aspects of the Plan, the Debtors' businesses, and related matters.

The Debtors believe that the Plan is fair and equitable and in the best interests of all stakeholders. To achieve such higher value, the Plan contemplates treatment of the Debtors' creditors and equity interest holders in accordance with the classifications set forth more fully herein. You should review the proposed classifications and the treatment to be afforded each class carefully before voting to accept or reject the Plan.

**THE PLAN IS THE RESULT OF A THOROUGH MARKETING EFFORT AND BANKRUPTCY COURT-APPROVED PROCEDURES FOR THE SOLICITATION OF ONE OR MORE SALE TRANSACTIONS. THE DEBTORS BELIEVE THAT THE PLAN REPRESENTS THE BEST POSSIBLE RETURN TO HOLDERS OF CLAIMS AND EQUITY INTERESTS. THE DEBTORS STRONGLY URGE YOU TO READ THE DISCLOSURE STATEMENT AND VOTE IN FAVOR OF THE PLAN.**

This Disclosure Statement is submitted pursuant to Section 1125 of the Bankruptcy Code to holders of Equity Interests or Claims against the Debtors in connection with

---

[3]     On April 26, 2011, the Debtors filed the *Motion of The Banning Lewis Ranch Company, LLC for an Order: (A) Approving Procedures for the Sale of the Debtor's Assets, (B) Scheduling Auction and Hearing to Consider Approval of Sale, (C) Approving Notice of Respective Dates, Times and Places for Auction and Hearing on Approval of (I) Sale and (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice of Sale Process and of Approval Hearing, (E) Approving the Agreement with Stalking Horse Purchaser and (F) Granting Related Relief* [Docket No. 266] and the *Motion of Banning Lewis Ranch Development I & II, LLC for an Order: (A) Approving Procedures for the Sale of the Debtor's Assets, (B) Scheduling Auction and Hearing to Consider Approval of Sale, (C) Approving Notice of Respective Dates, Times and Places for Auction and Hearing on Approval of (I) Sale and (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice of Sale Process and of Approval Hearing, and (E) Granting Related Relief* [Docket No. 267] (collectively, the "Bid Procedures Motions"). The Debtors hope that the auctions will result in one or more Sale Transactions which will allow the Debtors to consummate a Plan.

(i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan, scheduled for _____, 2011 at _____ (**Eastern Daylight Time**).

Attached as Exhibits to this Disclosure Statement are copies of the following:

* The Plan (Exhibit "A");

* The Disclosure Statement Order (Exhibit "B");

* The Bid Procedures Orders (Exhibit "C");

* Liquidation Analysis and Projections (Exhibit "D");

* Legal Descriptions of each of the Debtors' real property (Exhibit "E").

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims and Equity Interests that the Debtors believe are entitled to vote to accept or reject the Plan.

## II.   OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.

A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Class or Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied before the Effective Date; a Claim or Equity Interest which is not an Allowed Claim or Allowed Equity Interest is not in any Class. A Disputed Claim or Disputed Equity Interest, to the extent that it subsequently becomes an Allowed Claim or Allowed Equity Interest, shall be included in the Class for which it would have qualified had it not been disputed. Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim or Equity Interest which is not an Allowed Claim or an Allowed Equity Interest.

**THE FOLLOWING DESCRIPTIONS OF TREATMENT ARE SUBJECT TO, AND CONTINGENT UPON APPROVAL BY THE COURT OF THIS PLAN, AND THE SALE OF THE DEBTORS' ASSETS IN BANNING UNDER 11 U.S.C. §§ 1123 AND 1129, AND THE SALE OF THE DEBTORS' ASSETS IN DEVCO, EITHER UNDER 11 U.S.C. § 363 OR 11 U.S.C. §§ 1123 AND 1129. IN THE EVENT NO PARTY BIDS ON THE ASSETS OF DEVCO, THIS PLAN WILL BE MODIFIED TO EXCLUDE THE TREATMENT OF CLAIMS AGAINST DEVCO.**

| Class | Type of Allowed Claim or Equity Interest | Treatment | Estimated Recovery |
|-------|------------------------------------------|-----------|--------------------|
| --- | Administrative Claims | Debtors do not anticipate that there will be any Administrative Claims. To the extent that there are Administrative Claims, they will be paid in full in Cash on the Effective Date or as soon as practicable thereafter, or in accordance with the terms and conditions of transactions or agreements relating to obligations incurred in the ordinary course of business during the pendency of the Chapter 11 Cases or assumed by Buyer. The total amount of Administrative Claims is estimated to be $0 as they are to be paid in the ordinary course of business. To the extent that any such claims exist, the Stalking Horse Purchaser's bid includes up to $100,000 to be paid towards Administrative, Priority Tax, and Priority Claims. | 100% |
| --- | Priority Tax Claims | Debtors do not anticipate that there will be any Priority Tax Claims. To the extent that there are Priority Tax Claims, they will be paid in full in Cash on the Effective Date or as soon as practicable thereafter, or in accordance with the terms and conditions of transactions or agreements relating to obligations incurred in the ordinary course of business during the pendency of the Chapter 11 Cases or assumed by Buyer. The total amount of Priority Tax Claims is estimated to be $0 as they are to be paid in the ordinary course of business. To the extent that any such claims exist, the Stalking Horse Purchaser's bid includes up to $100,000 to be paid towards Administrative, Priority Tax, and Priority Claims. | 100% |
| 1 | DIP Credit Facility Claims | Unimpaired. Pursuant to the Asset Purchase Agreement with the Stalking Horse Purchaser for the Debtors' assets in Banning, the lenders under the DIP Credit Facility will waive their rights to repayment of the DIP Credit Facility.[4] | 100% |

---

[4] To the extent that the Stalking Horse Purchaser is not the successful bidder at the Auction, any higher and better bid would likely, absent consent of the DIP Facility Lender, be

| Class | Type of Allowed Claim or Equity Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| 2 | Secured Claims of Term Lenders against Banning[5] | Impaired. The Term Lenders shall, pursuant to § 1129(b)(2), (i) retain their security interest and liens against the Banning Assets, and (ii) receive deferred cash payments in an amount equal to the Allowed amount of their claim pursuant to the terms of the New Term Loan[6] and in accordance with the terms and conditions of the Amended and Restated Senior Secured Term Loan Agreement[7]. Such deferred cash payments shall be made directly to the Term Lenders by the Stalking Horse Purchaser of | 100% |

required to repay the obligations still outstanding under the DIP Credit Agreement through the date of termination of the DIP Credit Agreement, plus any additional funding necessary to reach closing of the Sale Transaction..

[5] Defined below.

[6] "New Term Loan" means the senior secured term loan facility to take effect on the Effective Date and which will be issued to the Term Lenders. The New Term Loan shall be governed by the Amended and Restated Senior Secured Term Loan Agreement. The aggregate principal amount (the "Face Amount") of the New Term Loan as of the Effective Date shall be equal to the amount of the Allowed Term Lenders' Claims (which shall equal the principal amount, plus accrued interest and other arrearages arising under the Term Loan) as of the Effective Date. The New Term Loan shall (i) have a "Maturity Date" of September 7, 2019, and (ii) shall bear and pay interest at the market interest rate which shall be either the 1 or 3 month Libor, as selected by the Purchaser from time to time upon the expiration of the current Libor period, plus 200 basis points. Other than as set forth above, the New Term Loan shall be in form and substance substantially similar to the terms of the Term Loan.

[7] "Amended and Restated Senior Secured Term Loan Agreement" means that certain Amended and Restated Senior Secured Term Loan Agreement, to be dated as of the Effective Date, among Banning and the Term Lenders, with respect to the New Term Loan, which shall be in form and substance acceptable to the Purchaser of Banning's assets. The Amended and Restated Senior Secured Term Loan Agreement shall be in form and substance substantially similar to the terms of the Senior Secured Term Loan Agreement By and Among Banning and the Term Lenders, dated September 7, 2007, as amended from time to time, provided however, that: (i) the "Maturity Date" shall be September 7, 2019, (ii) the applicable interest rate shall be either the 1 or 3 month Libor, as selected by the Purchaser from time to time upon the expiration of the current Libor period, plus 200 basis points and (iii) aggregate principal amount (the "Face Amount") of the New Term Loan as of the Effective Date shall be equal to the amount of the Allowed Term Lenders' Claims (which shall equal the principal amount, plus accrued interest and other arrearages arising under the Term Loan) as of the Effective Date.

| Class | Type of Allowed Claim or Equity Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| | | Banning's assets.[8] | |
| 3 | Secured Claims of Revolver Lenders against Devco[9] | Impaired. The Debtors anticipate that the Secured Claims of the Revolver Lenders under the Revolver Credit Agreement[10] will be impaired, and paid the amount received for the purchase of the Devco assets, after an auction, if any, for the Devco assets.[11] Any amount received by the Revolver Lenders will be in full and final satisfaction of the Revolver Lenders' secured claim and liens. | Unknown |
| 4 | Banning Other Secured Claims[12] | Banning does not anticipate that there will be any Banning Other Secured Claims. To the extent any Banning Other Secured Claims exist, and unless the purchaser of the Banning assets agrees otherwise, the assets of Banning will be sold pursuant to a Sale Transaction, free and clear of all liens, security interests or other encumbrances on the assets. Any such lien, security interest or other encumbrance shall attach to the proceeds of the sale, if any, or the collateral will be returned to such secured creditor. | 100% |
| 5 | Devco Other Secured Claims | Devco does not anticipate that there will be any Devco Other Secured Claims. To the extent any Devco Other Secured Claims exist, and unless the | 100% |

---

[8] To the extent that the Stalking Horse Purchaser is not the successful bidder at the Auction, any higher and better bid would likely be required to satisfy the obligations to the Term Lenders in accordance with 11 U.S.C. § 1129(b)(2)(A)(i), or, alternatively, in accordance with 11 U.S.C. § 363. Still alternatively, the Term Lenders may consent to other treatment.

[9] Defined below.

[10] Defined below.

[11] In the event no party bids on the Debtors' assets in Devco, the Plan will be modified to exclude any treatment of claims against Devco.

[12] During the Debtors' chapter 11 cases, the Debtors obtained authority from the Bankruptcy Court to sell building lots in the ordinary course of business, and to pay liens at the closing of any sale. To the extent liens remain on the building lots, they will be assumed by the Buyer of the Devco assets. Other than certain mechanics' liens on the building lots, the Debtors are not aware of any other lien claims.

| Class | Type of Allowed Claim or Equity Interest | Treatment | Estimated Recovery |
|-------|------------------------------------------|-----------|--------------------|
|       |                                          | purchaser of the Devco assets agrees otherwise, the assets of Devco will be sold pursuant to a Sale Transaction, free and clear of all liens, security interests or other encumbrances on the assets, with any such lien, security interest or other encumbrance attaching to the proceeds of the sale. |  |
| 6 | Priority Claims | Unimpaired.  Debtors believe that no parties hold Priority Claims.  To the extent that any such claims exist, the Stalking Horse Purchaser's bid includes up to $100,000 to be paid towards Administrative, Priority Tax, and Priority Claims. | Estimated at 100% |
| 7 | Banning General Unsecured Claims | Impaired.  Each Holder of an Allowed Class 7 Claim in Banning will receive, on the Effective Date or as soon as practicable thereafter, a *pro rata* share of the amount remaining of the cash proceeds of the Sale Transaction for the assets of Banning, including any proceeds from any Avoidance Actions,[13] and any other assets of the Debtors in Banning immediately after the members of the Convenience Class have been paid.[14] | Estimated at 0% - 1% |
| 8 | Devco General Unsecured Claims | Impaired.  Each Holder of an Allowed Class 8 Claim against Devco will receive, on the Effective Date or as soon as practicable thereafter, a pro rata share of the amount remaining of the cash proceeds of the Sale Transaction for the assets of Devco, including any proceeds from any Avoidance Actions, and any other assets of the Debtors in Devco immediately after the members of the Convenience Class have been paid. | Estimated at 0% - 2% |

---

[13] The proceeds of any Avoidance Action will be distributed to the creditors of the respective Debtor.

[14] The Debtors are currently Plaintiffs in Avoidance Actions captioned, *Banning and Devco v. Banning Lewis Ranch Management Company, LLC* (Case No. 11-50219 (KJC)), *Banning and Devco v. Scott R. Baugh d/b/a Scott Baugh & Associates* (Case No. 11-50385 (KJC)), and *Banning and Devco v. The Lebovic Law Firm* (Case No. 11-50370 (KJC)).

| Class | Type of Allowed Claim or Equity Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| 9 | Banning Convenience Class Claims | Impaired. Paid in the amount of 90% in Cash on the Effective Date or as soon as practicable thereafter, or in accordance with the terms and conditions of transactions or agreements relating to obligations incurred in the ordinary course of business during the pendency of the Chapter 11 Cases or assumed by the Buyer of the Banning assets.<br><br>Under the Plan, unsecured claims which are allowed in the amount of $10,000 or less will be paid an amount equal to 90% of the amount of the Allowed claim. If a claim is for an amount in excess of $10,000, such creditor can elect to have its claim reduced to $10,000 so that, if allowed, it will be treated as a Banning Convenience Class Claim. | 90% |
| 10 | Devco Convenience Class Claims | Impaired. Paid in the amount of 90% in Cash on the Effective Date or as soon as practicable thereafter, or in accordance with the terms and conditions of transactions or agreements relating to obligations incurred in the ordinary course of business during the pendency of the Chapter 11 Cases or assumed by the Buyer of the Devco assets.<br><br>Under the Plan, unsecured claims which are allowed in the amount of $10,000 or less will be paid an amount equal to 90% of the amount of the Allowed claim. If a claim is for an amount in excess of $10,000, such creditor can elect to have its claim reduced to $10,000 so that, if allowed, it will be treated as a Devco Convenience Class Claim. | 90% |
| 11 | Subordinated Claims | Impaired. It is estimated each Holder of an Allowed Subordinated Claim will not receive or retain any property or interest. | Estimated at 0% |
| 12 | Intercompany Claims | Impaired. It is estimated each Holder of an Allowed Intercompany Claim will not receive or | Estimated at 0% |

| Class | Type of Allowed Claim or Equity Interest | Treatment | Estimated Recovery |
|-------|------------------------------------------|-----------|--------------------|
|       |                                          | retain any property or interest. |         |
| 13    | Banning Equity Interest Claims           | Impaired. Equity of Banning will be canceled pursuant to the Plan. Each Holder of an Allowed Banning Equity Interest Claims Claim will not receive or retain any property or interest. | 0% |
| 14    | Devco Equity Interest Claims             | Impaired. Equity of Devco will be canceled pursuant to the Plan. Each Holder of an Allowed Devco Equity Interest Claims Claim will not receive or retain any property or interest. | 0% |

## A.   Holders of Claims and Equity Interests Entitled To Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims and Allowed Equity Interests in Classes of Claims and Equity Interests, respectively, that are impaired are entitled to vote to accept or reject a proposed chapter 11 plan. Holders of Claims and Equity Interests in classes that are unimpaired under a chapter 11 plan are deemed to accept the Plan and are not entitled to vote. Holders of Claims and Equity Interests in classes that will receive no property or interest under the Plan are deemed to have rejected the Plan and are not entitled to vote.

With respect to Class 1, Class 4, Class 5, Class 6 those classes are unimpaired and are presumed conclusively to have accepted the Plan.

With respect to Class 2, Class 3, Class 7, Class 8, Class 9, Class 10, Class 11, Class 12 and Class 13, such classes are impaired.

With respect to Classes 11, 12, 13 and 14, such classes are expected to be impaired, but the votes of these Classes will not be solicited. Holders of such Claims and Equity Interests are not receiving any distributions under the Plan and therefore are deemed to have rejected the Plan.

Generally, for the Plan to be confirmed by the Court, two-thirds in dollar amount, and one-half in number of the Allowed Claims, or with respect to the Allowed Equity Interests two-thirds of the Equity Interests, in each Impaired Class of Claims, or Equity Interests, that actually are voted must vote to accept the Plan. However, a holder of a Claim or Equity Interest will be deemed to have rejected the Plan if such plan provides that the Claims or Equity Interests of such class do not entitle such holders to receive or retain any property under the Plan.

The Plan may be confirmed under certain circumstances, despite dissent by one or more Impaired Classes, and the Debtors reserve the right to seek such non-consensual confirmation of the Plan.

If a Class of Claims or Equity Interests rejects the Plan, the Plan may be confirmed by the Court pursuant to Section 1129(b) of the Bankruptcy Code Section 1129(b) permits the confirmation of a plan of liquidation notwithstanding the non-acceptance of the Plan by one or more impaired classes of claims or equity interests, so long as the Court finds that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

The Bankruptcy Code contains provisions authorizing the confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims (without including any acceptance of the Plan by an insider) has accepted it. These so-called "cram down" provisions are set forth in Section 1129(b) of the Bankruptcy Code. As indicated above, a plan may be confirmed under the cram down provisions if, in addition to satisfying the other requirements of Section 1129 of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) "does not discriminate unfairly" with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting class of claims or a class of interests receives full compensation for their allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property on account of such claims.

The Debtors believe that, if necessary, the Plan may be crammed down over the dissent of certain Classes of Claims and Equity Interests, in view of the treatment proposed for such Classes. There can be no assurance, however, that the requirements of Section 1129(b) of the Bankruptcy Code would be satisfied even if the Plan treatment provisions were amended or withdrawn as to one or more Classes. The Debtors believe that the treatment under the Plan of the Holders of Claims and Equity Interests will satisfy the "fair and equitable" test since, although no distribution will be made in respect of Equity Interests in such Classes and, as a result, such Classes will be deemed pursuant to Section 1126 of the Bankruptcy Code to have rejected the Plan, no Class junior to such non-accepting Classes will receive or retain any property under the Plan.

In addition, the Debtors do not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan. A plan of liquidation "does not discriminate unfairly" if (i) the legal rights of a no accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similarly situated to those of the non-accepting class, and (ii) no class receives payments in excess of that which it is legally entitled to receive for their claims or equity interests. The Debtors believe the Plan does not discriminate unfairly.

Debtors anticipate that at least one Impaired Class of Claims will vote to accept the Plan. However, certain Classes of Claims are Impaired and deemed to reject the Plan because they are not anticipated to receive or retain any property or interest.

B.    **Voting Procedures**

As described more fully in this Disclosure Statement, if you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you are entitled to vote Claims or Equity Interests in more than one Class, you will receive a separate Ballot for each Class of Claims or Equity Interests.  Each Ballot has been coded to reflect the Class of Claims and Equity Interests it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement, Please complete and sign your original Ballot (copies, facsimiles and oral votes will not be accepted), and return it to the Voting Agent at the address set forth on the Ballot.

TO BE COUNTED, YOUR COMPLETED BALLOT MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN 4:00 P.M., EASTERN TIME, ON _____, 2011 ANY EXECUTED BALLOT RECEIVED BY THE VOTING AGENT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DISALLOWED.

Any Claim or Equity Interest in an Impaired Class that otherwise is entitled to vote on the Plan, and as to which an objection or request for estimation is pending or that is scheduled by the Debtors as unliquidated, disputed or contingent, is not entitled to vote on the Plan unless the holder of such Claim or Equity Interest has obtained an order of the Court temporarily allowing such Claim or Equity Interests for the purpose of voting on the Plan.

Pursuant to the Disclosure Statement Order, the Court set _____, 2011 as the record date for voting on the Plan and for receiving distributions under the Plan. Accordingly, only holders of record as of _____, 2011 that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are the holder of a Claim or Equity Interest entitled to vote on the Plan, but did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions regarding the procedures for voting your Claims or Equity Interests, please contact the Voting Agent at:

> Christopher P. Simon, Esq.
> Joseph Grey, Esq.
> Kevin S. Mann, Esq.
> CROSS & SIMON, LLC
> 913 N. Market St., 11th Floor
> Wilmington, DE 19801
> Phone:  (302) 777-4200

C.    **Confirmation Hearing**

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing has been scheduled for _____, 2011 at _____, Eastern Time, before the Honorable Kevin J. Carey, United States Bankruptcy Court for the District of Delaware located at 824 N. Market Street, Wilmington, Delaware 19801. The Court may adjourn the Confirmation Hearing

from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing.

Objections to the Confirmation of the Plan must be filed with the Court and served upon (a) counsel for the Debtors, Christopher P. Simon, Esq., Joseph Grey, Esq., and Kevin S. Mann, Esq., Cross & Simon, LLC, 913 N. Market Street, 11th Floor, P.O. Box 1380, Wilmington, Delaware 19899-1380; (b) counsel for KeyBank, as agent for the Revolver Lender, Mary Calloway, Esq., Buchanan Ingersoll & Rooney PC, 1105 North Market Street, Suite 1900, Wilmington, Delaware 19801-1228 and counsel to Associated Bank, as agent for the Term Lender, Brian M. Graham, Esq., Pedersen & Houpt, 161 North Clark Street, Suite 3100, Chicago, Illinois 60601 and Christopher A. Ward, Esq., Polsinelli Shughart PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801; (c) counsel to the Stalking Horse Purchaser, Filiberto Agusti, Esq. and Joshua Taylor, Esq., Steptoe & Johnson LLP, 1330 Connecticut Ave, NW, Washington, DC 20036, Howard H. Stahl, Esq. and Gregg L. Weiner, Esq., Fried, Frank, Harris, Shriver & Jacobson, LLP, 801 17th Street, NW, Washington, DC 20006, Marc J. Phillips, Esq., Connolly Bove Lodge & Hutz LLP, 1007 North Orange Street, P.O. Box 2207, Wilmington, Delaware 19899 and Robert S. Brady, Esq. and Edmon L. Morton, Esq., Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801; and (d) the Office of the United States Trustee, Attention: David Buchbinder, Esq., 844 King Street, Suite 2207 - Lockbox #35, Wilmington, Delaware 19801, so as to be received by such parties before 4:00 p.m., Eastern Time, on _____, 2011.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO CONDUCT AN ORDERLY DISTRIBUTION TO THEIR CREDITORS AFTER A SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS AS A GOING CONCERN, THUS ENABLING THE DEBTORS TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11. THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

**D.** **Disclaimer**

ALL CREDITORS AND OTHER PARTIES IN INTEREST ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN OF LIQUIDATION IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES

AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN, PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED HEREIN, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NO PERSON OR ENTITY MAY USE ANYTHING IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED HEREIN, INCLUDING THE DESCRIPTION OF THE DEBTORS, THEIR BUSINESSES, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS AND OTHER WRITINGS RELATING TO THE DEBTORS, AND FROM DISCUSSIONS WITH AND VARIOUS WRITINGS PREPARED BY THE DEBTORS AND THEIR LEGAL COUNSEL AND FINANCIAL ADVISORS.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES HEREIN. ALL EXHIBITS HERETO ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS. THIS DISCLOSURE STATEMENT SHALL NOT BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER, AND SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES LAW OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

## III.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business and capital structure for the benefit of its estate, creditors and stockholders. Alternatively, chapter 11 of the Bankruptcy Code authorizes a debtor to conduct an organized sale and liquidation of its business and assets for the benefit of its estate, creditors and

stockholders. In addition to permitting rehabilitation or an organized liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate containing all of the debtor's property as of the filing date. Generally, the debtor remains in possession of its property and continues to operate its business as a "debtor-in-possession."

The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. A plan of reorganization or liquidation sets forth the means for treating claims against, and equity interests in, a debtor. Confirmation of a plan of reorganization or liquidation by the bankruptcy court makes the Plan binding upon the Debtors, any person acquiring property under the Plan and any creditor or equity interest holder of the debtor. Subject to certain limited exceptions, an order of the bankruptcy court confirming a plan of reorganization or liquidation discharges the debtor from any debt that arose prior to the date of confirmation of the Plan, and substitutes therefore the obligations specified under the confirmed plan.

A claim or interest is impaired under a plan of reorganization or liquidation if the Plan provides that such claim will not be repaid in full or that the legal, equitable or contractual rights of the holder of such claim or interest are altered. A holder of an impaired claim or interest that is receiving a distribution under a plan is entitled to vote to accept or reject a plan of reorganization. Chapter 11 does not require that every holder of a claim or interest to vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the Plan. However, the bankruptcy court must find that the Plan meets a number of statutory tests before it may confirm the Plan of reorganization. Many of these tests are designed to protect the interests of holders of claims or interests who do not vote to accept the Plan of reorganization or liquidation, but who nonetheless will be bound by the Plan's provisions if it is confirmed by the bankruptcy court.

Before soliciting acceptances of the proposed plan, a plan proponent must prepare and distribute to its creditors and equity interest holders entitled to vote on the Plan a detailed disclosure statement. Section 1125 of the Bankruptcy Code requires that the disclosure statement contain adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the Plan. The Debtors have prepared this Disclosure Statement in accordance with the requirements of Section 1125 of the Bankruptcy Code.

## IV. DESCRIPTION OF THE DEBTORS' OPERATIONS, ASSETS, LIABILITIES AND RESTRUCTURING EFFORTS

The Debtors are two separate limited liability companies organized under the laws of the State of Delaware and engaged in real estate development related to the Property described below.

## A.      History of the Debtors

In June 2004, the Banning Lewis Ranch Management Company, LLC ("Management")[15], Makar BLR Investors, LLC, Greenfield BLR Partners, L.P. ("Greenfield"), and Farallon BLR Investors, LLC ("Farallon") entered into the Operating Agreement of The Banning Lewis Ranch Company, LLC (the "Operating Agreement") that established Banning. Banning was founded to develop approximately 20,000 acres of land in southeastern Colorado Springs, Colorado. The land was ultimately to be developed as a community of some 76,000 residential units and approximately 79 million square feet of commercial space (the "Property").

In early 2005, Devco was created to own and operate the first portion of the Property to be developed (the "Devco Property"). On or about March 31, 2005, Banning contributed approximately 2,700 completed acres of the Property to Devco and became Devco's 99.9% equity owner.[16]

The Debtors' primary business purpose was to develop the Property and sell individual building lots to merchant builders who then construct and sell houses. The Debtors do not have any employees; rather, the Debtors contracted with Management to develop, secure, manage and market the Property. On or about June 15, 2004, Management and Banning executed a Development Agreement (the "Banning Development Agreement") pursuant to which Banning engaged Management as the developer of the Property. Concurrent with the formation of Devco, Management and Banning terminated the Banning Development Agreement and all obligations thereunder. On or about March 31, 2005, concurrent with the formation of Devco, Devco and Management executed a Development Agreement (collectively with the Banning Development Agreement, the "Development Agreements") pursuant to which Banning engaged Management as the developer of the Devco Property. As the developer of the Devco Property, Management managed the day-to-day operations of Devco and was responsible for, among other things, making payments to its employees, vendors, and other creditors. Management was also, along with Greenfield, the co-managing member of Banning.

The severe decline in residential real estate severely impacted Banning and Devco. Lot sales were generating revenues far below projections. At the same time, the value of lots as loan collateral collapsed with the precipitous drop in real estate values. The Debtors were faced with mounting debts far in excess of the value of their assets.

A majority of the Members of the Debtors approved resolutions dated October 27, 2010, authorizing Debtors to file bankruptcy petitions in this Court and to hire Edward A. Phillips of EisnerAmper, LLP, as Chief Restructuring Officer ("CRO") to guide Debtors through the bankruptcy process. Greenfield, as co-managing member, supervises his actions.

---

[15] Management is the successor in interest to Makar Properties, LLC, the original signatory to the Operating Agreement.

[16] The remaining, 0.1% interest was transferred to another Delaware limited liability company, MFG I and II, LLC, which is also owned by members of Banning.

The Debtors filed voluntary petitions for Chapter 11 bankruptcy protection on the Petition Date). On the Petition Date, the Debtors estimated that Devco's debt exceeded the value of its assets by at least $142 million, and that Banning's debt exceeded the value of its assets by at least $129 million. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## B.   The Debtors' Real Property

Banning currently owns approximately 17,760 acres of largely undeveloped raw land. Devco owns approximately 2,700 acres of land in a more developed portion of the Banning Lewis Ranch project.

Copies of the legal descriptions of the real property underlying the Property are attached hereto as Exhibit "E".

## C.   Other Assets

Outside of the real property described above, the Debtors' other personal assets consist of cash on hand in the amount of $_____, accounts receivable of approximately $_____, deposits of approximately $_____, furniture and fixtures of approximately $_____, and the Debtors' interest in an escrow account held by First American Heritage Title Company, k/n/a Heritage Title Company in the amount of approximately $25,000.

The Debtors are currently plaintiffs in Avoidance Actions captioned, *Banning and Devco v. Banning Lewis Ranch Management Company, LLC* (Case No. 11-50219 (KJC)), *Banning and Devco v. Scott R. Baugh d/b/a Scott Baugh & Associates* (Case No. 11-50385 (KJC)), and *Banning and Devco v. The Lebovic Law Firm* (Case No. 11-50370 (KJC)). The total amount claimed in these adversary proceedings is $2,257,176.74. The Debtors are in settlement negotiations with Scott R. Baugh and The Lebovic Law Firm and anticipate that their matters will be settled shortly with the defendants making payments to the Debtors' estates. The Debtors are confident in their position in the action against Management and anticipate a considerable amount of the transfers made to Management being returned to the estates for distribution to the Debtors' creditors.

The Debtors continue to review their records and anticipate filing more preference and Avoidance Actions if necessary. The proceeds that the Debtors' receive from Avoidance Actions will fund the claims of the Debtors' general unsecured creditors and the convenience classes.

Finally, the Debtors believe that Devco may be entitled to recover funds from infrastructure improvements completed by Devco. Pursuant to agreements with the City of Colorado Springs, once certain areas of the Property are developed, the developers make payments to the City of Colorado Springs for the right to use the infrastructure improvement. The City of Colorado Springs, in turn, reimburses Devco for such improvements. At this time,

the Debtors are unable to value the potential recovery on account of the infrastructure improvements, which assets are subject to sale in accordance with the Bid Procedures Order.

**D.      The Debtors' Liabilities**

After the Petition Date, the Debtors filed schedules listing undisputed, liquidated, and non-contingent claims totaling approximately $341,281,349.

**1.      Secured Debt**

Devco is the borrower under a certain Senior Secured Revolving Credit Agreement dated as of September 7, 2007 (as amended, the "Revolver Credit Agreement") by and among Devco as borrower, KeyBank National Association ("KeyBank") and the lenders thereto (the "Revolver Lenders"). Banning guaranteed payment of Devco's obligations under the Revolver Credit Agreement. The guarantee by Banning of the Revolver Credit Agreement is unsecured. Banning is the borrower under a certain Senior Term Loan Agreement dated as of September 7, 2007 (as amended, the "Term Loan Agreement") by and among Banning, KeyBank and the lenders thereto (the "Term Lenders"). Associated Bank, N.A. is now the agent for the Term Lenders. Devco's obligations under the Revolver Credit Agreement are secured by first priority liens on substantially all of Devco's assets. Banning's obligations under the Term Loan Agreement are secured by first priority liens on substantially all of Banning's assets.

As of the Petition Date, their obligations to KeyBank and the Revolver Lenders and Term Lenders under the Revolver Credit Agreement, the Term Loan Agreement, and the agreements, instruments, and documents the Debtors executed and delivered in connection thereto, constitute allowed secured claims to the extent permitted by section 506(a) of the Bankruptcy Code, and allowed unsecured claims to the extent they are not allowed secured claims, respectively, in amounts not less than the following:

(a)      Under the Revolver Credit Agreement, $67,840,767.23, consisting of $65,486,866.74 principal, $280,717.73 interest, $13,182.76 other charges, and $2,060,000 letters of credit (the "Prepetition Revolver Debt"); and

(b)      Under the Term Loan Agreement, $23,631,556.27, consisting of $23,500,000 principal, $127,866.12 interest, and $3,690.15 other charges (the "Prepetition Term Debt" and collectively, with the Prepetition Revolver Debt, the "Prepetition Debt").

**2.      Member Loans**

In February 2009, in response to the financial difficulties of Banning and Devco, Greenfield and Farallon began to make "Special Member Loans" to the Debtors pursuant to a Third Amendment to the Operating Agreement (the "Third Amendment"). Greenfield and Farallon were already owed approximately $219 million in Mezzanine Loans made prior to 2009. Pursuant to the Third Amendment, Greenfield and Farallon agreed to extend Special Member Loans to Banning in February 2009 in the total amount of approximately $36 million.

3. **Claims Filed Against the Debtors**

On December 21, 2010, the Court entered an order (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim. Pursuant to the Bar Date Order, any person or entity that fails to timely file a proof of claim by February 21, 2011 at 4:00 p.m. prevailing Eastern time (the "General Bar Date") and any governmental unit that fails to timely file a proof of claim by April 29, 2011 at 4:00 p.m. prevailing Eastern time (the "Governmental Unit Bar Date") be barred, estopped and enjoined forever from voting on, or receiving a distribution under, the Plan, and be barred, estopped and enjoined forever from asserting a Claim against the Debtors, their estates, the Post Effective Date Debtors, and any successors or assigns.

Parties have filed proofs of claim totaling approximately $457,628,479 in liquidated claims. Parties have also filed claims seeking indemnification in unliquidated amounts.

Although the Debtors are parties to several adversary proceedings currently pending before this Court, neither Debtor is currently a party to any litigation in other jurisdictions.

Several of the Debtors' contractors and vendors have asserted mechanics' liens against the Debtors' Property. Specifically, Lafarge West, Inc. has filed mechanics' liens on certain building lots based on unpaid invoices totaling $27,333.65. The Debtors continue to investigate mechanics' liens against the Property. It is anticipated that these mechanics' liens will be resolved upon the sale of the respective portion of the Property.

The City of Colorado Springs alleges that predecessors of the Debtors entered into certain agreements with the City of Colorado Springs, including, but not limited to: Annexation Agreement dated September 23, 1988; Colorado Springs Utilities Electric Extension Agreement Banning Lewis Ranch effective as of March 30, 2006; Modified and Restated Wastewater Facilities Participation, Utilization, and Service Agreement dated February 10, 2009 (with four amendments); October 30, 2009 Letter Agreement concerning maintenance of existing Wastewater Main; June 23, 2010 Intergovernmental Assignment Agreement; June 23, 2010 Assignment Agreement; BLR Trailwood Village Master Plan; and Amended and Restated Metro District Service Plan1. The City has asserted that these agreements run with the land. The Debtors are still investigating whether these agreements are covenants that run with the land, and assuming that they do, which of the Debtors are bound to such agreements. The City of Colorado Springs has filed proofs of claims alleging, among other things, the Debtors' failure to complete certain infrastructure and improvements to the Property. The City's filed proofs of claims total $795,281.00.

E. **The Debtors Obtain Post-Petition Financing**

The Third Amendment states that apart from its express provisions, neither Greenfield nor Farallon is required to "make any Capital Contributions or Members Loans (or otherwise provide or advance money)" for the operations of the Debtors. Greenfield and Farallon informed the Debtors that they would not provide additional Special Member Loans.

On or about September 21, 2010, KeyBank stated that it was not interested in further extending the maturity of its debt or in restructuring the Property. Indeed, KeyBank suggested to the Debtors, Management, Greenfield, and Farallon that the Debtors' assets were no longer worth the $88 million that KeyBank had provided.

On October 8, 2010, Greenfield and Farallon informed Management that, in light of the financial condition of the Debtors, they felt it would be an imprudent use of their investors' assets to extend further loans to the Debtors and refused to continue to fund the Debtors through loans or further equity contributions.

The absence of additional funding posed an imminent threat to the Debtors. The real-estate developments that Banning and Devco own require services to be performed and facilities to be maintained. If sources of funding could not be secured, operations would cease, harming current development residents and further damaging the value of the assets. This would have resulted in a fire sale of assets at unreasonably low prices, seriously damaging the creditors of Debtors and the current residents of the developed Devco parcels.

Because the Debtors' existing debt to secured and unsecured creditors already far exceeded the value of their assets, no other financier, outside the protections of bankruptcy, would provide them with financing. But due to the protections provided bankruptcy "debtor in possession" lenders under Section 364 of the Bankruptcy Code, financing for operating expenses became available.

After the Petition Date, BDL Investors, LLC and Greenfield BLR Finance Partners, L.P. (collectively, the "DIP Lenders"), affiliates of the Debtors' members, agreed to provide debtor-in-possession financing on the terms and conditions set forth in the Debtors-in-Possession Credit Agreement ("DIP Financing Documents").

On or about December 6, 2010, the Debtors filed a motion for authority to obtain debtor in possession financing (the "Post-Petition Financing") of up to $3,500,000.00 upon entry of the DIP Order. On December 22, 2010, this Court authorized the Debtors to obtain the Post-Petition Financing. The Debtors anticipated that the Post-Petition Financing would reassure the Debtors' creditors, as well as their critical vendors and suppliers, and insure that the Debtors would be able to continue to meet their post-petition obligations in the ordinary course.

The Post-Petition Financing has been an integral factor in the Debtors' ability to preserve the ongoing confidence of their creditors, vendors and suppliers while the Debtors implement their financial restructuring. Pursuant to the DIP Financing Documents, the Debtors granted, and the Court approved, among other things, the granting of security interest, liens (including priming liens pursuant to section 364(d) of the Bankruptcy Code), to the DIP Lenders to secure all obligations of the Debtors under and with respect to the DIP Facility: (1) a first priority, perfected Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, upon (i) all Banning's Collateral that is not subject to valid perfected and non-avoidable liens in existence at the time of the commencement of the of the Bankruptcy Case(s), (ii) all Devco's Collateral that is not subject to valid perfected and non-avoidable liens in existence at the time of the commencement of the of the Bankruptcy Case(s), and (iii) any rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof; and (2) a perfected Lien, pursuant to Section

364(c)(3) and 364(d)(1) of the Bankruptcy Code: (i) upon all of Banning's Collateral that is (a) junior in priority and payment only to the Key Bank Term Loan Lien and Key Bank Term Loan up to the value of the Key Bank Term Loan Collateral as of the Petition Date, and (b) senior in priority and payment as to any other liens (other than the Key Bank Term Loan Lien) on Banning's Collateral, and (ii) upon all Devco's Collateral that is (a) junior in priority and payment only to the KeyBank Revolving Loan Lien and Key Bank Revolving Loan up to the value of the Key Bank Revolving Loan Collateral as of the Petition Date, and (b) senior in priority and payment as to any other liens (other than the Key Bank Revolving Loan Liens) on Devco's Collateral; (3) an allowed superpriority administrative expense claim in the Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (4) waiver of any rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof; (5) authorizing the Debtors to execute and deliver the Security Documents to the DIP Lenders and to reasonably cooperate with the DIP Lenders in obtaining for the DIP Lenders valid and perfected security interests and liens as security for the DIP Obligations. The Post-Petition Financing also contained a carve out of an amount up to $150,000 for the Debtors' professionals.

## V. THE DEBTORS' CHAPTER 11 CASES

### A. Significant "First Day" Motions in the Chapter 11 Cases

Shortly after the filing of their chapter 11 petitions, the Debtors filed numerous "first day" motions seeking orders from the Court authorizing the Debtors to retain professionals and providing the Debtors certain relief from certain administrative requirements imposed by the Bankruptcy Code. Subsequently, the Court entered orders granting the Debtors the various forms of relief requested. In particular, the Debtors obtained the following orders which allowed the Debtors to continue with the prosecution of their Chapter 11 cases and continue operating in the ordinary course of business:

1. *Order Approving the Debtors' Retention of EisnerAmper LLP* [Docket No. 67];

2. *Order Directing Joint Administration of the Debtors' Chapter 11 Cases Pursuant to 11 U.S.C. Section 105(a), Rule 1015(b) of the Bankruptcy Rules and Local Rule 1015-1 and Granting Related Relief* [Docket No. 68];

3. *Order Granting Debtors Additional Time to file Schedules and Statements* [Docket No. 69];

4. *Order Approving Debtors' Application for Order Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Cross & Simon, LLC as Bankruptcy Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 70];

5. *Administrative Order Pursuant to 11 U.S.C. Sections 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 71];

6. *Order Authorizing the Debtors to Conduct Sales of Building Lots Free and Clear of Liens, Claims and Encumbrances* [Docket No. 133].

In addition to the "first day" motions, other significant motions filed in the cases include the following:

1. *Motion of The Banning Lewis Ranch Management Company, LLC for Relief from the Automatic Stay to the Extent it Applies and Abstention Pursuant to 28 U.S.C. § 1334* [Adv. D.I. No. 49], wherein Management sought relief from the automatic stay so that it could proceed in the California Action against certain of the Debtors' members. This motion is still pending before the Bankruptcy Court. Prior to the filing of this motion, Management filed a different motion seeking abstention, described above;

2. *Motion of the Debtors for an Order Under 11 U.S.C. §§ 105(a) and 363(b) Authorizing the Debtors to Pay Certain Tax Claims in Full* [Docket No. 186], wherein the Debtors sought authority to pay certain property taxes to El Paso County, Colorado. The Court entered an Order [Docket No. 214] allowing the Debtors to pay these taxes. The taxes have now been paid, pursuant to the Order;

3. *Motion of Colorado Springs to Transfer Venue* [D.I. No. 38], wherein the City of Colorado Springs sought to transfer the Debtors' cases to the District of Colorado. The Court entered an Order [Docket No. 109] denying the City of Colorado Springs request to transfer venue.

4. In April 2009, Management filed an action in California titled *Banning Lewis Ranch Management Company, LLC v. Greenfield BLR Partners, L.P.* (Case No. 30-2009-00263749) (the "California Action"). In the California Action, Management seeks compensatory and punitive damages from Greenfield and Farallon based on alleged breaches of fiduciary duty and the implied covenant of good faith and fair dealing.[17]

After the Debtors filed voluntary petitions for Chapter 11 bankruptcy protection, Management filed mechanics' liens in Colorado against the Debtors properties, alleging a lien claim against Banning in the amount of $35 million and a lien claim against Devco in the amount $16 million. Management's liens were based on its claim to a fee from each of the Debtors based on a percentage of the

---

[17] Management also sued cross-defendants Harvard Management Company, Inc., Harvard Management Private Equity Corp., and The Trustees of Princeton University (together, the "Investor Defendants") for the same alleged breaches of fiduciary duty and the covenant of good faith and fair dealing.