Debtors' projected and unrealized budgeted revenue (the "Purported Development Fee"). Management claimed that it was entitled to the Purported Development Fee under the Debtors' Operating Agreements and Development Agreements.

On January 25, 2011, Debtors filed the Complaint (I) to Avoid Transfers Pursuant to 11 U.S.C. §§ 547, 548, 549, (II) to Recover Property of the Debtors' Estates Transferred Pursuant to 11 U.S.C. § 550, (III) for Declaratory Judgment and (IV) Injunctive Relief [Adv. D.I. 1] (the "Complaint"). The Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Counts VI, VII, VIII, and X of the Complaint (the "Fee Counts") concern the liens and the Purported Development Fee. The filing of the Complaint commenced the adversary proceeding, *The Banning Lewis Ranch Company, LLC v. Banning Lewis Ranch Management Company, LLC* (Adv. Proc. No. 11-50219 (KJC)) (the "Adversary Proceeding").

As noted above, Management recorded its mechanics' liens on the Debtors' properties in the amount of the Purported Development Fee. Management also named the Debtors as cross-defendants in the California Action and claimed that the Debtors were liable for payment of the Purported Development Fee. However, Management dismissed the Debtors as named parties in the litigation after realizing that the Chapter 11 proceedings in this Court stayed the prosecution of claims against the Debtors.

Despite the fact that neither Greenfield nor Farallon were signatories to the Development Agreements, Management is now seeking to recover the Purported Development Fee from those parties in the California Action. The Debtors objected to the pursuit of the California Action because, to the extent that Greenfield and Farallon were held liable for the decision not to pay the Purported Development Fee, the Debtors believed Greenfield and Farallon would have the power to assert, and would have asserted, pursuant to Section 12 of the Debtors' Operating Agreements, a right of indemnification from the Debtors for the amount they may pay in damages in the California Action. Therefore, despite being dismissed as a party in the California Action and despite Management's release of the liens, the Debtors wished to challenge the amount of the Purported Development Fee.

Recognizing that the California Action implicated the Debtors' property, and in deference to this Court's jurisdiction, the California trial judge stayed the California litigation on January 27, 2011. On February 8, 2011, Management filed the Motion to Dismiss Counts VI, VII, VIII and X of the Complaint [Adv. D.I. 15] (the "Motion to Dismiss"). On February 16, 2011 Management filed a motion in the Bankruptcy Court seeking an order of abstention from hearing litigation related to the California Action (the "Motion for Abstention").

Although, Management alleged that its claims in the California Action were state law claims, those claims include causes of action based on the Debtors'

nonpayment of the Purported Development Fee. The Debtors believed those claims were core proceedings pursuant to 28 U.S.C. § 157(b)(2). In response, Management claimed, in its Motion for Abstention, that the California Action did not involve the Debtors and, therefore, this Court is free to abstain from hearing any litigation related to the California Action. The Debtors disputed this, claiming that the California Action involves disputes among the Debtors' members — disputes that could result in a claim being brought against the Debtors' estates; the claims in the California Action involved the interpretation of the Debtors' Operating Agreement, which are the Debtors' formative documents and provide the governing structure for the Debtors, and the Development Agreements, to which only the Debtors and Management were signatories. Furthermore, the Debtors believed that Management asserted claims in the California Action that rightfully belonged to the Debtors and should be brought as derivative claims on behalf of the Debtors.

The Debtors anticipate that Management's Motion for Abstention will be resolved by settlement between Management and the Debtors' members, which settlement would also contemplate a settlement of the California Action.

### B.     Disclosure Statement and Plan Confirmation Hearings

On May 16, 2011, the Debtors filed this Disclosure Statement and the Plan with the Court. The Court considered the adequacy of the Disclosure Statement at a hearing on _____, 2011. The Confirmation Hearing in respect of the Plan has been scheduled for _____, 2011, at ___:___ __.m., Eastern Time, before the Honorable Kevin J. Carey at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801.

### C.     Background Regarding The Sale Transactions

The Debtors, in the exercise of their informed and considered business judgment, have determined that the best way to maximize value for the benefit of their estates and creditors is to sell the Property. To assist the Debtors with the sale and marketing of the Property, the Debtors, with approval of the Bankruptcy Court, employed Eastdil Secured, L.L.C. ("Eastdil"). The Debtors have enlisted the services of Eastdil to assist in the sale of their Property based on Eastdil's experience and knowledge of the industry. Eastdil has detailed knowledge of the Debtors' business, the market for the Debtors' assets, commercial real estate issues and other issues that led the Debtors to believe that the retention of Eastdil was in the best interest of their estates and creditors. The retention of Eastdil was approved by the Court on December 23, 2010.

### 1.     Marketing Efforts

As noted above, the residential real estate market in the Colorado Springs area is in extremely poor condition.

Prior to the Petition Date, the Debtors did not retain an outside financial advisor or outside marketing consultant to assist in the sale of the Property, due to their knowledge of market conditions and their prior attempts to work with homebuilders.

In December of 2010, the Debtors retained Eastdil to assist in the marketing of the Property. On or about January 14, 2011, Eastdil disseminated its marketing materials to over 1,400 investors representing over 900 companies. Since that time, Eastdil has been in contact with at least fifty potential purchasers many of whom have signed confidentiality agreements and some of whom have expressed an interest in bidding on the Property. Those that have signed confidentiality agreements have been provided with the Confidential Offering Memorandum and Due Diligence Information Package which contains detailed information on the Property. This information has also been uploaded to Eastdil's due diligence website, which is consistently updated with recent sale activity in the area. Eastdil has also conducted tours of the Property with potential bidders.

To date, notwithstanding all of the foregoing, no party submitted an offer acceptable to the Debtors to purchase any portion of the Property other than the Stalking Horse Purchaser. Eastdil has encouraged potential investors to review the Property and helped approved potential investors review the due diligence materials. The interested parties are largely institutional and consist primarily of private equity funds, opportunity funds, land bankers and regional homebuilders and community developers. Eastdil continues to actively discuss the Property and encourage investors to participate in the sale.

## 2. The Motions and Sale Procedures

The Debtors have determined that it is in the best interests of the Debtors' estates to solicit and enter into one or more Sales Transactions with willing bidders with respect to an asset sale conducted in connection with the Plan. In addition, entry into any proposed Sale Transactions is anticipated to be highly advantageous, as it is expected to provide a fair valuation of each of the Debtors' assets and to provide the capital necessary for the Debtors to confirm and implement the Plan using the proceeds to make payments to certain lenders in exchange for releases of their claims and security interest. Sale Transactions will also allow the Debtors to satisfy their obligations under the DIP Credit Agreement and make distributions to general unsecured creditors.

On April 26, 2011 the Debtors filed the Bid Procedures Motions. Pursuant to the Bid Procedures Motions, the each of the Debtors seek, among other things, (i) approval of procedures for the sale of their assets in Devco and Banning, (ii) approval of the Stalking Horse Purchaser as the purchaser of the Banning assets, (iii) approval of certain bid protections to the Stalking Horse Purchaser, and (iv) approval of procedures for the receipt of other bids on the Banning and Devco assets and the conduct of an auction, if necessary.

[On May 18, 2011, the Court considered and approved the Bid Procedures Motions. The Stalking Horse Purchaser's Bid was approved as a Stalking Horse Bid for the Banning assets. The Bid Procedures Motions call for an auction to be held on June 28, 2011 and a hearing to consider approval of the Sale to be held on _____ 2011, before the Honorable Kevin J. Carey at the United States Bankruptcy Court for the District of Delaware,

824 N. Market Street, Wilmington, Delaware 19801. If competing bids are received, the Debtors will hold an auction to determine the highest and best bid. If no competing bids are submitted for the Banning assets, the Stalking Horse Purchaser shall be declared the Winning Bidder of the Banning assets and the auction cancelled. If no competing bids are submitted for the Devco assets, the auction will be cancelled.]

If bids are received for the Debtors' assets in Devco, the Debtors will make a determination to proceed to auction, if necessary, to select a Winning Bidder for the Devco assets. To the extent the Winning Bid for the Devco assets requires modification of the Plan to implement the Sale Transaction, the Debtors will take such steps as are necessary to implement the Sale Transaction. If no bids are submitted for the Devco assets, the Debtors will not sell their assets in Devco under the Plan, and the unsecured creditors of Devco may not receive any recovery under the Plan.

**AT THE AUCTION, THE DEBTORS WILL SELECT THE HIGHEST AND BEST SALE TRANSACTIONS WHICH WILL BE IMPLEMENTED PURSUANT TO THE PLAN. THE PLAN MAY BE MODIFIED, PURSUANT TO 11 U.S.C. § 1127, FOLLOWING THE AUCTION TO SPECIFICALLY IMPLEMENT THE SELECTED SALE TRANSACTIONS, INCLUDING, BUT NOT LIMITED TO THE TREATMENT OF SPECIFIC CREDITORS' CLAIMS, AND THE ASSUMPTION OF CERTAIN DEBTS BY A PURCHASER OF ONE OR MORE OF THE DEBTORS' ASSETS.**

### 3. The Stalking Horse Purchaser of the Banning Assets.

As noted above, pursuant to the Plan and Bid Procedures Order, the Debtors propose to sell the assets of Banning to the Stalking Horse Purchaser, or bidder with the highest or otherwise best bid at auction, free and clear of liens, claims, encumbrances and other interests, with such liens, claims, encumbrances and other interests to attach to the proceeds of the Sale.

Generally, the Stalking Horse Purchase Agreement provides as follows:

1. Stalking Horse Purchaser: A newly formed entity to be designated by, Greenfield BLR Finance Partners, L.P. and BDL Investors, LLC.

2. Acquired Assets: Pursuant to a sale under 11 U.S.C. § 1129(b)(2)(A)(iii) under the Plan, Banning will sell, and the Stalking Horse Purchaser shall purchase, all of Banning's assets and property (the "Banning Purchased Assets") including without limitation the developed and undeveloped real property in Colorado Springs, Colorado owned by Banning including the Assumed Contracts (defined in the Agreement), but excluding the Excluded Assets (as defined in the Agreement). In connection with the Sale, Stalking Horse Purchaser shall purchase all of the real and personal property of Banning other than the Excluded Assets and assume the Assumed Liabilities (as defined in the Agreement) but shall not assume any other liabilities.

3. Excluded Assets: Banning's ownership interests in Devco, Avoidance Actions and such other assets to be identified by the Stalking Horse Purchaser.

4. Assumed Contracts:

(a) the Term Loan Agreement and the other Term Loan Documents, provided that the Term Loan Documents shall be modified pursuant to terms to be agreed upon by Purchaser, Associated Bank and all other necessary lenders party to the Term Loan Agreement, and which must include, unless otherwise agreed to by Purchaser in its sole discretion, the following modified terms: (i) the "Maturity Date" (as defined in the Term Loan Agreement) shall be extended to September 7, 2019, (ii) the applicable interest rate shall be amended to allow Purchaser to select the 1 or 3 month LIBOR from time to time upon the expiration of the current LIBOR period, such that the interest rate shall equal the 1 or 3 month LIBOR, as selected by Purchaser, plus 200 basis points, and (iii) any interest, fees or other amounts due as a cure amount required to be paid by the Bankruptcy Court in connection with assumption shall be added to the principal amount of the Term Loan; and

(b) other Executory Contracts and Leases to be identified by the Purchaser, which Purchaser may add or remove subject such Executory Contracts and Leases up to and including the Closing Date.

5. Assumed Liabilities: The Stalking Horse Purchaser shall assume (i) all obligations under executory contracts and unexpired leases to be identified by Stalking Horse Purchaser, (ii) the obligations under the Modified Term Loan Agreement, (the "Assumed Term Loan Obligations") and (iii) such other liabilities and obligations identified by Stalking Horse Purchaser.

6. Banning Purchase Price: The purchase price to be paid by the Stalking Horse Purchaser for the Purchased Assets shall be (i) the assumption of the Assumed Term Loan Obligations, plus (ii) waiver of the Debtors' obligation to repay the DIP Credit Agreement, plus (iii) up to $100,000 for the payment of allowed administrative expenses, plus (iv) the assumption of the Assumed Liabilities (collectively, the "Banning Purchase Price").

7. Deposit: Pursuant to the Agreement, prior to the hearing to approve the Bid Procedures Motions, the Stalking Horse Purchaser shall provide a deposit of $1,000,000 by, at its election, treating $1,000,000 of the DIP Financing as a deposit or by depositing $1,000,000 of cash. The deposit shall be nonrefundable in the event that the Stalking Horse Purchaser is the Winning Bidder (as defined below) at the Auction, the Order approving the Sale has been entered by this Court (and such Order has not been modified, reversed, vacated or stayed), and the Stalking Horse Purchaser fails to close the Sale for any reason other than the Debtor's breach or the failure of any conditions precedent set forth in the Agreement to be satisfied.

8. Closing Date: June 30, 2011. Closing is conditional upon: (i) modification of the Term Loan as set forth in the Agreement and (ii) satisfaction of conditions precedent set forth in the Agreement.

9. Release of Claims: Pursuant to the Agreement and Plan, the Debtors will provide a full and complete release of claims and causes of action against and exculpation in favor of the Stalking Horse Purchaser, the DIP Lenders, Greenfield BLR Partners, L.P., Farallon BLR Investors, LLC, BLR Manager, LLC, Harvard Management Company, Inc., The Trustees

of Princeton University and Harvard Management Private Equity Corporation, and their respective directors, officers, partners, members, shareholders, representatives, employees and professional advisors (but excluding Makar BLR Investors, LLC and Management).

10.     The Stalking Horse Purchaser has no obligation to purchase the assets unless and until the Court: (i) enters an Order approving the Bid Procedures, (ii) enters an order approving the Sale and (iii) enters an order confirming the Plan (and none of such Orders has been modified, reversed, vacated or stayed), and (iv) the other conditions precedent set forth in the Agreement are satisfied.

11.     Break-Up Fee and Expense Reimbursement:  Subject to entry of the Procedures Order, the Stalking Horse Purchaser shall be entitled to be paid by the Debtors (a) a break-up fee of $250,000 (the "Break-Up Fee")[18] plus (b) reimbursement of actual out-of-pocket expenses incurred in connection with the Sale and the transactions contemplated hereby in an amount not to exceed $250,000 ("Expense Reimbursement") if (i) the Stalking Horse Purchaser is not the Winning Bidder for Banning's Property, (ii) an order is entered that approves a sale of all or substantially all of Banning's Property to any person other than Stalking Horse Purchaser, (iii) the Debtors breach the Agreement, or (iv) any plan other than a Plan providing for the sale of Banning's Property to the Stalking Horse Purchaser on the terms set forth in the Agreement is confirmed; *provided* that Purchaser will not be entitled to such payments if the Stalking Horse Purchaser has materially breached its obligations under the Agreement or the Plan.

### 4.     Assumption and Rejection of Executory Contracts

The Plan constitutes a motion to assume or reject all executory contacts for each Debtor, except for those executory contracts that have already been assumed or rejected pursuant to an earlier Order of the Court or that are the subject of a motion for such an Order pending as of the Confirmation Hearing.  Included in the Plan Supplement is Exhibit [___] which is a schedule of all executory contracts to be assumed.  All other contracts will be deemed rejected.

Exhibit [___] to the Plan Supplement will list all executory contracts to be assumed and assigned to the Buyer.

The Debtors, Plan Agent (as defined below) or Buyer, as appropriate, except as otherwise agreed by the parties, will cure any and all undisputed defaults within 30 days of the Effective Date under any executory contract assumed or assumed and assigned pursuant to the Plan, in accordance with section 365 of the Bankruptcy Code.  All disputed defaults that are required to be cured shall be cured either within 30 days of the entry of a Final Order determining the amount, if any, of the Debtors' or Buyer's liability with respect thereto, or as may be agreed otherwise by the parties.

Any Claim for damages arising from the rejection of an executory must be filed and served on counsel for the Debtors within thirty (30) days after the order of the Court approving such rejection or be (i) forever barred and unenforceable against the Debtors, their

---

[18] The Stalking Horse Purchaser has subsequently agreed to waive its rights to the Break-Up Fee.

estates, the Post Effective Date Debtors and respective property, and (ii) barred from receiving any distribution under the Plan. All allowed Claims arising from the rejection of executory contracts shall be treated as General Unsecured Claims.

5. **Parties in Interest and Professionals**

During the course of the chapter 11 case, the Court has approved or has been asked to approve the Debtors' retention of the following professionals to advise the Debtors in a variety of areas: Cross & Simon, LLC (bankruptcy counsel); Robins, Kaplan, Miller & Ciresi L.L.P. (litigation counsel); Holland & Hart LLP (real estate counsel); Eastdil Secured, L.L.C. (investment banker); EisnerAmper LLP (interim management and restructuring services).

## VI. SUMMARY OF THE PLAN OF LIQUIDATION

### A. Introduction

The Plan is the product of diligent efforts by the Debtors to formulate a plan that provides for a fair allocation of the Debtors' assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law.

The Debtors believe that confirmation of the Plan provides the best opportunity for maximum recoveries to the Debtors' creditors. The Debtors believe, and will demonstrate to the Court, that the Debtors' creditors will receive significantly more value under the Plan than any available alternative.

### B. Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An administrative claim, claim or equity interest becomes "allowed" when a plan proponent agrees, or in the case of a dispute, the Court determines, that the administrative claim, claim or equity interest is a valid obligation of a debtor, including the amount. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense claim, claim or equity interest is "allowed" automatically unless the debtor or another party in interest objects. Section 502(b) of the Bankruptcy Code, however, provides that certain claims may not be "allowed" in bankruptcy even if a proof of claim is filed, Such claims include, without limitation, claims that are unenforceable under a governing agreement or applicable non-bankruptcy law, claims for unmatured interest, claims for certain services that exceed their reasonable value, lease and employment contract rejection damage claims in excess of specified amounts and late-filed claims. In addition, Rule 3003(c)(2) of the Federal Rules of Bankruptcy Procedure prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder of such claim or equity interest has not timely filed a proof of claim or equity interest.

The Bankruptcy Code also requires that, for the purposes of treatment and voting, a chapter 11 plan divide different types of claims and equity interests into separate classes, based upon their legal nature. Claims of a substantially similar nature generally are classified together,

as are equity interests of a substantially similar nature. As a single entity may hold multiple claims and/or equity interests that give rise to different legal rights, such a holder may be a member of multiple classes under a plan.

Under a chapter 11 plan, the separate classes of claims and equity interest must be designated as either "impaired" or "unimpaired". If a class of claims is "impaired" under a plan, the Bankruptcy Code affords certain rights to the holders of such claims, including the right to vote on the Plan (with the exception of classes of claims and interests that receive no distributions under the Plan, and which therefore are deemed to have rejected the Plan), and the tight to receive an amount under the Plan that is no less than the value that claim holder would receive in a chapter 7 liquidation. Under Section 1124 of the Bankruptcy Code, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified, outlier than by curing defaults and reinstating maturity or by payment in full in cash. Typically, this means that the holder of a unimpaired claim will receive under the Plan payment in full, in cash, with prepetition interest to the extent permitted and provided under the governing agreement between the parties (if applicable) or applicable non-bankruptcy law, and the remainder of the debtor's obligations, if any, will be performed as they become due in accordance with their terms. Thus, other than the right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position in which it would have been if the debtor had not commenced a chapter 11 case.

Distributions on accounts of Claims that become Allowed Claims after the Effective Date will be made pursuant to the Plan as it relates to timing and calculation of amounts to be distributed under the Plan and to distributions on account of Disputed Claims once they are allowed.

1. **Unclassified Claims**

(a) **Administrative Claims**

Administrative Claims include the costs and expenses of administration of the chapter 11 case of a kind specified in Section 503(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(1) of the Bankruptcy Code. Such costs include any actual, necessary costs and expenses of operating the Debtors' businesses and preserving the Debtors' estates, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses, all compensation and reimbursement of expenses to the extent Allowed by the Court pursuant to Section 330 or Section 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtors' estates pursuant to Section 1930, Chapter 123 of Title 28 of the United States Code. Debtors anticipate that substantially all Administrative Claims will be paid in the ordinary course of business after the Petition Date, and the Stalking Horse Bid will satisfy all of the Debtors' obligations under the DIP Facility. Should any unpaid Administrative Claims exist as of the Effective Date of this Plan, those claims will be paid using funds set aside for Administrative and priority claims from the Sale Transactions. To the extent that any such claims exist, the Stalking Horse Purchaser's bid includes up to $100,000 to be paid towards Administrative, Priority Tax, and Priority claims.

(b) **Post-Petition Tax Claims**

All requests for payment of Post-Petition Tax Claims, for which no bar date has otherwise been previously established, must be filed on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any holder of any Post-Petition Tax Claim that is required to file a request for payment of such taxes and that does not file such a Claim by the applicable bar date shall be forever barred from asserting any such Post-Petition Tax Claim against the Debtors, or any of their respective properties, whether any such Post-Petition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date. The Debtors are paying all Post-Petition Tax Claims as they come due; however, certain taxing authorities conduct audits which may result in a post petition tax liability of which the Debtors are currently unaware. Should any unpaid Post-Petition Tax Claims exist as of the Effective Date of this Plan, those claims will be paid using funds set aside for Administrative and priority claims from the Sale Transactions. The Stalking Horse Purchaser's bid includes up to $100,000 to be paid towards Administrative and priority claims.

El Paso County, Colorado property taxes are paid one year in arrears. The Debtors' 2010 El Paso County property taxes were paid by the estate, pursuant to Court Order, in April 2011. The Debtors anticipate that certain portions of the El Paso County property taxes will need to be paid by each of the Debtors upon the sale of their respective real property. To the extent not paid, these taxes will be assumed by the Buyer.

### (i) General

Subject to (x) the bar date provisions herein and (y) additional requirements for professionals and certain other entities set forth below, Plan Agent shall pay to each holder of an Allowed Administrative Claim, on account of their Administrative Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Claim on the Effective Date or as soon as practicable thereafter, unless the holder agrees or shall have agreed to other treatment of such Claim. Payment on an Administrative Claim that arose in the ordinary course of the Debtors' business will not be made until such payment would have become due in the ordinary course of the Debtors' business or under the terms of the Claim in the absence of the Chapter 11 Cases.

### (ii) Payment of Statutory Fees

On or before the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the hearing on Confirmation, shall be paid in Cash equal to the amount of such Administrative Claim.

### (iii) Bar Date for Administrative Claims

1. General Provisions.

Except for (i) non-tax liabilities incurred in the ordinary course of business by the Debtors and (ii) Post-Petition Tax Claims, requests for payment of Administrative Claims must be filed and served on counsel for Debtors or the Plan Agent no later than (x) sixty (60) days after the Effective Date, or (y) such later date, if any, as the Court shall order upon application made prior to the end of such 60-day period. Holders of Administrative Claims (including,

without limitation, professionals requesting compensation or reimbursement of expenses and the holders of any Claims for federal, state or local taxes) that are required to file a request for payment of such Claims and that do not file such requests by the applicable bar date shall be forever barred from asserting such Claims against the Debtors, the Plan Agent or any of their respective properties.

## 2. Professionals.

All professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, inter alia, any compensation requested by any professional or any other Person for making a substantial contribution in the Liquidation Case) shall file and serve on the Debtors or Plan Agent an application for final allowance of compensation and reimbursement of expenses no later than (i) sixty (60) days after the Effective Date, or (ii) such later date as the Court shall order upon application made prior to the end of such 60-day period. Objections to applications of professionals for compensation or reimbursement of expenses must be filed and served on Debtors or Plan Agent and the professionals to whose application the objections are addressed on or before (i) sixty days after such application is filed and served or (ii) such later date as the Court shall order upon application made prior to the end of such 60-day period or upon agreement between the Debtors or Plan Agent and the affected professional. Any professional fees and reimbursements or expenses incurred by the Debtors or Plan Agent subsequent to the Effective Date may be paid by the Debtors or Plan Agent without application to or Order of the Court.

## 3. Ordinary Course Liabilities.

Holders of Administrative Claims based on liabilities incurred post petition in the ordinary course of the Debtors' business (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required to file any request for payment of such Claims. Such Administrative Claims shall be paid by Debtors or Plan Agent pursuant to the terms and conditions of the Sale Transaction giving rise to such Administrative Claim, without any further action by the holders of such Claims.

## 4. Tax Claims.

All requests for payment of Post-Petition Tax Claims, for which no bar date has otherwise been previously established, must be filed on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any holder of any Post-Petition Tax Claim that is required to file a request for payment of such taxes and that does not file such a Claim by the applicable bar date shall be forever barred from asserting any such Post-Petition Tax Claim against the Debtors, or any of their respective properties, whether any such Post-Petition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date. The Debtors is paying all Post-Petition Tax Claims as they come due; however, certain taxing authorities conduct audits which may result in a post petition tax liability of which the Debtors is currently unaware.

Treatment of Priority Tax Claims.

Debtors do not anticipate any outstanding Priority Tax Claims. The Debtors do not anticipate that there will be any funds available to pay Priority Tax Claims as Priority Tax Claims.

2.        **Classified Claims Against and Equity Interests in Debtors.**

*__Class 1: DIP Credit Facility Claims__*. Class 1 shall consist of the claims of BDL Investors, LLC and Greenfield BLR Finance Partners, L.P., Lenders under the DIP Facility Credit Agreement. On the Effective Date, to the extent that there are any other amounts outstanding under the DIP Credit Facility, pursuant to the Asset Purchase Agreement with the Stalking Horse Purchaser for the Debtors' assets in Banning, the Stalking Horse Purchaser will waive its rights to repayment under the DIP Credit Facility.[19] Once such waiver has been made, the DIP Credit Facility shall be deemed terminated, and the lenders under the DIP Credit Facility shall take all reasonable action necessary to confirm the removal of any claims and liens on the properties and assets of the Debtors or Post-Effective Date Debtors securing the DIP Credit Facility Claim.

The Holders of the Class 1 DIP Credit Facility Claims are Unimpaired and will be deemed to have accepted the Plan.

*__Class 2: Secured Claims of Term Lenders in Banning.__*

The Term Lenders shall, pursuant to § 1129(b)(2), (i) retain their security interest and liens against the Banning Assets, and (ii) receive deferred cash payments in an amount equal to the Allowed amount of their claim pursuant to the terms of the New Term Loan, as defined in the Plan, and in accordance with the terms and conditions of the Amended and Restated Senior Secured Term Loan Agreement. Such deferred cash payments shall be made directly to the Term Lenders by the Stalking Horse Purchaser of Banning's assets.

Class 2 is Impaired and therefore is entitled to vote on the Plan.

*__Class 3: Secured Claims of Revolver Lenders in Devco.__* Class 3 consists of the Secured Claims of the Revolver Lenders in Devco. Treatment of the Secured Claims of the Revolver Lenders will be determined by the results of the auction for the assets of Devco. Generally, on the Effective Date, or as soon as practicable thereafter, the Holder of the Class 3 Secured Claims of the Revolver Lenders, if this Plan is confirmed, would accept, in full satisfaction, settlement, release and discharge of and in exchange for such Secured Claims, any amounts received pursuant to the sale of the Devco assets up to the amount of the Secured Claims of the Revolver Lenders. In the event no party bids on the assets of Devco, this Plan will

---

[19] To the extent that the Stalking Horse Purchaser is not the successful bidder at the Auction, any higher and better bid would likely, absent consent of the DIP Facility Lender, be required to repay the obligations still outstanding under the DIP Credit Agreement through the date of termination of the DIP Credit Agreement, plus any additional funding necessary to reach closing of the Sale Transaction.

exclude treatment of the Secured Claims of Revolver Lenders, and disposition of the collateral securing such claims.

Class 3 is Impaired and therefore is entitled to vote on the Plan.

***Class 4: Banning Other Secured Claims***.  Class 4 consists of all other Secured Claims against Banning.  To the extent any Banning Other Secured Claims exist, they are unimpaired.  To the extent any Banning Other Secured Claims exist, and unless the purchaser of the Banning assets otherwise agrees, the assets of Banning will be sold pursuant to a Sale Transaction, free and clear of all liens, security interests or other encumbrances on the assets, with any such lien, security interest or other encumbrance attaching to the proceeds of the sale or the collateral will be returned to the claimant.

If a Banning Other Secured Claim Holder chooses to release and waive its security interest, such Banning Other Secured Claim will become and be treated as a Banning General Unsecured Claim.

The Holders of the Class 4 Claims are Unimpaired and will be deemed to have accepted the Plan.

***Class 5: Devco Other Secured Claims***.  Class 5 consists of all other Secured Claims against Devco.  To the extent any Devco Other Secured Claims exist, they are unimpaired.  To the extent any Devco Other Secured Claims exist, and unless the purchaser of the Devco assets otherwise agrees, the assets of Devco will be sold pursuant to a Sale Transaction, free and clear of all liens, security interests or other encumbrances on the assets, with any such lien, security interest or other encumbrance attaching to the proceeds of the sale or the collateral will be returned to the claimant.

If a Devco Other Secured Claim Holder chooses to release and waive its security interest, such Devco Other Secured Claim will become and be treated as a Devco General Unsecured Claim.

The Holders of the Class 5 Claims are Unimpaired and will be deemed to have accepted the Plan.

***Class 6: Priority Claims***.  Class 6 shall consist of all Priority Claims.  A Priority Claim is a Claim for an amount entitled to priority under sections 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, and does not include any Administrative Claim or Tax Claim.  Debtors believe that no parties hold any Priority Claims.

Should any unpaid Priority Claims exist as of the Effective Date of this Plan, those claims will be paid using funds set aside for Administrative, Priority Tax, and Priority Claims from the Sale Transactions.  To the extent that any such claims exist, the Stalking Horse Purchaser's bid includes up to $100,000 to be paid towards Administrative, Priority Tax, and Priority Claims.  Additionally, should any Cash be available from an alternate Sale Transaction, such funds can be used to pay Priority Claims.

Class 6 is Impaired and therefore is entitled to vote on the Plan.

***Class 7: Banning General Unsecured Claims***.  Class 7 shall consist of all General Unsecured Claims held against Banning.

On the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Class 7 Claim in Banning will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such Claim, a pro rata share of the amount remaining of the cash proceeds of the Sale Transaction for the assets of Banning and any other assets of the Debtors in Banning, including the proceeds of any Avoidance Actions[20], immediately after the members of the Convenience Class have been paid.

Class 7 is Impaired and therefore is entitled to vote on the Plan.

***Class 8: Devco General Unsecured Claims***.  Class 8 shall consist of all General Unsecured Claims held against Devco.

On the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Class 8 Claim against Devco will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such Claim, a pro rata share of the amount remaining of the cash proceeds of the Sale Transaction for the assets of Devco, and any other assets of the Debtors in Devco, including the proceeds of any Avoidance Actions, immediately after the members of the Convenience Class have been paid.

Class 8 is Impaired and therefore is entitled to vote on the Plan.

***Class 9 – Banning Convenience Class Claims***.  Class 9 shall consist of all Convenience Class Claims in Banning.

Under the Plan, unsecured claims in Banning which are allowed in the amount of $10,000 or less will be paid an amount equal to 90% of the amount of the Allowed claim. If a claim is for an amount in excess of $10,000, such creditor can elect to have its claim reduced to $10,000 so that, if allowed, it will be treated as a Banning Convenience Class Claim (in which case, assuming the claim is allowed in the amount of $10,000 or more, the claimant will receive an amount equal to 90% of $10,000).

Members of the Banning Convenience Class shall be paid from the cash proceeds of the Sale Transaction related to the Banning assets, proceeds from any Avoidance Actions belonging to Banning, or from any other assets of Banning.

Members of the Banning Convenience Class shall be paid immediately prior to distributing the pro rata shares due to the Banning General Unsecured Creditors.

Class 9 is Impaired and therefore is entitled to vote on the Plan.

---

[20] The Debtors are currently Plaintiffs in Avoidance Actions captioned, *Banning and Devco v. Banning Lewis Ranch Management Company, LLC* (Case No. 11-50219 (KJC)), *Banning and Devco v. Scott R. Baugh d/b/a Scott Baugh & Associates* (Case No. 11-50385 (KJC)), and *Banning and Devco v. The Lebovic Law Firm* (Case No. 11-50370 (KJC)).

***Class 10 – Devco Convenience Class Claims***.  Class 10 shall consist of all Convenience Class Claims in Banning.

Under the Plan, unsecured claims in Devco which are allowed in the amount of $10,000 or less will be paid an amount equal to 90% of the amount of the Allowed claim.  If a claim is for an amount in excess of $10,000, such creditor can elect to have its claim reduced to $10,000 so that, if allowed, it will be treated as a Devco Convenience Class Claim (in which case, assuming the claim is allowed in the amount of $10,000 or more, the claimant will receive an amount equal to 90% of $10,000).

Members of the Devco Convenience Class shall be paid from the cash proceeds of the Sale Transaction related to the Devco assets, proceeds from any Avoidance Actions belonging to Devco, or from any other assets of Devco.

Members of the Devco Convenience Class shall be paid immediately prior to distributing the pro rata shares due to the Banning General Unsecured Creditors.

Class 10 is Impaired and therefore is entitled to vote on the Plan.

***Class 11 – Subordinated Claims***.  Class 11 shall consist of all Subordinated Claims.

It is anticipated that each holder of an Allowed Class 11 Claim will not receive or retain any property under the Plan on account of such Claim.

Class 11 Claims, if any, are Impaired under the Plan and deemed to have voted to reject the Plan.  The votes of holders of Class 11 Claims are not being solicited.

***Class 12 – Intercompany Claims***.  Class 12 shall consist of all Intercompany Claims.

It is anticipated that each holder of an Allowed Class 12 Claim will not receive or retain any property under the Plan on account of such Claim.

Class 12 Claims, if any, are Impaired under the Plan and deemed to have voted to reject the Plan.  The votes of holders of Class 12 Claims are not being solicited.

***Class 13 – Banning Equity Interest Claims***.  Class 13 shall consist of all Holders of Equity Interests in Banning.

It is anticipated that all Equity Interests in Banning will be cancelled on the Effective Date and the Holders of such Equity Interests will not receive or retain any property under the Plan on account of such Claim.

Class 13 Claims, if any, are Impaired under the Plan and deemed to have voted to reject the Plan.  The votes of holders of Class 13 Claims are not being solicited.

**_Class 14 – Devco Equity Interest Claims_**.  Class 14 shall consist of all Holders of Equity Interests in Devco.

It is anticipated that all Equity Interests in Devco will be cancelled on the Effective Date and the Holders of such Equity Interests will not receive or retain any property under the Plan on account of such Claim.

Class 14 Claims, if any, are Impaired under the Plan and deemed to have voted to reject the Plan.  The votes of holders of Class 14 Claims are not being solicited.

## VII.    MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.    Overview of Plan Implementation

[As discussed above, Banning has entered into an Agreement with the Stalking Horse Purchaser for the purchase of the Banning assets.  If no further bids are received for the Banning assets, the Debtors will cancel the Auction for the Banning assets, declare the Stalking Horse Purchaser the Winning Bidder, and request the Court to approve the Sale of the Banning assets to the Stalking Horse Purchaser at the Sale Approval Hearing which is currently scheduled for _____, 2011.]

If bids are received for the Debtors' assets in Devco, the Debtors will make a determination to proceed to Auction, if necessary, to select a Winning Bidder for the Devco assets.  To the extent the Winning Bid for the Devco assets requires modification of the Plan to implement the Sale Transaction, the Debtors will take such steps as are necessary to implement the Sale Transaction.  If no competing bids are received for the Devco assets, the Debtors will cancel the Auction as to the Devco assets.

The Plan may be modified, pursuant to 11 U.S.C. § 1127, following the Auction to specifically implement the selected Sale Transactions, including, but not limited to the treatment of specific creditors' claims, and the assumption of certain debts by a purchaser of one or more of the Debtors' assets.

The Bid Procedures Orders, as approved by the Court, outline the procedures governing the conduct of the sales process to solicit and select the highest and best Sale Transactions.  The Debtors are soliciting proposals for the Sales Transactions, and the Debtors will select the highest and best Sale Transactions in accordance with the terms of the Bid Procedures Orders.  The Debtors intends to amend and supplement this Plan and the Disclosure Statement to incorporate details of the selected Sale Transaction, as necessary, prior to distributing this Plan and the Disclosure Statement in connection with seeking acceptance of this Plan from the holders of Claims of Impaired Classes of Claims.

The Sale Transactions will be consummated and funded upon the Effective Date (or as soon thereafter as practicable) in order to establish the fair value of the Debtors available for distribution to holders of Claims (other than Secured Claims) and Equity Interests in accordance with the Subordination Provisions and applicable law.

The Debtors will consummate the Plan as soon as practicable after Confirmation of the Plan and Approval of the Sale Transactions.

All cash necessary for the Plan Agent to make payments pursuant to the Plan will be obtained from the Sale Transaction Proceeds and other retained assets of the Debtors.

**B.      Sale Agreements**

On the Effective Date or as soon as practicable thereafter, the Sale Agreements for each of the Debtors and all related agreements shall be consummated in accordance with such agreements.

The Sale Agreements may also provide for the assumption of certain liabilities and/or the assumption and assignment of certain leases and contracts subject to the ability to satisfy the requirements of the Bankruptcy Code.

**C.      Distributions Under the Plan**

**1.      General**

On the Effective Date or as soon as practicable thereafter, the Post Effective Date Debtors or Plan Agent shall fund or arrange for the funding of the Effective Date Payments. Subject to the provisions of the Plan, and except as otherwise provided herein, property to be distributed hereunder to an Impaired Class shall be distributed on or as soon as practicable after the later of (i) the Effective Date, to each holder of a Claim or an Equity Interest in that Class that is an Allowed Claim as of the Effective Date, and (ii) the date the Order of the Court allowing such Claim becomes a Final Order, to each holder of an Allowed Claim of that Class that is Allowed after the Effective Date, to the extent allowed. Property to be distributed under the Plan to a Class that is not Impaired or on account of a Claim of a kind described in Bankruptcy Code section 507(a)(1) shall be distributed on the later of (x) the date specified in the preceding clauses (i) and (ii) applicable to the Claims and (y) the date on which the Distribution to the holder of the Claim would have been due and payable in the ordinary course of business or under tire terms of the Claim in the absence of the Liquidation Case. Notwithstanding any other provision of the Plan, the Debtors, or Plan Agent shall not be obligated to make any Distribution with respect to any unclassified Claim, or any Allowed Claim, other than those in the hands of the Holders shown on the books and records of the Debtors as of the Confirmation Hearing unless otherwise identified on a filed proof of claim.

The proceeds from the Sale Transactions and any unsold assets of the Debtors, including any preference and Avoidance Actions and any recovery of funds from infrastructure improvements completed by Devco, will be used to make all payments pursuant to the Plan.

The Plan Agent, or such persons as the Debtors or Plan Agent may employ in their sole discretion, will serve as disbursing agent (the "Disbursing Agent"). It is anticipated that the Plan Agent will act as the Disbursing Agent. The Disbursing Agent will make all Distributions of cash and securities required to be distributed under the applicable provisions of the Plan. Any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan. Each Disbursing Agent will serve without bond, and each

Disbursing Agent, other than the Post Effective Date Debtors or Plan Agent, will receive, without further Court approval, reasonable compensation for Distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Plan Agent on negotiated terms.

Cash payments made pursuant to the Plan will be in U.S. dollars by checks drawn on a bank selected by the Post Effective Date Debtors or Plan Agent, or by wire transfer from a bank, at the option of Plan Agent. Cash payments to foreign creditors, if any, may be made, at the option of the Plan Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

The Disbursing Agent will make all Distributions required under the applicable provisions of the Plan. No Distributions under the Plan will be made to or on behalf of any Holder of any Allowed Claim or Allowed Equity Interest evidenced by the instruments, securities or other documentation cancelled pursuant to the Plan, unless such Holder first tenders the applicable instruments, securities or other documentation to the Disbursing Agent.

(a)     **Timing and Methods of Distributions**

(i)     Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Disbursing Agent must comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan will be subject to such withholding and reporting requirements. The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

Notwithstanding any other provision of the Plan: (i) each Holder of an Allowed Claim or Equity Interest that is to receive a Distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution; and (ii) no Distribution will be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations. Any Cash to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to the Plan.

(ii)     Pro Rata Distribution

When the Plan provides for Pro Rata Distribution, the property to be distributed under the Plan shall be divided Pro Rata among the Holders of Allowed Claims entitled to a Pro Rata share of the funds.

(iii)     Distribution Record Date

As of the close of business on the Distribution Record Date, the transfer registers for any Notes or Old Securities maintained by the Debtors, or their respective agents, will be closed. The Disbursing Agent and the respective agents of the Debtors or Plan Agent will have

no obligation to recognize the transfer of the Notes or Old Securities occurring after the Distribution Record Date, and will be entitled for all purposes relating to the Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date. Distributions under the Plan shall be made by Plan Agent or a designee to the holders of Allowed Administrative Claims and Allowed Claims at the addresses set forth on the Schedules, unless such addresses are superseded by addresses listed on proofs of claim or transfers of claims filed pursuant to Bankruptcy Rule 3001, or at the last known address of such holders if Debtors or Plan Agent has been notified in writing of a change of address.

(iv)    Special Procedures for Lost, Stolen, Mutilated or Destroyed Instruments

In addition to any requirements under the Bylaws of the Debtors, any Holder of a Claim evidenced by an Instrument that has been lost, stolen, mutilated or destroyed will, in lieu of surrendering such Instrument, deliver to the Disbursing Agent: (a) evidence satisfactory to the Disbursing Agent of the loss, theft, mutilation or destruction; and (b) such security or indemnity as may be required by the Disbursing Agent to hold the Disbursing Agent harmless from any damages, liabilities or costs incurred in treating such individual as a Holder of an Instrument. Upon compliance with the Plan, the Holder of a Claim evidenced by such an Instrument will, for all purposes under the Plan, be deemed to have surrendered an Instrument, as applicable.

(v)    Failure to Surrender Cancelled Instrument

Any Holder of an Instrument that fails to surrender or be deemed to have surrendered such Instrument within one year after the Effective Date will have their Claim for a Distribution pursuant to the Plan on account of such Instrument discharged and shall be forever barred from asserting any such Claim against the Post Effective Date Debtors, Post-Confirmation Debtors or their property. In such cases, any Cash held for Distribution on account of such Claim will be disposed of pursuant to the provisions of the Plan.

(vi)    Undeliverable or Unclaimed Distributions

Any Person that is entitled to receive a cash Distribution under the Plan but that fails to cash a Distribution check within ninety (90) days of their issuance and delivery (or attempted delivery) shall be entitled to receive a reissued check from the Post Effective Date Debtors or Plan Agent for the amount of the original check, without any interest, if such person requests to the Disbursing Agent that it reissue such check and provides the Disbursing Agent with such documentation as the Disbursing Agent requests to verify that such Person is entitled to such check, provided that such request occurs prior to the first anniversary of the Effective Date. If a Person fails to cash a check within ninety (90) days of their issuance and fails to request reissuance of such check prior to the first anniversary of the Effective Date, such Person shall not be entitled to receive any Distribution under this Plan. In the event that interim Distributions are made under this Plan, any Person, who fails to cash an interim Distribution check within ninety (90) days of their issuance and delivery (or attempted delivery) shall be entitled to receive a reissued check from the Post Effective Date Debtors or Plan Agent for the amount of the original check, without any interest, if such person requests to the Disbursing Agent that it reissue such interim Distribution check and provides the Disbursing Agent with

such documentation as the Disbursing Agent requests to verify that such Person is entitled to such interim Distribution check, provided that such request occurs prior' to the first anniversary of the Effective Date. A Person failing to cash an interim Distribution check within ninety (90) days of their issuance and failing to request from the Disbursing Agent reissuance of such check within the time period described above, shall forfeit all right to any subsequent Distributions, including final Distributions, under the Plan. Undeliverable Distributions will remain in the possession of the Disbursing Agent pursuant to the Plan until such time as a Distribution becomes deliverable, but in no event for a period longer than one year following the Effective Date. Undeliverable cash will be held in trust in segregated bank accounts in the name of the Disbursing Agent for the benefit of the potential claimants of such funds, and will be accounted for separately. The Disbursing Agent holding undeliverable cash in a manner consistent with Post Effective Date Debtors' or Plan Agent's investment and deposit guidelines.. Any Distribution which is not claimed within one year of the Effective Date shall be deemed property of Post Effective Date Debtors or Plan Agent without further notice to any party or further order of the Court.

## 2. Objections to Claims

No later than the Claims Objection Deadline, which shall be a date that is 120 days after the Effective Date of the Plan or such other date as determined by the Court (unless extended by an order of the Bankruptcy Court), the Debtors, or the Plan Agent, as the case may be, shall file objections to Claims with the Bankruptcy Court and serve such objections upon the Holders of the Claims to which objections are made; provided, however, the Debtors or Plan Agent shall not object to Claims expressly deemed Allowed pursuant to the Plan. Nothing contained herein shall limit the Plan Agent's right to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Debtors or Plan Agent shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment (in the Bankruptcy Court or such other court having jurisdiction) the validity, nature and/or amount thereof.

## 3. Disputed Claims; Reserve and Estimations

### (b) Treatment of Disputed Claims

Notwithstanding any other provisions of the Plan, no payments or Distributions will be made on account of a claim that is disputed by the Debtors (a "Disputed Claim"), including a disputed tort claim, or a Disputed Equity Interest until such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest. Debtors or Plan Agent may, at any time, request that the Court estimate any contingent or un-liquidated Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether Debtors or Plan Agent previously objected to such Claim or whether the Court has ruled on any such objection. The Court will retain jurisdiction to estimate any contingent or un-liquidated Claim at any time during litigation concerning any objection to the Claim, including during the pendency of any appeal relating to any such objection. If the Court estimates any contingent or un-liquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, Debtors or Plan Agent may elect to pursue any supplemental

proceedings to object to any ultimate payment on account of such Claim. All of these Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. In addition to seeking estimation of Claims as provided in the Plan, Debtors or Plan Agent may resolve or adjudicate certain Disputed Claims of Holders in Unimpaired Classes in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Case had not been commenced, subject to any applicable discharge and limitations on amounts of claims and remedies available under bankruptcy law. Claims may be subsequently compromised, settled, withdrawn or resolved by Debtors or Plan Agent.

(c)      <strong>Creation of Disputed Claims Reserve</strong>

The Disbursing Agent, the Debtors and/or the Plan Agent, as the case may be, shall establish an appropriate reserve for Disputed Claims by withholding 100% of Distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims.

On, or as soon as practicable after, the initial Distribution date, the Debtors or Plan Agent shall transmit to the Disbursing Agent, and the Disbursing Agent shall reserve for the account of each holder of a Disputed Claim any Sale Transaction Proceeds which would otherwise be distributable to such holder on such date in accordance with the Plan were such Disputed Claim an Allowed Claim on such date, in the face amount thereof. Sale Transaction Proceeds shall be set aside and segregated by Class of Claims in accounts to be established and maintained by the Disbursing Agent pending resolution of such Disputed Claims.

(d)      <strong>Distributions on Account of Disputed Claims Once They Are Allowed</strong>

Within 30 days after the end of each calendar quarter following the Effective Date and after an initial Distribution has been made to undisputed and Allowed Claims, the Disbursing Agent will make all Distributions on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter. Such Distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Holders of Disputed Claims that are ultimately allowed will also be entitled to receive, on the basis of the amount ultimately allowed, matured and payable interest, if any, at the rate provided for the Class to which such Claim belongs.

<strong>4.      Setoffs</strong>

Except with respect to claims of Debtors or Post Effective Date Debtors released pursuant to the Plan or any contract, instrument, release, indenture or other agreement or document created in connection with, contemplated by or assumed in connection with the Plan, the Debtors or Plan Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before any Distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to effect

such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by Debtors or Plan Agent of any such claims, rights and causes of action that Debtors or Plan Agent may possess against such Holder.

### 5. Preservation of Causes of Action

Except as set forth in any contract, instrument, release, or other agreement entered into in connection with the Sale Transaction, the Plan or as otherwise provided in the Plan, in accordance with section 1123(b) of the Bankruptcy Code, Post Effective Date Debtors or Plan Agent shall retain all Litigation Claims that the Debtors or the estates may hold against any Person, including any claims pursuant to Chapter 5 of the Bankruptcy Code. The Debtors have not transferred, nor do they intend to transfer, any causes of action pursuant to Chapter 5 of the Bankruptcy Code to the Stalking Horse Purchaser or any other potential purchaser.

The Debtors previously filed actions against Scott Baugh, The Lebovic Law Firm, and Management for, *inter alia*, the recovery of preferential, fraudulent and post-petition transfers. The Debtors specifically reserve their right to file additional Avoidance Actions after the Effective Date. The Debtors anticipate actions related to the resolution or release of escrowed funds held by WL Homes, LLC. The Debtors and their counsel continue to investigate potential causes of action. Additionally, the Plan Agent will have the power to bring actions which it believes would inure to the benefit of creditors of the estate. It is not anticipated that any purchaser of either Debtors' assets will purchase these causes of action.

### 6. Value of Post Effective Date Debtors

After the Effective Date, the Debtors' assets will consist of their interest in the escrow account held by First American Heritage Title Company, k/n/a Heritage Title Company, their checking account with Wachovia Bank, their preserved causes of action, their interests in easements related to the Property, and any cash proceeds realized from a Sale Transaction.

### D. General Information Concerning the Plan

The following is a summary of certain additional information concerning the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan.

### 1. No Liability For Solicitation or Participation

As specified in section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### 2. Limitation of Liability

The Plan provides for certain releases of the Debtors, the Post Effective Date Debtors, the Plan Agent, the DIP Lender, the Buyer, and certain members of the Debtors. On the

Effective Date, each holder of a Claim or Interest who votes in favor of the Plan and does not opt out of that certain section of the Plan shall be deemed to have released and discharged those parties as described more fully below.

Neither (i) the Debtors, their present directors, officers, partners, members, representatives, employees, attorneys, and professional advisors, and (ii) the Purchaser, the lenders under the DIP Credit Agreement, Greenfield BLR Partners, L.P., Farallon BLR Investors, LLC, The Trustees of Princeton University, and Harvard Management Private Equity Corporation, their respective directors, officers, partners, members, representatives, employees, and professional advisors shall have or incur any liability to any holder of any Claim or Equity Interest or any other entity, provided that such Claim holder, Interest holder, or other entity votes in favor of the Plan and does not opt out of section 6.12 of the Plan, for any act or omission in connection with or arising out of the Chapter 11 Case, negotiating, formulating, implementing, confirming, or consummating the Plan, or any other act or omission in connection with the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan, provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted gross negligence or willful misconduct. Any of the foregoing parties in all respects shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities in connection with the Plan.

All Persons that have held, currently hold or may hold a Claim or other debt or liability or an Equity Interest or other right of an equity security holder, are permanently enjoined from bringing any of the following actions on account of any such Claims, debts or liabilities or terminated Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Released Parties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Released Parties; (c) creating, perfecting or enforcing any lien or encumbrance against the Released Parties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any obligation due to the Released Parties; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

As of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, the Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Purchaser, the lenders under the DIP Credit Agreement, Greenfield BLR Partners, L.P., Farallon BLR Investors, LLC, The Trustees of Princeton University, and Harvard Management Private Equity Corporation, their respective directors, officers, partners, members, representatives, employees, and professional advisors from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors, the Purchaser or Disbursing Agent to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent,

matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including, without limitation, actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan.

The Debtors believe that these permissive provisions are consistent with Section 1123(b). The release provisions are part of the overall agreement with the Debtors' DIP Lender. The claims released in the Plan are, in the Debtors' estimation, virtually worthless on the merits and would be expensive and time-consuming to prosecute. The Debtors will not have sufficient resources to pursue these claims and, if the Plan is not confirmed and these cases convert to Chapter 7 proceedings, the liquidation value of the Debtors' assets will not support the litigation expenses either. Finally, the releases can be justified by the contributions which released parties have made towards the Debtors' prosecution of their Chapter 11 cases. Accordingly, the Debtors believe these releases are amply justified and are in the best interest of the Debtors' estates and parties in interest.

### E. **Effect of Confirmation of the Plan**

#### 1. **Vesting of Assets**

Upon consummation of the Sale Transaction, except as otherwise provided in any provision of the Plan, on the Effective Date, any remaining property of the Debtors' estates shall vest in the Post Effective Date Debtors. From and after the Effective Date, the Plan Agent shall administer the Plan. All actions taken under the Plan in the name of the Post Effective Date Debtors shall be taken by or through the Plan Agent.

### F. **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date to the full extent permitted by law, including, without limitation, jurisdiction to:

(i)     Allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance or priority of Claims or Equity Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan;

(ii)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending before the Effective Date;

(iii)   Resolve any matters related to the assumption or rejection of any executory contract to which the Debtors is a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

(iv)     Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(v)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors, Post Effective Date Debtors, Plan Agent or the Chapter 11 Cases that may be pending upon consummation or filed thereafter;

(vi)     Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided herein;

(vii)     Resolve any cases, controversies, suit or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Plan and the Confirmation Order, or any entity's rights arising under or obligations incurred in connection with the Plan or the Confirmation Order;

(viii)     Subject to any restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Court Order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(ix)     Issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(x)     Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xi)     Determine any other matters that may arise in connection with or relating to the Plan, this Disclosure Statement, the Confirmation Order or any