# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No.: 10-13445 (KJC) |
| THE BANNING LEWIS RANCH | ) |
| COMPANY, LLC, *et al.*,[1] | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Related Docket No. 38, 109, 232, 318, 319, 337, |
| | ) 340, 341, 371, 373, 377, 378, 387, 388, 389, 390 |
| | ) and 392 |
| | ) |
| | ) **Hearing Date: July 28, 2011 at 11:00 a.m.** |

## DECLARATION OF BRUCE MCCORMICK IN SUPPORT OF COLORADO SPRINGS' RENEWED MOTION TO TRANSFER VENUE AND IN SUPPORT OF OBJECTIONS TO DEBTORS' SALE MOTIONS AND PROPOSED ORDERS

Bruce McCormick declares as follows under penalty of perjury:

1. I am the Chief Energy Services Officer for Colorado Springs Utilities. I have personal knowledge of the information contained in this Declaration based upon my more than 20 years of employment with Colorado Springs Utilities, my duties as Chief Energy Services Officer and, previously, Chief Water Officer, and my review of public records, information gathered by staff, and recorded documents. If called upon to testify, I would testify truthfully to the facts states in this Declaration.

2. I have worked continuously with Colorado Springs Utilities in a variety of capacities beginning in 1988. Currently, I am the Chief Energy Services Officer. Before that, I

---

[1] The Debtors in these proceedings, along with the last four digits of each Debtor's federal tax identification numbers, are The Banning Lewis Ranch Company, LLC (4090) and Banning Lewis Ranch Development I & II, LLC (3461). The Debtors' corporate headquarters and the service address for each Debtor is 101 West Avenue, Jenkintown, Pennsylvania 19046.

was the Chief Water Officer. Based upon my duties, I am familiar with Banning Lewis Ranch, the Annexation Agreement, and various agreements between Utilities and Debtors. I personally participated in the negotiation of a number of those agreements.

### A. Colorado Springs and Its Utilities

3. Colorado Springs is a municipal corporation and home rule city. Colorado Springs Utilities ("Utilities") is an enterprise of Colorado Springs. Under Article X, Section 20 of the Colorado State Constitution and Article VII, Section 7-90 of the Charter of the City of Colorado Springs, the revenue generated by an enterprise of Colorado Springs is not included within the calculation of revenue and debt limits that are intended, among other things, to limit the size and growth of government. Because Utilities is an integral part of the City, the provision of utility services is an integral part of the land use process, and Utilities' actions generally are approved by City Council, I am familiar with the local laws governing development within the City in general and Banning Lewis Ranch specifically.

4. Colorado Springs is a party in interest in these bankruptcy cases based on a number of agreements that Colorado Springs has with the Debtors.

### B. General Information Concerning Banning Lewis Ranch

5. Banning Lewis Ranch represents approximately 20% of the land area of Colorado Springs. The Debtors own approximately 90% of the land area of Banning Lewis Ranch. There are approximately 20 other entities that are annexors and own the remaining 10% of the land area of Banning Lewis Ranch.

6.  The Banning Lewis Ranch Development is critical to Colorado Springs because the future growth of Colorado Springs is limited to growth primarily on the east side of the City where the Banning Lewis Ranch is located.

### C. The Annexation Agreement and Master Plan

7.  The Annexation Agreement was entered into on September 23, 1988, and recorded with the Clerk and Recorder of El Paso County on the same day. The Annexation Agreement outlines complex annexor responsibilities including the requirement that each annexor share in the cost of certain public improvements and infrastructure that is required to support the buildout of the Banning Lewis Ranch Development. In 2004 the City of Colorado Springs settled a lawsuit that had been commenced by state court appointed receivers for property owners of portions of Banning Lewis Ranch that are not owned by the Debtors. The Settlement Agreement required Colorado Springs to complete a study concerning future costs of the development and establish an agreement as to the shared costs of that development among the annexors. That Settlement Agreement is an order in judgment of a state court in El Paso County, Colorado and was recorded in the El Paso County, Colorado Clerk and Recorder's office.

8.  When the parties entered into the Annexation Agreement, the City Council for Colorado Springs also approved the Master Plan and hard zoning for the Banning Lewis Ranch annexation area. The Master Plan must be consistent with the City's overall comprehensive plan for development. Among other things, the Mater Plan identifies land use and density throughout Banning Lewis Ranch. The Master Plan has to be consistent with the City of Colorado Springs

Comprehensive Plan, which establishes the broad goals of future development within Colorado Springs.

9. The Annexation Agreement requires Debtors to dedicate real property to Colorado Springs for infrastructure and services including police and fire stations, electric service center and substations, drainage facilities, roads and parks and a number of other items that are spelled out by article in the Annexation Agreement. These dedications of real property require the Debtors to transfer that property to the City of Colorado Springs. And these dedications will continue to occur in the future as development progresses.

10. The Master Plan for Banning Lewis Ranch has been amended and will require future amendments. All amendments to the Master Plan must be approved by the City Council before they become effective.

11. A development the size of Banning Lewis Ranch requires substantial infrastructure at significant cost. These infrastructure costs are funded through a variety of means including fees for building permits and fees charged on a per acre basis as plats are recorded.

12. Future development north of Drennan Road within Banning Lewis Ranch is currently subject to a fee of $11,910 per acre, in accordance with City Code requirements. The fee is assessed at the time of plat recordation. The fee is based upon the study undertaken pursuant to the Settlement Agreement entered into as an order and judgment of the El Paso County District Court.

13. The current area being developed by Banning Lewis Ranch Development I & II, LLC, referred to as Village I, was exempted from the fee as a means to provide some incentive and assistance to spur development in the area.

**D.     Agreements Between Utilities and Debtors**

14.   Colorado Springs and Debtors are parties to the following agreements:

a)   Annexation Agreement made and entered the 23rd day of September 1988 and recorded in the real property records of El Paso County, Colorado on September 23, 2008, at Book 5557, Page 405 (the "Annexation Agreement");

b)   The Order and Judgment (as defined below) recorded in the real property records of El Paso County, Colorado on April 8, 2005, at Reception No. 205050396.

c)   Modified and Restated Wastewater Facilities Participation, Utilization, and Service Agreement, entered into the 10th day of February, 2009, by and between Colorado Springs Utilities, an enterprise of the City of Colorado Springs, a Colorado home rule city and municipal corporation, and The Banning Lewis Ranch Company, LLC and Banning Lewis Ranch Development I & II, LLC, as amended and modified from time to time (the "Wastewater Facilities Agreement"), recorded on February 20, 2009, in the real property records of El Paso County, Colorado at Reception No. 209017179;

d)   Assignment Agreement entered into the 23rd day of June, 2010, by and between the City of Colorado Springs, on Behalf of Its Utility Enterprise, Colorado Springs Utilities, The Banning Lewis Ranch Company, LLC and Banning Lewis Ranch Development I & II, LLC, and Banning Lewis Ranch Regional Metropolitan District, formerly known as Banning Lewis Ranch Metropolitan District No. 6 (the "Assignment Agreement"), recorded on August 11, 2010, in the real property records of El Paso County, Colorado at Reception No. 210077136;[2]

e)   Colorado Springs Utilities Electric Extension Agreement Banning Lewis Ranch, effective as of March 30, 2006, by and between Banning Lewis Ranch Development I & II, LLC and Colorado Springs Utilities, as amended, which includes a letter of credit to secure obligations of Debtors under the Electric Extension Agreement (the "Electric Extension Agreement");

---

[2] Pursuant to the Assignment Agreement, Debtors assigned the Wastewater Facilities Agreement to Banning Lewis Ranch Regional Metropolitan District, formerly known as Banning Lewis Ranch Metropolitan District No. 6, which then assigned the Wastewater Facilities Agreement to Banning Lewis Ranch Metropolitan District No. 1, pursuant to an Intergovernmental Assignment Agreement. Debtors remain obligated under the Wastewater Facilities Agreement and Annexation Agreement in the event of a default by the Districts.

f) Eight Bills of Sale (which include warranties) that convey title to certain infrastructure to the Colorado Springs Utilities, as well as letter agreements related to work still to be performed (collectively, "Bills of Sale and Warranties");

g) Easements granted to Colorado Springs by plat or separate agreement (collectively, "Easements").

The Annexation Agreement, Order and Judgment, Wastewater Facilities Agreement, Assignment Agreement, Electric Extension Agreement, Bills of Sale and Warranties, and Easements (together with all other agreements between Colorado Springs and Debtors) shall be referred to collectively as the "Agreements."

15. In addition to the Agreements, developments within Colorado Springs are subject to tariffs, rules, and regulations of Colorado Springs Utilities and local laws and ordinances pertaining to development and building. For example, development and issuance of building permits for both residential and commercial construction are governed by the Code of the City of Colorado Springs 2001, as amended ("City Code"), including Chapter 7 (Planning, Development and Building), Article 3 (Land Use Zoning Districts), Part 1 (Residential), Part 2 (Commercial), Part 3 (Industrial); and Chapter 7, Article 7 (Subdivision Regulations). Additionally, all development within Colorado Springs is subject to the requirements contained in City Code Chapter 7, Article 5, Parts 4 and 5 related to Master Plans and Development Plans. Debtors also are obligated to pay a number of fees on a per acre basis before areas are platted including engineering fees, plat recording fees, Development Review Enterprise fees, drainage fees, bridge fees, pond land fees, and pond facilities fees. With respect to lots in areas that are subject to recorded plats, a number of fees must be paid when a building permit is issued. Debtors also provide financial assurances for the adequate completion of landscaping and site development.

16. The Agreements and local laws represent governmental decisions of Colorado Springs that control land use and future growth within the municipal boundaries. Development within Banning Lewis Ranch is also governed by the Master Plan for Banning Lewis Ranch dated January 1987, as supplemented. Building within the platted portion of the property owned by Devco is also governed by twelve recorded development plans, as well as twelve recorded plats.[3] With exceptions that are inapplicable to these Debtors, building permits are granted only in areas subject to a recorded plat (assuming all other requirements for a building permit are satisfied) and an approved development plan.

17. The Annexation Agreement was the subject of litigation brought in 2001 by receivers for local improvement districts within the area affected by the Annexation Agreement. That litigation was resolved by the November 19, 2004, Order and Judgment in *C. Randel Lewis, et al. v. The City of Colorado Springs, et al.*, Case No. 01-CV-0566 (the "Order and Judgment"). By their own request, Debtors joined in the Order and Judgment and became parties to the Settlement Agreement. The Order and Judgment provides in part:

> that the Annexation Agreement is valid and binding. Except to the extent clarified by the terms of the Settlement Agreement, the Annexation Agreement remains in full force and effect and is binding on all parties, their successors and assigns.
>
> * * *
>
> The Receivers are directed to promptly record a certified copy of this Order and Judgment in the real property records of El Paso county. The terms of the Settlement Agreement, and this Order and Judgment, shall run with the land set forth on Exhibit A to the Settlement Agreement, to the same extent that the Annexation Agreement runs with the land, and shall be binding on all parties to the Annexation Litigation, all Transferees, and their successors and assigns.

---

[3] The plats include easements dedicated to Colorado Springs.

(Order and Judgment, p. 5). The Order and Judgment was then recorded on April 8, 2005, at Reception No. 205050396 in the real property records of El Paso County, Colorado.

18. As required by the Order and Judgment, Colorado Springs completed the Banning Lewis Ranch Annexor Shared Obligation Study (the "Shared Obligation Study"). The Shared Obligation Study provides the methodology for sharing the cost of the "obligations, public improvements, and infrastructure required by the Annexation Agreement, and subject to existing laws, rules, regulations, policies, and standards" of Colorado Springs. The Shared Obligation Study identifies the shared obligations that would be subject to reimbursement by the annexors and those obligations for which each individual annexor must pay. The costs were to be paid by the annexors, not Colorado Springs. Debtors participated significantly in the creation of the Shared Obligation Study and hired its own consultant to work with Colorado Springs in the creation of the Shared Obligation Study.

19. The various agreements between Colorado Springs Utilities and the Debtors are needed because Colorado Springs must provide services to the Banning Lewis Ranch Development and to residents throughout Colorado Springs. The services provided by the Utilities include water, electric, gas and wastewater facilities.

20. The purpose of the Wastewater Facilities Agreement is to implement the Annexation Agreement and the tariffs of the Colorado Springs Utilities. It identifies the timing of wastewater system infrastructure obligations and the conditions of interim service required as development progresses.

21. That Wastewater Facilities Agreement has been assigned two times, first pursuant to an Assignment Agreement entered into on June 23, 2010 between Colorado Springs, on behalf

of its Utilities, the Debtors and one of the special districts, Banning Lewis Ranch Regional Metropolitan District, which was formerly known as Banning Lewis Ranch Metropolitan District No. 6.

22. The Regional Metropolitan District then assigned the Wastewater Facilities Agreement to Banning Lewis Ranch Metropolitan District No. 1. That was an assignment between two governmental entities, done by intergovernment assignment agreement. Under the terms of the assignments and under the terms of the Wastewater Facilities Agreement itself, the Debtors remain obligated in the event of a default by one or both of the district assignees.

23. In addition, effective March 30, 2006, Banning Lewis Ranch Development I & II, LLC entered into the Colorado Springs Utilities Electric Extension Agreement. This agreement defines the terms and conditions for the extension of the electric distribution system to serve portions of the Banning Lewis Ranch Development and, again, in accordance with the tariffs of the Utilities.

24. In addition to the services provided through these agreements, the Utilities provides other services in accordance with the terms of the tariffs. Debtors are obligated to provide funding and perform certain construction work in accordance with the City ordinances and the tariffs of the Utilities. This construction work includes things such as infrastructure for pipelines, manholes, valves and other appurtenances.

25. The majority of that work has been completed, but there are some punchlist items remaining to be completed.

26.     In sum, the Agreements, local law and related rules and regulations, and the Shared Obligation Study impose a complicated matrix of obligations between Debtors and Colorado Springs, as well as the other annexors.

### E.    The Banning Lewis Ranch Special Districts

27.     A total of seven (7) interrelated metropolitan districts ("Districts") have been created to assist in financing the development costs associated with the overall development within the Ranch, and in some cases to provide ongoing ownership, operations and maintenance services. The districts are Banning Lewis Ranch Metropolitan Districts Nos. 1-5 and 7 and the Banning Lewis Ranch Regional Metropolitan District, formerly District No. 6 and also known as the "overlay district." All are related via intergovernmental agreements with District No. 1 being the "control" district and the other six being financing districts effectively intended to be controlled in perpetuity by District No. 1. The controlling "electors" of District 1 consist of the developer board members who maintain their eligibility via a shared ownership arrangement for the single parcel included in District No. 1.

28.     The control district format provides the developer assurances that resident electors will never be in a position to "veto" future bond issues that they might not see as in their best interests. The multi-district structure allows differentiation between the commercial and residential potions of the project. This is important because the City's District Policy limits maximum mill levies to go higher in commercial versus residential districts. Having more than one residential district allows the developer to address the likelihood that the overall project will require more than 40 years to complete. In residential districts only, the City's District Policy

10

does not normally allow a debt service mill levy of any kind to be imposed for more than 40 years.

29. The overlay district covers all of the property owned by Debtors and exists for the purpose of addressing certain regional wastewater obligations.

30. At this point only District No. 2 has a mill levy in place. The intent has been for the overlay district to certify its levy in December 2011. Although none of the Districts has issued bonds as of this date, they have entered into major reimbursement agreements.

31. Even if the court were to relieve the successors to the Debtors of their Annexation Agreement obligations, their properties will remain in the various metropolitan districts until a Colorado district court orders dissolution of one or more of these districts or exclusion of the successor's property from the districts' boundaries. The property owners will continue to pay metro district mill levies, the proceeds of which are intended to facilitate the financing of Annexation Agreement and/or Wastewater Agreement obligations. The District No. 1 board of directors would effectively be in control of the operations of the Districts and the City would continue to be the approving authority for the District's Service Plans.

### F. Contacts Between Colorado Springs and the Debtors

32. Before these cases were filed virtually all contacts between Colorado Springs and its Utilities, on the one side, and the Debtors, on the other side, occurred in Colorado Springs. During important periods these contacts often occurred on a daily basis, frequently through John Cassiani, Vice President of Project Operations for BLR Management Company, LLC.

33. Various issues were discussed, including negotiations of the Wastewater Facilities Agreement, negotiations of the Electric Extension Agreement, negotiations concerning other

facility plans and extension agreements that had to be agreed to in order to extend pipelines for water and electric in the areas being developed. Discussions also concerned the creation and administration of the special metro districts, the amounts owed under the Wastewater Facilities Agreement and the Electric Extension Agreement, construction required under those agreements and, in a more general nature, the infrastructure and development obligations required for progress in the Banning Lewis Ranch.

G.   Adverse Consequences

34.   The ordinances, agreements, rules, regulations, tariffs, permits, covenants running with the land, land use restrictions, dedications of easements and other rights of use, and other acts and documentation implementing the Annexation Agreement set forth a complex and interrelated regime for the gradual, staged, coherent development of the property annexed into the City of Colorado Springs as contemplated by the Annexation Agreement. If, as Ultra requests, these agreements were set aside, the future development of both Banning Lewis Ranch and surrounding areas will be adversely affected.

35.   Development of a property this vast requires careful planning. Also, there is a need to coordinate connections within the property, and with adjacent properties, to be sure that roads, utilities and other amenities connect and have sufficient capacity so that sensible regional integration and growth occurs.

36.   I have reviewed recent filings in the bankruptcy case in which Debtors and Ultra Resources, Inc. ("Ultra") request that the Court allow the sale of the property (the "Banning Property") owned by Banning Lewis Ranch Company, LLC ("Banning") to Ultra free and clear of the Annexation Agreement and all other restrictions, covenants, and land use regulations.

Ultra argues that no development has occurred on the Banning Property, that all of the obligations under the Annexation Agreement with respect to the Banning Property remain unperformed, that all future obligations under the Annexation Agreement depend upon future development, and that "changed circumstances" requires that the Annexation Agreement and all other land use restrictions governing the Banning Property no longer apply. Ultra is wrong on all counts.

37. First, the Annexation Agreement contemplated development over a 60-year period. Under the Annexation Agreement and the Master Plan, vertical development can occur at any location within Banning Lewis Ranch once such areas are platted as required by local law. Currently, there are several areas contiguous to the Banning Property where development makes it likely that residential development within the Banning Property will occur in the foreseeable future.

38. Second, the Annexation Agreement and state and local law do not preclude oil and gas or other mineral exploration and development. Such exploration and development must be consistent with local and state law. For example, portions of the Banning Property would need to be re-zoned.

39. Third, significant development activity has occurred on the Banning Property, albeit not vertical development. Debtors have already transferred properties to Colorado Springs within the Banning Property and additional transfers have been under negotiation. This includes transfers related to the expansion of Peterson Air Force Base, trail expansions to connect two parks within Banning Lewis Ranch, power line and water line easements and substation sites

needed by Utilities, and a section of the Banning Property that is used by the Denver Museum of Nature and Science for archeological study related to dinosaurs.

40. Fourth, Banning is a party to a number of recent agreements including notably the Wastewater Facilities Agreement. That agreement was executed in 2009. There is no changed circumstance other than Ultra's desire to evade its obligations under this agreement, which is recorded and constitutes a legislative act. Banning also is a party to the Settlement Agreement and Order and Judgment, which is also a recorded document. These documents are from 2004. Again, there are no changed circumstances. Banning also participated extensively in the Shared Obligation Study, which was adopted by the City Council as an ordinance of Colorado Springs in 2007. The Shared Obligation Study relates to numerous issues essential to future development ranging from future land dedications, rights of way, and infrastructure construction costs. The total cost of the shared obligations are estimated to be $190,000,000, which will be shared equitably by all annexors in accordance with local law.

41. Fifth, the Southern Delivery System ("SDS") is an essential water delivery and storage project now under construction in El Paso and Pueblo Counties with a projected cost of $880 million in 2009 dollars. Colorado Springs, Pueblo West, Fountain, and Security have made significant investments in SDS, which has been planned for several decades. SDS will deliver water through a 60-mile underground pipeline. One of several possible reservoir sites is located within the Banning Property. Uncertainty over the Annexation Agreement can cause complications in the completion of SDS, including the acquisition of easements and funding for SDS (which is provided in part by Banning Lewis Ranch annexors).

42. Sixth, the Annexation Agreement transferred all of the Banning Lewis Ranch water rights to Colorado Springs, as required by local law. In 2004, Colorado Springs commenced an action in the Colorado Water Court to obtain a decree approving its appropriation of return flows from groundwater used by the City, including the groundwater transferred pursuant to the Annexation Agreement. That case remains pending. The previous transfer of those water rights cannot be changed by a free and clear sale.

43. Finally, Ultra is blind to the adverse consequences the relief its requests will have on all other annexors (including the purchaser of the property of Debtor Banning Lewis Ranch Development I & II, LLC), Colorado Springs in general, and surrounding communities. For example, Ultra fails to consider the impact on other annexors and the development of their properties if the property to be purchased by Ultra were disconnected from Banning Lewis Ranch and the other annexors found themselves in enclaves no longer contiguous to the City limits. By local law, annexation is a prerequisite to Utilities' provision of wastewater and water services, unless expressly approved by the City Council.

Under penalty of perjury under the laws of the Untied States of America and pursuant to 28 U.S.C. § 1746, I certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated this 26 day of July, 2011.

_Bruce McCormick_
Bruce McCormick

## CERTIFICATE OF MAILING

I hereby certify that on this 26th day of July, 2011, a true and correct copy of the foregoing DECLARATION OF BRUCE MCCORMICK IN SUPPORT OF COLORADO SPRINGS' RENEWED MOTION TO TRANSFER VENUE AND IN SUPPORT OF OBJECTIONS TO DEBTORS' SALE MOTIONS AND PROPOSED ORDERS was served by hand on the persons listed below located in Wilmington, Delaware and by facsimile on the persons listed below located outside of Wilmington, Delaware:

Christopher P. Simon, Esq.
Kevin Scott Mann, Esq.
Joseph Grey, Esq.
Cross & Simon, LLC
913 N. Market Street, 11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380

Mary Calloway, Esq.
Buchanan Ingersoll & Rooney, PC
1105 North Market Street, Suite 1900
Wilmington, DE 19801-1228

Christopher A. Ward, Esq.
Polsinelli Shughart PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801

Howard H. Stahl, Esq.
Gregg L. Weiner, Esq.
Fried, Frank, Harris, Shriver &
  Jacobson, LLP
801 17th Street, NW
Washington, D.C. 20006

Robert S. Brady, Esq.
Edmon L. Morton, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
Wilmington, DE 19801

David L. Buchbinder, Esq.
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Room 2207, Lockbox #35
Wilmington, DE 19801

Brian M. Graham, Esq.
Pederson & Houpt
161 North Clark Street, Suite 3100
Chicago, IL 60601

Filiberto Agusti, Esq.
Joshua Taylor, Esq.
Steptoe & Johnson LLP
1330 Connecticut Ave., NW
Washington, D.C. 20036

Marc J. Phillips, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Patrick L. Hughes, Esq.
Haynes & Boone, LLP
1221 McKinney Street, Suite 2100
Houston, TX 77010

Michael Foreman, Esq.  
Haynes & Boone, LLP  
30 Rockefeller Plaza, 26th Floor  
New York, NY 10112

Gregory W. Werkheiser, Esq.  
Morris, Nichols, Arsht & Tunnell LLP  
1201 North Market Street, 18th Floor  
Wilmington, DE 19801

/s/ William A. Hazeltine