## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE BANNING LEWIS RANCH | ) | Case No. 10-13445 (KJC) |
| COMPANY, LLC, *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: D.I. Nos. 38, 83, 404** |

### OBJECTION OF THE DEBTORS TO THE RENEWED MOTION
### OF COLORADO SPRINGS TO TRANSFER VENUE

The Banning Lewis Ranch Company, LLC ("Banning") and Banning Lewis Ranch Development I & II, LLC ("Devco," and together with Banning, the "Debtors"), by and through their undersigned counsel, hereby respectfully submit this objection (the "Objection") to the Renewed Motion of Colorado to Transfer Venue (the "Venue Motion") [D.I. No. 404]. In support of this Objection, the Debtors respectfully state as follows:

### Preliminary Statement

The City of Colorado Springs, Colorado (the "City") has again failed to meet its heavy burden that the proposed transfer is in the interest of justice or the convenience of the parties. Venue is, and remains proper in Delaware. More than ever, the factual record and the procedural posture of this case warrant venue remaining in Delaware.

Moreover, a wholesale transfer of the Debtors' two chapter 11 cases is unwarranted given the finite issues between the proposed purchaser of Banning's assets and the City. Following a vibrant auction, Ultra Resources, Inc. ("Ultra") was declared the winning bidder

---

[1] The Debtors in these proceedings, along with the last four digits of each Debtor's federal tax identification number, are The Banning Lewis Ranch Company, LLC (4090) and Banning Lewis Ranch Development I & II, LLC (3461). The Debtors' corporate headquarters and the service address for each Debtor is 101 West Avenue, Jenkintown, PA 19046.

for the assets of Banning by order of this Court, with a cash bid of $26,250,000.[2] KeyBank National Association, as administrative agent for the Revolving Lenders ("KeyBank"), was declared the winning bidder for the assets of Devco.

After the auction, however, Ultra asserted that it is not obligated to assume two agreements between the Debtors and the City. In response, a mere two days before the first scheduled hearing on the approval of the sale of Banning's assets to Ultra, the City filed its Venue Motion.

The transfer of venue at this point poses a real and substantial threat to the orderly liquidation of the Debtors' assets, including the sale of Devco, and successful conclusion of the Debtors' bankruptcy cases. The Debtors' DIP Credit Facility has expired and has only been extended by days to permit the Debtors to close their sales.[3] The Debtors have minimal liquidity to pay administrative expenses, and no prospect of liquidity if these cases are transferred. Change of venue would force the Debtors' estates to incur additional substantial costs – including administrative and interest expenses – to the detriment of all creditors. Change of venue would throw the sale of all of the Debtors' assets into uncertainty.

Most importantly, however, the averments of Ultra, and the City's objection and resulting request to transfer venue, involve Ultra's obligations to the City, and the City's obligations to Ultra after the sale. Notwithstanding their position on agreements with the

---

[2] Order: (I) Determining the Winning Bidder of the Banning Lewis Ranch Company, LLC's Assets at Auction; (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief (the "Winning Bidder Order") [D.I. No. 371].

[3] The Debtors' DIP Lenders are neither the purchaser of the Debtors' assets nor the prepetition secured lender. The DIP Lenders – and the DIP Credit Facility – are subordinate to the Debtors' prepetition secured lenders. Therefore, inter-creditor issues will remain to be resolved after the sale.

City, the Debtors always disclosed these agreements to prospective purchasers, and marketed their assets "As Is, Where Is." Ultra has always been aware of the Annexation Agreement and the Wastewater Agreement, and has already pledged and promised to purchase the assets of the Debtor without any contingency to closing. (See auction transcript dated June 28, 2011, attached hereto as Exhibit A (the "Auction Transcript").[4] Determination of whether the Annexation Agreement or Wastewater Agreement are executory contracts subject to rejection, or whether the Annexation Agreement or Wastewater Agreement "run with the land" are immaterial to Banning's rights to sell its assets, and Ultra's obligations to purchase Banning's assets. While Ultra has the right to challenge whether the City's agreements bind Banning's successor, and the Debtors retain the right to reject un-assumed executory agreements, those rights do not warrant wholesale transfer of the Debtors' chapter 11 cases to Colorado. The Debtors believe the Court should authorize the Debtors to sell their assets free and clear of claims, interests and encumbrances, and leave determination of the parties' post-closing obligations and rights under certain agreements for another day.[5]

At this stage in the proceedings, more than ever, these cases are – at their core – about the sale of the assets of Delaware entities. As has always been the case, this chapter 11 proceeding does not involve the administration of a dormant, undeveloped property located

---

[4] "Ultra Resources' bid has no contingencies for financing, environmental, or any other outs or other contingencies, except to the extent that there may have been any in the stalking horse bid, because our bid now basically tracks the stalking horse bid." (Auction Transcript at 10.)

[5] The Debtors believe any sale order entered by the Court could authorize the sale of assets free and clear of claims, liens, encumbrances and interests, with those claims, liens and encumbrances attaching to the proceeds of the sale. Additionally, the Court could authorize the transfer of real property without the assumption by Ultra of any agreements with the City, but subject to any interests of the City that "run with the land" and which interests would not be alienable under sections 363 and 365 of the Bankruptcy Code.

in Colorado. Indeed, creditors who have the most to gain by the sale process – and who will require this Court to resolve any inter-creditor disputes – are present in Delaware for this case, and are not located in Colorado. The Debtors' secured lenders support venue in Delaware. The Debtors' DIP Lenders support venue in Delaware. Ultra supports venue in Delaware. The City itself has actively and vociferously participated in every aspect of this case, including the auction for the Debtors' assets, and has not been prejudiced in any credible way by venue in Delaware. For the reasons set forth herein, this Court should retain jurisdiction, and the venue of this case should remain in Delaware, not only for the determination of validity of the sale, but for the determination of any ancillary issues related to the sale.

### Background

1.     On November 12, 2010, the City filed the Original Venue Motion, which argued that the Debtors' bankruptcy cases should be transferred to the United State Bankruptcy Court for the District of Colorado. The Debtors and other parties, including pre-petition lenders, objected to the Original Venue Motion.[6] The Debtors incorporate and adopt by reference, as if fully stated herein, their Original Objection.

2.     On December 8, 2010, the Court, after conducting an evidentiary hearing, denied the Original Venue Motion without prejudice. In denying the Original Venue Motion, the Court stated, in relevant part:

> I'm denying the motion without prejudice because if it turns out that, as part of the sale process, the debtor proposes over the objection of the City ... to disturb any of the land use requirements or restrictions or any of the

---

[6] Objection of the Debtors to the Motion of the City of Colorado Springs, Colorado for an Order Transferring the Debtors' Chapter 11 Cases to the United States Bankruptcy Court for the District of Colorado Pursuant to 28 U.S.C. § 1412 (the "Original Objection") [D.I. No. 83].

> obligations under the recorded agreements, I would consider a renewed
> venue motion at that time....
>
> Now, I say to the City. That's not an invitation. And I have no intention
> and will not consider favorably a roadblock thrown up for reasons other
> than with merit and not to suggest that the City would file something and
> ask for relief that was not meritorious.

(Transcript of Dec. 8, 2010 Hearing (the "Venue Hearing Transcript"), attached to the Venue

Motion as Exhibit "A").

3.      On June 28, 2011, the Debtors, after an intense marketing effort, held an auction

for their respective assets. The auction for the Banning assets was conducted in accordance with

the Banning Bid Procedures Order and Ultra ultimately made the highest and best bid for those

assets.

4.      On June 29, 2011, the Court entered the Winning Bidding Order declaring that

Ultra was the highest bidder for the Banning Assets. At the hearing on the Winning Bidder

Order, the City acknowledged that Ultra would likely seek a determination from the Court that it

was not bound by the Annexation Agreement and other agreements Banning has with the City.

5.      On July 19, 2011, Ultra filed a Response[7] to the City's objections to the Banning

Sale Motion in which it stated its intent to purchase the Banning Assets free and clear of certain

---

[7]  Ultra Resources, Inc.'s Response to (1) Colorado Springs' Limited, Anticipatory
Objection and Reservation of Rights to the Motion of the Banning Lewis Ranch Co., LLC for an
Order: (I)(A) Declaring the Stalking Horse Purchaser (1) Colorado Springs' Limited,
Anticipatory Objection and Reservation of Rights to the Motion of the Banning Lewis Ranch
Co., LLC for an Order: (I)(A) Declaring the Stalking Horse Purchaser the Winning Bidder (B)
Assuming and Assigning Certain Executory Contracts and Unexpired Leases and (C) Granting
Related Relief; Or (II) In the Alternative (A) Approving the Sale of the Debtor's Assets Free and
Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f)
and (m), (B) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and
(C) Granting Related Relief and Request for Adequate Protection Pursuant to 11 U.S.C. §
363(e); and (2) Colorado Springs' Limited Anticipatory Objection and Reservation of Rights
Concerning the Notices of Counterparties to Executory Contracts and Unexpired Leases That
May Be Assumed and Assigned ("Ultra's Response") [D.I. No. 390].

of Banning's prepetition agreements with The City, including the Annexation Agreement, (collectively, the "CS Agreements") and various covenants and obligations thereunder. Ultra's Response makes clear the legal arguments in favor of purchasing the assets free and clear of the CS Agreements.

## Objection

6.      The proponent seeking a transfer of venue has the burden of proving that such a move is necessary for the ends of justice or the convenience of the parties – and doing so by a preponderance of the evidence. As a matter of law, the Debtors' choice of forum alone carries substantial weight. Virtually no issues remain to be decided other than the finite issue of alienability of the Debtors' agreements with the City, which disposition has no bearing on the Debtors' or Ultra's obligations under the asset purchase agreement for the sale of the Banning assets. The rejection of the Annexation Agreement and Wastewater Agreement might be an important issue to the City and Ultra, but it is also a discrete issue of bankruptcy law, that is well within this Court's competence to determine. Because of this one issue, the City would upend this entire case, and potentially, the successful sale of the Debtors' properties. Transferring these cases to Colorado, and the delay, uncertainty and added expense associated with the transfer, will not benefit the Debtors, their creditors or parties in interest. On the contrary, transfer at this juncture will drain limited estate resources, diminish the value of the Debtors' assets, and throw these cases into disarray.

7.      In the event this Court determines that Ultra's future rights and interests under the CS Agreements are best addressed by a Colorado court, this Court should still not transfer venue of these chapter 11 cases. Resolution of core issues in these chapter 11 cases should remain in Delaware, together with any attendant issues arising out of this sale. This Court

has been involved in every aspect of these bankruptcy cases and is familiar with the legal intricacies involved; therefore, it is most efficient for it to enter the sale orders. To the extent finite issues regarding alienability of agreements require determination, such determination should have no bearing on the Debtors' ability to sell their assets, or subsequent core proceedings in these chapter 11 cases.[8]

## A.    <u>Venue in Delaware is Proper</u>

8.    Politicians from outside Delaware have long battled the propriety of venue in a debtor's state of incorporation, but the law is crystal clear. While some legislators attempted to insert such restrictions into the bill that became the Bankruptcy Reform Act of 1999, the final bill passed by the Senate removed those proposals. See S. 220, 107th Cong. (2001).[9] Congress has repeatedly rebuffed assaults on the provision ever since.[10]

9.    Both Debtors were formed under the laws of Delaware. Consequently, 28 U.S.C. § 1408 authorizes the filing of these bankruptcy cases in Delaware. In re Innovative Communication Co., LLC, 358 B.R. 120, 125 (Bankr. D. Del. 2006) ("Venue is appropriate in the state of incorporation, 28 U.S.C. § 1408(1), so venue is proper in Delaware with respect to the corporate Debtors.").[11] The City does not dispute that venue is proper.[12] It simply suggests

---

[8] The determination of the parties' rights and obligations can be adjudicated in an adversary proceeding.

[9] Senator Biden of Delaware was pivotal in striking the bill's venue reform provisions, whose chief proponent was Senator Cornyn of Texas. See Charles J. Tabb, Courting Controversy, 54 Buff. L. Rev. 467, 468 n.5 (2006).

[10] Senator Cornyn has subsequently introduced stand alone venue measures such as the Fairness in Bankruptcy Litigation Act, S. 314, 109th Cong. (2005), but has been unsuccessful.

[11] The same approach is universal among other courts. See, e.g., In re Dunmore Homes Inc., 380 B.R. 663, 670 (Bankr. S.D.N.Y. 2008) (New York appropriate bankruptcy venue for corporation incorporated in New York); In re Segno Comms. Inc., 264 B.R. 501 (Bankr. N.D. Ill.

that the Debtors' choice of venue should be disturbed due to the cases' ostensible connections to Colorado.

**B.** **To Transfer Venue, the City Must Carry the Burden of Showing that the Equities Weigh Heavily in Favor of Transfer**

10.     Under 28 U.S.C. § 1412, the Court has discretion to transfer venue of a case properly "in the interest of justice or for the convenience of the parties," but there is a "strong presumption[13] in favor of maintaining venue where the bankruptcy case is pending." In re Hechinger Inv. Co. of Del., Inc., 288 B.R. 398, 402 (Bankr. D. Del. 2003) (citation omitted), quoted with approval in In re Onco Invest. Co., 320 B.R. 577, 579 (Bankr. D. Del. 2005); see also In re Reliance Group Holdings, Inc., 273 B.R. 374, 406-07 (Bankr. E.D. Pa.2002).

11.     A debtor's choice of venue should only be disturbed when the balance weighs heavily in favor of the transfer. Id; In re Onco Invest. Co., 320 B.R. 577, 579 (Bankr. D. Del. 2005) (citations omitted); In re Uslar, 131 B.R. 22, 23 (Bankr. E.D. Pa.1991)(balance must "strongly" favor transfer); In re PWS Holdings, 1998 Bankr. LEXIS 549, at *4; see also In re Delaware & Hudson Railway Co., 96 B.R. 467 (D. Del. 1998); Intel Corp. v. Broadcom Corp., 167 F. Supp.2d 692, 706 (D. Del. 2001); In re Ocean Properties of Delaware, Inc., 95 B.R 304, 305 (Bankr. D. Del. 1988) ("when venue is proper, the debtor's choice of forum is entitled to

---

2001) (Illinois appropriate bankruptcy venue for corporation incorporated in Illinois); *In re B.L. of Miami, Inc.*, 294 B.R. 325, 328 (Bankr. D. Nev.2003) (finding venue in Nevada proper because it was the state of incorporation); 1 Collier on Bankruptcy ¶ 4.01[2][b] (15th ed. rev.2007).

[12] Original Venue Mot. ¶ 42.

[13] See In re United Button Co., 137 F. 668, 671 (D. Del. 1904) ("It is not going far to say that on general principles of policy a court having taken cognizance of a [bankruptcy] case within its undoubted jurisdiction should not abandon to other tribunals the performance of the duty it has assumed unless it has a clear warrant for so doing.").

great weight"). The moving party must show by this heavy preponderance that the case cannot be efficiently and fairly administered in the debtor's chosen forum. <u>In re Denham Homes, LLC</u>, 2010 WL 1486237, at *2 (Bankr. N.D. Ill.2010).

12.     These principles apply with even greater force when a Delaware corporate entity seeks the protection of Delaware bankruptcy courts. There is a "fundamental legal tenet that every citizen of a state is entitled to take advantage of the state and federal judicial process available in that state." <u>In re PWS Holdings</u>, 1998 Bankr. LEXIS 549, at *14. And correspondingly, "Delaware has an interest in protecting the rights of its citizens." <u>Intel</u>, 167 F. Supp.2d at 706. Congress has repeatedly confirmed its desire to keep Delaware as an appropriate forum for proceedings such as this one.[14] Implementing Congressional intent thus requires that change of venue can only be granted on a strong showing of equities favoring transfer.

13.     The party moving for transfer bears the burden of establishing the need for a change of venue; it must carry that burden by a preponderance of the evidence. <u>In re Manville Forest Prods. Corp.</u>, 896 F.2d 1384, 1390 (2d Cir. 1990); <u>Larami Ltd. v. Yes! Entm't Corp.</u>, 244 B.R. 56, 61 (D.N.J. 2000); <u>In re Enron Corp.</u>, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002); <u>In re Indus. Pollution Control, Inc.</u>, 137 B.R. 176, 180 (Bankr. W.D. Pa. 1992). The City is required to demonstrate that the transfer is necessary either for (1) the interests of justice or (2) the convenience of the parties and witnesses. <u>In re Centennial Coal, Inc.</u>, 282 B.R. 140, 144 (Bankr. D. Del. 2002) quoting 28 U.S.C. § 1404(a).

---

[14] Senator Biden of Delaware was pivotal in striking venue reform provisions from a Senate bill, whose chief proponent was Senator Cornyn of Texas. *See* Charles J. Tabb, *Courting Controversy*, 54 Buff. L. Rev. 467, 468 n.5 (2006). Senator Cornyn has subsequently introduced stand alone venue measures such as the Fairness in Bankruptcy Litigation Act, S. 314, 109th Cong. (2005), but has been unsuccessful.

14.     None of the City's legal authority contradicts this established proposition. (See Original Venue Motion ¶ 34 (listing 3 unpublished orders, or transcripts)). Accordingly, the City must prove, by a preponderance of evidence, that transfer is required because the balance weighs heavily in favor of the motion for transfer.

**C.      The City Has Not Carried Its Burden of Showing that Transfer is Warranted by the Interests of Justice**

15.     The City has fallen far short of carrying its burden of showing that transfer is warranted by the interests of justice. The City's argument in the Venue Motion centers on Ultra's purchase of the Banning assets free and clear of the CS Agreements – particularly the Annexation Agreement. The City's approach in the Venue Motion and the Original Venue Motion, insisting – without citing any authority whatsoever – that location of the real property trumps everything else, including the Debtors,' Ultra's and the major creditors' choice of venue, ignores the fact that transferring these cases to Colorado, and the delay, uncertainty and added expense will not benefit the Debtors, their creditors and other parties in interest. Importantly, the City fails to demonstrate how a finite issue regarding the alienability of agreements warrants transfer of this entire case, particularly in light of the current posture, and the important fact that determination of the issues raised by Ultra has no bearing on the Debtors' rights and obligations under respective asset purchase agreements with buyers.

16.     The Debtors have complied with all orders of the Court in conducting the sales of their assets. The Debtors' involvement in these bankruptcy proceedings is nearly at an end and the finalization of the sale order would mean that the Debtors' outlay of funds to cover expenses for this case would end. Transferring the bankruptcy case at this late stage would not just be inconvenient for the Debtors, it would be unjust. Transfer would mean that the case would drag

on with uncertainty, to the detriment of the Debtors, Ultra and the secured lenders. It would also mean that the Court to whom this case is transferred would need to be brought up to speed on a case that is in its final stages. Transfer, in a word, would be inefficient; inefficiency, in this instance, is not in the interests of justice.

17.     Courts have refused to transfer venue when the motion was made at an advanced stage in the case and would "result in duplication of administration expenses and a delay in the reorganization process." In re Jones, 39 B.R. 1019, 1020 (Bankr. S.D.N.Y.). The Advisory Committee Notes to Rule 1014 of Federal Rules of Bankruptcy Procedure state, "If the transfer would result in fragmentation or duplication of administration, increase expense, or delay closing the estate, such a factor would bear on the timeliness of the motion as well as on the propriety of the transfer." Advisory Committee Notes, Fed. R. Bankr. P. 1014(a)(1983). It is clear that transfer of these cases at this stage in the proceedings would duplicate administrative expenses and would delay closing of the debtors' estates and, therefore, is not warranted.

### 1. The Location of Real Estate is Not Dispositive

18.     The City's position that location is dispositive in a real estate bankruptcy was long ago rejected by the United States District Court for Delaware. In In re Fairfield Puerto Rico, Inc., 333 F. Supp. 1187, 1190 (D. Del. 1971), a Delaware corporation whose primary asset, a compost processing plant and main office located in San Juan, Puerto Rico, filed in Delaware. Unlike this case, the principal office, payroll, accounts receivable and accounts payable ledgers were also in San Juan. Puerto Rican officials were expected to be necessary witnesses for the administration of the estate. Id. The majority of its trade creditors were Puerto Rican, and they favored a transfer of the proceedings to Puerto Rico. But the majority of the debt, by amount, belonged to Ohio creditors who favored retention of the matter in Delaware.

19.     After weighing all the factors, the Court in <u>Fairfield</u> declined to transfer. It noted "that the formulation of a plan of arrangement depends primarily on efforts and activities which are centered in the eastern part of the United States," concluding "that the movants have failed to carry their burden of proof in support of transfer." <u>Id</u>. at 1171.

20.     This view was recently reaffirmed in <u>In re Caribbean Petroleum Corp., et al.</u>, Case No. 10-12553 (KG) (Bankr. D. Del. Sept 16, 2010) (Dkt # 159) portion of transcript of hearing on September 8, 2010, at 54 -58 (Bankr. D. Del. 2010). In <u>Caribbean Petroleum</u>, all of the Debtors' assets were in Puerto Rico, including some of its most significant petroleum facilities and its only deepwater dock for major vessels. Most creditors were located in Puerto Rico, but 70% of debt in amount was held by non-Puerto Rico entities and professionals were present in the Eastern U.S. The Court denied the motion to transfer and explained:

> I will say right at the start that I'm going to deny the motion to transfer. We have pending before me the secretary of Treasury of Puerto Rico's motion to transfer venue to Puerto Rico and of the Puerto Rico Electric Power Authority. And the motion now is opposed by the debtors, the official committee of unsecured creditors, AOT, the debtors' largest unsecured creditor, First Bank of Puerto Rico and its DIP lender and Chartis Insurance Company, debtors' insurer of claims.

> <u>And the movant argues that it filed the motion promptly; that the debtors' assets and operations are in Puerto Rico; that ninety percent of debtors' creditors are located in Puerto Rico; that the witnesses are in Puerto Rico; Puerto Rico law may apply; the secretary will have to conduct a tax audit; and employees are located in Puerto Rico and Delaware may be an inconvenient forum for the employees.</u> And although the foregoing are all important considerations, the Court is that it must deny the motion as I've indicated.

> First of all, <u>venue is appropriate in this district</u>. 28 United States Code, Section 1408(l) provides if the case is properly commenced in the district in which the debtor is domiciled; . . . . <u>Because venue is proper here, the Court will accord substantial weight in deference to debtors' choice of forum.</u> . . .

> <u>The burden is on the movant to prove by a preponderance of the evidence that the transfer serves the interest of justice and the convenience of the parties.</u>

Here, the facts strongly militate against transfer. . . . <u>This is a sale case. The Bankruptcy Code is applicable and will largely control the outcome of the bankruptcy case before the Court. And where Puerto Rican law, the Court is fully able to determine and apply Puerto Rican law. As has been indicated, this Court is no stranger to the laws of other jurisdictions.</u> When a Court's jurisdiction is largely based on the fact that a corporation's domicile here -- that there is jurisdiction over a corporation's domicile here, it's clear that very often this Court is asked to apply foreign law.

<u>I'm also moved by the fact that the movant, Hacienda, does not speak for other creditors and the constituency that speak for other creditors, which is the official committee unsecured creditors, opposes transfer as does AOT, the largest unsecured creditor, and First Bank.</u> And cases supporting that important factor are <u>Cuarcao</u> (ph.) and <u>In re Fairfield Puerto Rican Inc.</u> Transferring the case is fraught with risk for these debtors. The sale process and the DIP loan facility both largely hinge upon this case moving promptly and any delay regardless of how necessary it would be in the event of a transfer put these debtors at risk that they will not be able to accomplish the milestones that are really the center of the sale process and the recovery for creditors.

<u>Id</u>. (emphasis added).

21.    The Southern District of New York applied the same reasoning in rejecting efforts to transfer to Arizona a case of a debtor whose only asset was an Arizona apartment complex. <u>In re Garden Manor Assoc., L.P.</u>, 99 B.R. 551, 554-55 (Bankr. S.D.N.Y.1988).

22.    Cases involving a sole real estate asset reach similar conclusions. In <u>In re Denham Homes, LLC</u>, No. 10-03164, 2010 WL 14862371 (Bankr. N.D. Ill. 2010). Denham Homes was an Illinois LLC that was the owner and developer of a single subdivision in Denham Springs, Louisiana. As here, the real estate project ran into financial difficulties. Denham Homes had obtained secured financing and a line of credit from its bank, Teche Federal Bank, a Louisiana lender. Denham Homes fell behind on its payments to Teche, to its general contractor, Daigle, and various other creditors, subjecting the property to several mechanics' liens. Daigle filed suit in state court in Louisiana. Denham filed a Chapter 11 petition in the Northern District of Illinois. Teche sought to change venue to Louisiana. Daigle and other Louisiana parties with

13

liens, the so-called "trade creditors," also filed a separate motion to change venue. By every measure, therefore, the Denham court was faced with a more compelling case than that here. The principal asset was real property in Louisiana. Furthermore, not only were the parties and witnesses in Louisiana, but separate litigation had already commenced in that state.

> [The bank] and the Trade Creditors make much of the fact that almost all of Denham's creditors are in Louisiana; that potential witnesses in the case will likely be from Louisiana; that the principal asset, the Crystal Lakes development, is in Louisiana; that the case involves Louisiana mechanics lien law; and that there is a suit between Denham and its general contractor, Daigle, pending in Louisiana state court. They also argue that the nature of Denham's proposed Chapter 11 Plan (which has already been filed) weighs in favor of a transfer.

Id. at * 2. The Court denied both motions, explaining that the statutory inquiry was the efficacy of the debtor's chosen forum – if the forum was adequate, the analysis must stop there.

> The ultimate analysis under § 1412 is whether the case can be efficiently and fairly administered in the debtor's chosen forum.... Opinions in cases dealing with this issue usually recite a list of factors to be addressed to help determine whether transfer would be "in the interests of justice or for the convenience of the parties." Those used in opinions commonly include the location of the creditors, the location of the debtor, the location of necessary witnesses, and the location of the debtor's assets, among suggested factors. ... Consideration of these factors is beneficial, but only to the extent they bear upon the statutory issue, which essentially deals with the efficiency and fairness of the chosen forum....

> [After considering the Bank and Trade Creditor's arguments]: None of these factors are persuasive, and it is found and held that this case may be efficiently and fairly administered in the Northern District of Illinois.

Id. (Emphasis added, citations omitted).

23.     The City has not shown that the Debtors' chapter 11 cases cannot be fairly and efficiently administered in this Court. Indeed, it is clear that the Debtors, and the major stakeholders in this matter, prefer a Delaware forum as the most efficient location for the resolution of these cases.

24.     A final counterpoint to the City's real estate location theory is <u>In re LaGuardia</u> <u>Assocs., L.P.</u>, 316 B.R. 832, 838 (Bankr. E.D. Pa. 2004), where a Pennsylvania corporation instituted bankruptcy proceedings in the Eastern District of Pennsylvania, even though its principal assets were multiple New York hotels. The creditors sought to change venue to the Eastern District of New York, presenting a far more compelling case for a transfer than the City does here. In addition to the location of the real estate, the hotels at issue stood on property owned by New York City public agencies. The hotels themselves had been financed by bonds issued by New York City agencies. Numerous hotel operations and employees – the Debtors here have no employees – were based almost exclusively in New York City. Indeed, proceedings regarding the unionization of those employees were pending before the National Labor Relations Board in New York at the time.

25.     The transfer motion in <u>LaGuardia Assocs.</u> was denied. The court noted that the location of real estate is a factor in venue analysis, but that "[t]his factor is by no means a litmus test, for if it were, it would essentially eviscerate meaningful evaluation of the question." <u>Id.</u> at 839. Like the <u>Denham</u> court after it, the <u>LaGuardia Assocs</u>. court explained that the movants had simply not met their burden of showing that the interests of justice or the convenience of the parties necessitated the move:

> Counsel for the New York agencies stressed that the Debtors "took advantage" of bonds issued by New York agencies and had "unequivocally chose" to run their business in New York City, knowing that such things as litigation and labor disputes could arise. Counsels' argument, as well as any other, resonated the collective sense of what amounts for the most part to dismay and frustration on the part of the Movants and their supporters that the law could possibly permit the bankruptcy proceedings of these Debtors to go forward anywhere other than in New York. <u>Yet, clearly it does.</u>

The law, as hereinbefore noted, cautions the Court to respect the Debtors' selection of venue provided it is proper, absent cause to disturb it. In the instant case cause to transfer venue has not been shown.

In re LaGuardia Associates, L.P., 316 B.R. 832, 842 (Bankr. E.D. Pa. 2004)(emphasis added).

26.     The City cites no authority that contradicts this clear case law. Despite its concession that venue is proper in Delaware under 29 U.S.C § 1408, the City relies heavily on authority where venue was improper. For instance, the City relies in large part on In re Condor Exploration, LLC, 294 B.R. 370, 377-78 (Bankr. D. Colo. 2003), citing the case five times.[15] But in Condor, the case there had been filed in the wrong venue to begin with. Id. at 378-69. The difference between transferring a case filed in an improper venue and a proper one is obvious: the court had no discretion to retain the matter even if it was inclined to do so. See id. ("[T]he bankruptcy court does not have discretion to retain jurisdiction over an improperly venued case where a timely objection has been filed.").

27.     The City is reduced to relying on single page transcript fragments or unpublished letter opinions, all dating back well over a decade. Carefully examined, these fragments should provide the City no comfort. The City attaches a fragment of a hearing Transcript in In re Windsor Energy U.S. Corp., et. al, Case Nos. 98-1933 and 98-1934 (PJW) (Bankr. D. Del. Sept. 28, 1998). It is virtually impossible to discern precisely what is transpiring, and on what basis. But the fleeting picture that does emerge suggests that in granting the transfer, the Court was acquiescing to the desire of the debtor and the committee of unsecured creditors ("...based on argument of counsel for the debtor and the committee...."). Id. at 128 (emphasis added). No such desire has been manifested here.

---

[15] Motion at ¶ 20, 23, 25, 30, 31.

16

28. The other decisions turn <u>not on the location of real estate or other assets</u> – the touchstone of the City's Motion – but on the location of the major creditors. <u>See</u> <u>In re First New England Dental Centers, Inc.</u>, Case No. 98-347 (PJW) portion of transcript of hearing at 5[16] (Bankr. D. Del. March 20,1998) (noting that sixteen of the twenty largest creditors, accounting for 87% of the aggregate unsecured claims of the twenty largest were in New England, close to the transferee venue); <u>In re Ernst Home Center, Inc., et al</u>, Case Nos 96-1088 and 96-1089 (PJW) portion of transcript of hearing at 3-5 (Bankr. D. Del. Sept. 28, 1998) noting that 75% of creditors were located on the West Coast, the remainder in the Mid-West, and "only a small percentage. . . located on the East Coast"; West Coast creditors were owed $11 million, as opposed to $4 million for the East Coast creditors"). Given the magnitude of the secured parties' claims relative to those of any Colorado parties, and their preference for Delaware, these cases actually undercut the City's position.

29. In short, wherever the real estate may be located, if the Debtors' choice of venue is proper, as it is here, then the Court should not disturb it, unless cause to transfer is shown. The City's primary justification for transfer is inadequate.

### 2. This Court is an Appropriate Forum to Decide the Discrete Issues Raised by the City in the Venue Motion

30. The City may claim that it will be harmed if a venue transfer is not ordered. However, that ignores the role of, and expertise of, the Federal Bankruptcy Courts. The Venue Motion, in essence, amounts to a claim that this Court does not have the necessary knowledge to determine the validity of Ultra's rejection of the CS Agreements. However, Sections 363 and 365 of the Bankruptcy Code specifically address issues like the one present in this case. In other

---

[16] These pages were not attached to the City's Original Venue Motion, but were retrieved by Debtors' counsel.

words, the Code recognizes that the rejection of contracts is a necessary part of a bankruptcy case and that Bankruptcy Courts are charged with deciding issues regarding rejection. This Court assesses the rejection of contracts routinely, including contracts that "run with the land" or contracts that implicate local government interests, and is more than competent to deal with issues of Colorado state law in this case – to suggest otherwise would necessitate the possibility of venue transfer in each case where a state law is implicated by the proposed rejection of a contract and that state law is not the state where the bankruptcy court is located.

31.     If the existence of agreements with local government entities were a valid reason for transfer, districts such as Delaware, the Southern District of New York, and the Northern District of Illinois could seldom be the venue for real estate development bankruptcies. But as noted above, in Fairfield, Caribbean Petroleum, Garden Manor, Denham Homes, and LaGuardia Associates, bankruptcy courts have consistently rejected such arguments as providing a sufficient basis for transfer. A recent bankruptcy decision articulated why this argument is inadequate:

> Movants cite Arizona landlord lien law as having applicability here. Presumably, their point is that an Arizona court would be better positioned to apply that law. As a general matter, this court has no quarrel with that proposition. However, as with other aspects of the motion, no specifics are offered as to complexity of the law, problems with interpretation or application, or even precisely where it is implicated in addressing the stay violation claims of the Complaint. No special public policy of Arizona or familiarity of an Arizona judicial officer with the current dispute is cited, nor is there any assertion of a local interest or a characterization of this dispute as a "local controversy." Similarly, this court can enforce its judgment if one should eventuate, not unlike a bankruptcy court in another venue.

In re PermaLife Products, LLC, 432 B.R. 503, 519 (Bankr. D.N.J. 2010).

32.     The truth is that these proceedings are concerned with the sale of property under §363 of the Bankruptcy Code.  The relevant law is the United States Bankruptcy Code, and this Court is the best forum to adjudicate the issues regarding the sale.

### 3.  The Fact that a Locality Has a "Very Important Interest" in a Matter Has Been Repeatedly Rejected as a Basis for Transfer of Venue

33.     The City asserts that it has "a very important interest in having local controversies decided by Colorado Courts," suggesting, without any further explanation or authority, that this should suffice for overcoming Debtors' choice of venue.  It is plainly not enough.  Similar arguments failed in Caribbean Petroleum and LaGuardia Associates and the City cites no contrary case law.  Bankruptcies always raise important concerns for people where its facilities are centered.  But that is not and has never been a reason for transferring venue.

### D.     The Convenience of the Parties and Witnesses Favors Retention of Venue in Delaware

34.     As has been reiterated throughout this response, these bankruptcy proceedings are drawing to a close.  The Debtors' involvement and the Debtors' expenses will be minimal after a final sale order is entered by the Court.  The only party whose convenience is served by the transfer of venue is the City.  All parties involved, including the City, have retained local Delaware counsel and no party, other than the City, has indicated that venue in Delaware is inconvenient.  On the contrary, the City has been fully engaged in every aspect of this case while it remained in Delaware.  The City has actively and aggressively represented itself at every turn. The City appeared for and participated in the auction.  Transfer of venue at this late stage is actually inconvenient for almost all parties involved as it would entail more time and expense spent on this case for all parties – including the City.

19

### E.    **Bifurcation**

35.    As discussed above, the Debtors, Ultra and the secured lenders are better served by the retention of venue in the District of Delaware. Sale of the Debtors' assets is not conditioned upon the determination sought by Ultra. To the extent Ultra believes otherwise, it is imperative that this Court retain jurisdiction to resolve issues relating to the auction and sale procedures conducted under Orders entered by this Court. To the extent the Court believes that the discrete issue of Ultra purchasing the Banning Assets free and clear of the CS Agreements is better addressed by a Colorado court, and this Court is inclined to transfer venue, all parties would be better served if that issue alone was the sole issue subject to transfer. In all scenarios, this Court should retain jurisdiction of the Debtors' chapter 11 cases, and make a final determination on the disposition of the assets of both Debtors. Such an order would not prejudice the interests of the City or Ultra – the only two parties that are needed to determine the CS Agreements issue. Further, bifurcation would benefit the Debtors and the secured lenders as they would be able to finalize and conclude their involvement in this bankruptcy case.

36.    The Court has been involved in every aspect of these bankruptcy cases and is familiar with the legal intricacies involved; therefore, it is most efficient to have it enter the sale orders on the Debtors' properties, and retain jurisdiction ancillary to the sale, rather than have the Debtors expend money and time getting another court up to speed on the case and its current status.

### Conclusion

37.    The City has failed to meet its heavy burden that the proposed transfer is in the interest of justice or the convenience to the parties. Venue is proper in Delaware. At this

stage in the proceedings, this case involves sales of the assets of Delaware entities; not the administration of the Debtors' property, or contracts and rights under Colorado law. The City fails to demonstrate how a finite issue regarding the alienability of agreements warrants transfer of this entire Chapter 11 case, particularly in light of the current posture, and the important fact that determination of the issues raised by Ultra has no bearing on the Debtors' rights and obligations under respective asset purchase agreements with buyers. Disposition of the assets of these Delaware limited liability companies in a Delaware Bankruptcy Court will ultimately benefit all parties in interest in, and creditors of the Debtors. Transferring these cases to Colorado, and the delay, uncertainty and added expense will not benefit the Debtors or their creditors.

WHEREFORE, for these reasons and the reasons set forth herein, the Debtors respectfully request that the Court deny the Motion.

Dated: August 19, 2011                  CROSS & SIMON, LLC
       Wilmington, Delaware

By: _____
     Christopher P. Simon (No. 3697)
     Kevin S. Mann (No. 4576)
     David G. Holmes (No. 4718)
     913 North Market Street, 11th Floor
     P.O. Box 1380
     Wilmington, Delaware 19899-1380
     (302) 777-4200
     (302) 777-4224 facsimile
     csimon@crosslaw.com
     kmann@crosslaw.com

     *Attorneys for the Debtors and Debtors-in-Possession*